**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| BAKERS LOCAL 433 HEALTH FUND, TWIN CITIES BAKERY WORKERS HEALTH AND WELFARE FUND, GRAPHIC COMMUNICATIONS LOCAL 1B HEALTH AND WELFARE FUND "A" , MINNEAPOLIS AUTO DEALERS EMPLOYEE BENEFIT FUND, LOCAL 17 HOSPITALITY BENEFIT FUND, AND GREATER METROPOLITAN HOTEL EMPLOYERS- EMPLOYEES HEALTH AND WELFARE FUND, <br><br> Plaintiffs, <br><br> v. <br><br> PFIZER INC., PFIZER IRELAND PHARMACEUTICALS,  WARNER-LAMBERT COMPANY, WARNER-LAMBERT COMPANY LLC,  RANBAXY, INC. AND RANBAXY PHARMACEUTICALS, INC., <br><br> Defendants. | ) ) ) ) ) ) ) Civil Action No.: ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

**CLASS ACTION COMPLAINT AND JURY DEMAND**

96623

# TABLE OF CONTENTS

**PAGE**

I.    INTRODUCTION ................................................................................1

II.   JURISDICTION AND VENUE ........................................................5

III.  THE PARTIES...................................................................................6

IV.  BACKGROUND .............................................................................11

     A.    The Regulatory Structure for Approval of Generic Drugs and Substitution of Generics for Brand Name Drugs......................................11

          1.    The Hatch-Waxman Amendments.................................................12

          2.    Paragraph IV Certifications .........................................................13

     B.    The Benefits of Generic Drugs ..................................................14

V.   FACTS ............................................................................................16

     A.    Background Information on Statins.........................................................16

     B.    The Chemistry of Enantiomers ..................................................17

     C.    The Original Lipitor Patent: Warner-Lambert Obtains the '893 Patent.................................................................................................19

          1.    The Patent Specification Claims Atorvastatin, "the Corresponding Ring- Opened Acids Derived Therefrom" in Salt Form, and the R-trans and S-trans Enantiomers ...............................................................................20

          2.    The PTO Issues the Original Lipitor Patent..................................21

     D.    The Fraudulently Obtained Follow-On Patent: Warner-Lambert Obtains the '995 Enantiomer Patent by Repeatedly Misrepresenting the R-trans Enantiomer's Activity .................................22

          1.    The State of the Art: Knowledge of One Skilled in the Art of Statins in 1989.....................................................................23

          2.    The Application: Warner-Lambert Fraudulently Claims the R-Trans Enantiomer is Ten Times More Active than the Racemate.......................................................................................26

a.      The CSI Table Is Misleading and Affirmatively False .................................................................................28

3.      The Initial Rejection: The PTO Determines the Claimed Compounds Are Anticipated By the '893 Patent ..........................35

4.      The Renewed Application: Warner-Lambert Submits the Roth Declaration, Again Falsely Claiming the R-Trans Enantiomer is Ten Times More Active than the Racemate ...............................................................................37

a.      Warner-Lambert Admits the R-Trans Enantiomer Is Prima Facie  Obvious .................................38

b.      The Roth Declaration is Misleading and Affirmatively False ...........................................................39

5.      The Final Rejection: The PTO Determines the R-Trans Enantiomer is Anticipated .............................................43

6.      The Appeal: the PTO Determines the R-Trans Enantiomer is Prima Facie Obvious. ..............................................43

7.      The '995 Patent Issues: the PTO Relies on Biological Data to Overcome Obviousness ......................................45

E.      Warner-Lambert Intended to Deceive the PTO .........................................46

1.      Warner-Lambert Manipulated the Existing Biological Data to Show a Ten Fold Increase in Activity and Defendants Intentionally Presented False Information .................47

2.      Warner-Lambert Admits the Patent Specification Claims a Surprising Ten-Fold Increase in Activity ......................49

3.      Warner-Lambert Intended  the PTO to Rely on the False Data and Claims ..................................................51

F.      FDA Approval: The FDA approves Lipitor and the Original Lipitor Patent Provides Years of Patent Protection ...................................51

1.      The Orange Book Listings for the '893 and '995 Patents ......................................................................52

2.      The '893 Original Lipitor Patent Protected the Lipitor Franchise for Years .......................................................52

3.      The 1997 Launch of Lipitor .......................................................55

96623

G.      Patent Litigation: Pfizer Sues for Infringement of the '995 Patent to Keep Generics off the Market.................................................55

        1.     *Pfizer v. Ranbaxy*, 03-C V-209-JJF ...............................................56

        2.     *Pfizer v. Teva*, 07-C V-360 (B. Del. 2007). ...................................58

        3.     *Pfizer v. Cobalt*, 07-CV-790 (D. Del. 2007)..................................59

        4.     *Pfizer v. Apotex*, 08-C V-7231 (N.D. Ill. 2008)............................59

H.      Defendants' Scheme to Delay Generic Entry Continues Through the '995 Reissuance Process .......................................................60

        1.     Defendants Admit the Biologic Data is False..............................61

        2.     Lipitor's Commercial Success Has No Bearing on Whether the Invention Claimed by the '995 Patent is Obvious........................................................................................64

        3.     Pfizer and Ranbaxy Conspire to Divide Markets and Cause Reissuance of the '995 Patent ...............................65

VI.     EFFECT ON INTERSTATE COMMERCE .......................................73

VII.    EFFECT ON INTRASTATE COMMERCE.......................................74

VIII.   MONOPOLY POWER AND MARKET DEFINITION.......................74

IX.     MARKET EFFECTS ........................................................................75

X.      ANTITRUST IMPACT .....................................................................77

XI.     CLASS ACTION ALLEGATIONS ..................................................79

XII.    CLAIMS FOR RELIEF ....................................................................82

      A.      Claims Under Arizona State Law .................................................82

      B.      Claims Under Arkansas State Law ...............................................84

      C.      Claims Under California State Law...............................................85

      D.      Claims Under District Of Columbia Law ....................................87

      E.      Claims Under Florida State Law...................................................90

      F.      Claims Under Illinois State Law...................................................90

96623

G.      Claims Under Iowa State Law ................................................................92

H.      Claims Under Kansas State Law.............................................................94

I.      Claims Under Maine State Law ..............................................................97

J.      Claims Under Michigan State Law.........................................................99

K.      Claims Under Minnesota State Law .....................................................100

L.      Claims Under Mississippi State Law....................................................102

M.      Claims Under Missouri State Law ........................................................104

N.      Claims Under Nebraska State Law .......................................................106

O.      Claims Under Nevada State Law ..........................................................108

P.      Claims Under New Hampshire Law .....................................................109

Q.      Claims Under New Mexico State Law ..................................................111

R.      Claims Under New York State Law ......................................................113

S.      Claims Under North Carolina State Law ..............................................115

T.      Claims Under North Dakota State Law ................................................117

U.      Claims Under The Commonwealth Of Puerto Rico Law .......................119

V.      Claims Under Rhode Island State Law.................................................120

W.      Claims Under South Dakota State Law ................................................121

X.      Claims Under Tennessee State Law .....................................................123

Y.      Claims Under Vermont State Law ........................................................125

Z.      Claims Under West Virginia State Law................................................126

AA.     Claims Under Wisconsin State Law .....................................................128

XIII.   DEMAND FOR JUDGMENT..........................................................................130

XIV.    JURY DEMAND ...........................................................................................131

96623

End Payor Plaintiffs Bakers Local 433 Health Fund, Twin Cities Bakery Workers Health

and Welfare Fund, Graphic Communications Local 1B Health and Welfare Fund "A",

Minneapolis Auto Dealers Employee Benefit Fund, Local 17 Hospitality Benefit Fund and

Greater Metropolitan Hotel Employers-Employees Health and Welfare Fund, individually and on

behalf of all others similarly situated, bring this action on behalf of a proposed End Payor Class

for treble overcharge damages and other monetary and equitable relief to remedy Defendants'

violations of state antitrust and state consumer protection laws.

## I.     INTRODUCTION

1.      This action seeks damages resulting from Defendants' anticompetitive scheme

that delayed the entry of generic versions of Lipitor into the market.  The original compound

patent for Lipitor expired March 24, 2010.  Generic forms of Lipitor were foreclosed from

market entry until the end of November 2011 due to an unlawful scheme perpetrated by

Defendants.  Defendant Pfizer orchestrated and implemented this unlawful scheme to delay

generic entry by (i) obtaining, through fraud, a follow-on patent for Lipitor, (ii) listing that patent

in the FDA Orange Book in order to block generic entry, (iii) filing sham, baseless litigation on

this follow-on patent and other process patents known to have no merit, and (iv) conspiring with

and entering into an agreement with the first potential generic entrant, Defendant Ranbaxy, to

delay entry into, and allocate the market for, atorvastatin.  Defendants' unlawful conduct delayed

and continues to delay access to less expensive generic alternatives, resulting in Plaintiffs and the

End Payor Class paying billions of dollars in overcharges for Lipitor than they would have paid

absent Defendants' anticompetitive scheme.

2.      Lipitor (atorvastatin calcium) belongs to a class of drugs known as statins used to

lower cholesterol.  High cholesterol is associated with an increased risk of coronary artery

disease and atherosclerosis, which are among the leading causes of death in the United States.

1

3.      Lipitor, manufactured and sold by Pfizer, is one of the highest selling drugs for the treatment of high cholesterol in the United States.  Annual sales of Lipitor in the United States exceed $5 billion.  According to Pfizer, Lipitor has been prescribed for more than 17 million people.

4.      In 1987, Warner-Lambert obtained the original compound patent for Lipitor, U.S. Patent No. 4,681,893 (the "'893 patent").  The '893 patent included protection for various enantiomer forms, including the isolated enantiomer of atorvastatin which, when formulated into a calcium salt, is Lipitor.  Warner-Lambert obtained several extensions, but on March 24, 2010, the '893 patent expired.

5.      In 1989, Warner-Lambert sought even longer patent exclusivity for Lipitor. Warner-Lambert applied for a patent specifically for the isolated enantiomer in various forms, including the calcium salt.  The United States Patent and Trademark Office ("PTO") rejected the effort because the isolated R-trans enantiomer forms were either anticipated by (i.e. already covered by), or obvious in light of, the '893 patent (since a discrete number of isomers were known and disclosed in the '893 patent, and the desirability and mechanics of isolating these isomers were well known in the craft).

6.      Warner-Lambert then proceeded to defraud the PTO in an effort to extend the patent for Lipitor and delay generic entry.  To circumvent the obviousness objection, Warner-Lambert falsely represented that it had unexpectedly discovered that the isolated enantiomer form did not have, as one would expect, only twice the biologic activity of the racemate, but was ten times more effective in inhibiting the production of cholesterol than its non-isolated racemate compound.  This false representation became the basis upon which the PTO granted the follow-on enantiomer patent.

2

7.      Warner-Lambert's false representation that the isolated enantiomer had ten times the biologic activity of the racemate was highly material and recent patent lawsuits establish it was made with intent to defraud the PTO.  Warner-Lambert's fraudulent conduct before the PTO is further shown in recent patent lawsuits.  For example, the first purportedly complete data presentation used by Warner-Lambert to support the ten-fold representation was, in fact, an unscientific collection of data points selected ad hoc from over a dozen separate tests performed on different formulations over a two-year period.  Moreover, this "invention" falsely represented to be ten times more effective than the racemate, was only "discovered" after Warner-Lambert lawyers instructed the lead scientist, Bruce D. Roth, to go back through years of data in order to find something "surprising."  Similarly, a second, ostensibly complete and confirmed data submission was, in fact, the partial results of a single selected test so methodologically flawed (e.g., the drug was not even dissolved into a solution before testing) that no reasonable chemist would have relied on the conflicted quantitative results it reached.  These illustrative examples are indicative of the scientific abuses and misrepresentations made by Warner-Lambert in order to acquire the super-long extension of patent life for Lipitor.

8.      Warner-Lambert fraudulently obtained U.S. Patent No. 5,273,995 (the "'995 patent"). Warner-Lambert listed that patent in the FDA Orange Book, and Pfizer litigated infringement actions against generic companies that otherwise would have been able to enter the market upon the March 24, 2010 expiration of the '893 patent.

9.      Years into its efforts to prosecute sham litigation alleging infringement of the '995 patent, Pfizer faced a dramatic reduction in future revenue with the loss of exclusivity of Lipitor when the '995 patent was declared invalid.  Pfizer turned to its long-time adversary, Ranbaxy.  In June 2008 the two entered into an unlawful agreement to delay the entry of generic versions of Lipitor into the United States.

96623

10.     The fundamental terms of this agreement were that Ranbaxy would not enter the United States market with its Lipitor generic until November 2011.  By agreeing to delay entry, Ranbaxy maintained the bottleneck to other generics entering the United States market.[1]  In return, Ranbaxy was authorized to sell generic Lipitor in several other countries.  Pfizer also agreed to drop its challenge of Ranbaxy's current sale of a generic version of Lipitor in several countries, and Pfizer cancelled a Ranbaxy judgment debt arising from another case.

11.     In order to disguise the anticompetitive, market allocating nature of this agreement, Pfizer initiated litigation against Ranbaxy for infringement of two process patents. Pfizer and Ranbaxy both knew that Pfizer had previously been denied standing to bring an infringement case using those two process patents as Ranbaxy had already been enjoined from manufacturing generic Lipitor and therefore could not, as a practical matter, infringe the process patents.  Thus, a federal court would not have power to hear this "new" case.  This ruse over the process patents was "resolved" in three months, between the original filing of the case in March of 2008 and its dismissal in June of 2008.

12.     The overarching scheme by Pfizer, and the later illegal  agreement between Pfizer and Ranbaxy, unlawfully delayed entry of less expensive, AB-rated generic drugs into the market for atorvastatin calcium from March of 2010 through at least the end of November of 2011.

---

[1] In 2003, Ranbaxy, the largest pharmaceutical company in India, developed a generic version of Lipitor.  In order to sell its generic in the United States in competition with Lipitor, Ranbaxy challenged the validity of the Lipitor patents listed in the Orange Book.  Because Ranbaxy was the first to challenge the validity of the listed Lipitor patents, under the 1984 Hatch-Waxman law Ranbaxy gained the exclusive right to sell its generic and exclude all other generics for 180 days after either the first commercial launch of a generic Lipitor product or the entry of a final court decision declaring the Lipitor patents invalid or not infringed.

96623

13.     By the time a trial of this matter is conducted, it appears that generic entry of

Lipitor will have been foreclosed unlawfully for nearly two years.

## II.      JURISDICTION AND VENUE

14.     The Court has subject matter jurisdiction under 28 U.S.C. § 1332(d), in that this is

a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of

interests and costs, and in which some members of the proposed End Payor Class are citizens of

a state different from some Defendants.

15.     The Court has supplemental subject matter jurisdiction of the pendent state law

claims under 28 U.S.C. § 1367.

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) and (b) because

during the Class Period certain Defendants resided, transacted business, were found, or had

agents in this District, and because a substantial portion of the affected interstate trade and

commerce described herein is and has been carried out in this District.

17.     Defendants' conspiracy and conduct to prolong Pfizer's Lipitor monopoly and to

unreasonably restrain trade substantially affected commerce throughout the United States, and in

each of the states identified herein, because Defendants directly, or through their agents, engaged

in activities affecting each state.  Defendants have purposefully availed themselves of the laws of

each of these states in connection with their activities relating to the production, marketing, sale,

and/or distribution of Lipitor.  Defendants produced, promoted, sold, marketed, and/or

distributed Lipitor, thereby purposefully profiting from access to purchasers in each of the states.

As a result of the activities described herein, Defendants:

        a.      Caused damage to the residents of the states identified herein;

        b.      Caused damage in each of the states identified herein by acts or
                omissions committed outside each state and by regularly doing or
                soliciting business in each state;

5

c.    Engaged in a persistent course of conduct within each state and/or derived substantial revenue from the marketing and sale of Lipitor in each state; and

d.    Committed acts or omissions that they knew or should have known would cause damage (and, in fact, did cause damage) in each state identified herein while regularly doing or soliciting business in these states, engaging in other persistent courses of conduct in each state and/or deriving substantial revenue from the marketing and sale of Lipitor in each state.

18.    Defendants' conspiracy and conduct described herein adversely affected persons nationwide and more particularly, Plaintiffs and similarly situated End Payor Class members in each of the states, who purchased or paid for Lipitor indirectly. Defendants' conspiracy and conduct has resulted in an adverse monetary effect on end payors in each state identified herein.

19.    Defendants' scheme deprived Plaintiffs and the End Payor Class of generic Lipitor and caused them to pay supracompetitive prices for Lipitor in each of the respective states. Defendants knew that competition for Lipitor would be adversely affected in these states as a result of their conspiracy and conduct.

### III.    THE PARTIES

20.    Plaintiff Bakers Local 433 Health Fund ("BLF") is a jointly administered Taft-Hartley fund authorized pursuant to Section 302(c)(5) of the National Labor Relations Act, with its principal place of business in North Sioux City, South Dakota and is an employee welfare benefit plan as defined in Section 3(1) of the Employee Retirement Income Security Act of 1974. Plaintiff BLF provides health benefits, including prescription drug benefits, to its approximately 400 active participants, and their spouses and dependents, who reside in the states of Iowa, Nebraska and South Dakota. Plaintiff BLF paid or reimbursed for Lipitor and its generic equivalent on behalf of its participants and beneficiaries during the Class period, including the period of March 2010 through November 2011 and thereafter paid or reimbursed for a generic

6

form of Lipitor.  Plaintiff BLF was injured as a result of Defendants' unlawful conduct by paying

more than it would have absent Defendants' unlawful conduct preventing and delaying generic

entry.

21.     Plaintiff Twin Cities Bakery Workers Health and Welfare Fund ("TCBWF") is a

jointly administered Taft-Hartley fund authorized pursuant to Section 302(c)(5) of the National

Labor Relations Act, with its principal place of business in Eagan, Minnesota and is an employee

welfare benefit plan as defined in Section 3(1) of the Employee Retirement Income Security Act

of 1974.  Plaintiff TCBWF provides health benefits, including prescription drug benefits, to its

approximately 1200 active participants, plus their spouses and dependents who live in the State

of Minnesota.  Plaintiff TCBWF paid or reimbursed for Lipitor on behalf of its participants and

beneficiaries during the Class period, including the period of March 2010 through November of

2011 and thereafter paid or reimbursed for a generic form of Lipitor.  Plaintiff TCBWF was

injured as a result of Defendants' unlawful conduct by paying more than it would have absent

Defendants' unlawful conduct preventing and delaying generic entry.

22.     Plaintiff Graphic Communications Local 1B Health and Welfare Fund "A"

("GCLF") is a jointly administered Taft-Hartley fund authorized pursuant to Section 302(c)(5) of

the National Labor Relations Act, with its principal place of business in St. Paul, Minnesota and

is an employee welfare benefit plan as defined in Section 3(1) of the Employee Retirement

Income Security Act of 1974.  Plaintiff GCLF provides health benefits, including prescription

drug benefits, to its approximately 400 active participants, plus their spouses and dependents

who live in the State of Minnesota.  Plaintiff GCLF paid or reimbursed for Lipitor on behalf of

its participants and beneficiaries during the Class period, including the period of March 2010

through November of 2011 and thereafter purchased a generic form of Lipitor.  Plaintiff GCLF

7

was injured as a result of Defendants' unlawful conduct by paying more than it would have

absent Defendants' unlawful conduct preventing and delaying generic entry.

23.     Plaintiff Minneapolis Auto Dealers Employee Benefit Fund ("MADF") is a

jointly administered Taft-Hartley fund authorized pursuant to Section 302(c)(5) of the National

Labor Relations Act, with its principal place of business in Minneapolis, Minnesota and is an

employee welfare benefit plan as defined in Section 3(1) of the Employee Retirement Income

Security Act of 1974.  Plaintiff MADF provides health benefits, including prescription drug

benefits, to its approximately 1,050 active participants, plus their spouses and dependents who

live in the State of Minnesota.  Plaintiff MADF paid or reimbursed for Lipitor on behalf of its

participants and beneficiaries during the Class period, including the period of March 2010

through November of 2011 and thereafter purchased a generic form of Lipitor.  Plaintiff MADF

was injured as a result of Defendants' unlawful conduct by paying more than it would have

absent Defendants' unlawful conduct preventing and delaying generic entry.

24.     Plaintiff Local 17 Hospitality Benefit Fund ("LHBF") is a jointly administered

Taft-Hartley fund authorized pursuant to Section 302(c)(5) of the National Labor Relations Act,

with its principal place of business in Bloomington, Minnesota and is an employee welfare

benefit plan as defined in Section 3(1) of the Employee Retirement Income Security Act of 1974.

Plaintiff LHBF provides health benefits, including prescription drug benefits, to its

approximately 842 active participants, plus their spouses and dependents who live in the State of

Minnesota.  Plaintiff LHBF paid or reimbursed for Lipitor on behalf of its participants and

beneficiaries during the Class period, including the period of March 2010 through November of

2011 and thereafter paid or reimbursed for a generic form of Lipitor.  Plaintiff LHBF was injured

as a result of Defendants' unlawful conduct by paying more than it would have absent

Defendants' unlawful conduct preventing and delaying generic entry.

8

25.     Plaintiff Greater Metropolitan Hotel Employers-Employees Health and Welfare Fund ("GMHEF") is a jointly administered Taft-Hartley fund authorized pursuant to Section 302(c)(5) of the National Labor Relations Act, with its principal place of business in Bloomington, Minnesota and is an employee welfare benefit plan as defined in Section 3(1) of the Employee Retirement Income Security Act of 1974.  Plaintiff GMHEF provides health benefits, including prescription drug benefits, to its approximately 842 active participants, plus their spouses and dependents who live in the State of Minnesota.  Plaintiff GMHEF paid or reimbursed for Lipitor on behalf of its participants and beneficiaries during the Class period, including the period of March 2010 through November of 2011 and thereafter purchased a generic form of Lipitor.  Plaintiff GMHEF was injured as a result of Defendants' unlawful conduct by paying more than it would have absent Defendants' unlawful conduct preventing and delaying generic entry.

26.     Defendant Pfizer, Inc. is a corporation organized and existing under the laws of the State of Delaware and has a place of business at 235 East 42nd Street, New York, New York 10017.  Pfizer, Inc. prosecuted infringement litigation for the '995 patent in order to delay generic entry into the market for generic atorvastatin calcium.  Pfizer, Inc. knew the '995 patent was invalid and/or unenforceable.

27.     Defendant Pfizer Ireland Pharmaceuticals, formerly known at Warner-Lambert Export, Ltd., is a partnership organized and existing under the laws of Ireland, with registered offices at Pottery Road, Dun Laoghaire, Co. Dublin, Ireland.  Pfizer Ireland Pharmaceuticals is a wholly owned, indirect subsidiary of Pfizer, Inc.  Pfizer Ireland Pharmaceuticals is the exclusive licensee for the '995 patent.  Pfizer Ireland knowingly participated in Pfizer's attempts to enforce the '995 patent.

9

28.     Defendant Warner-Lambert Company is a corporation formerly organized under the laws of the State of Delaware with offices for service of process at 235 East 42nd Street, New York, New York 10017.  In 1997, Warner-Lambert and Pfizer began co-promotion of Lipitor.  In June of 2000, Pfizer completed its merger with Warner-Lambert whereby Pfizer purchased all outstanding shares of Warner-Lambert common stock.  Each share of Warner-Lambert stock was converted into 2.75 shares of Pfizer common stock.  The merger qualified as a tax-free reorganization and was accounted for as a pooling of interests.  Warner-Lambert Company became a wholly-owned subsidiary of Pfizer Inc.  At the end of 2002, Warner-Lambert Company became a Delaware limited liability company and changed its name to Warner-Lambert Company LLC.  Warner-Lambert knowingly controlled all activities of the applicant before the PTO in connection with the prosecution of the '995 patent.

29.     Warner-Lambert Company and Warner-Lambert Company LLC are collectively referred to throughout this Complaint as "Warner-Lambert."  "Warner-Lambert" includes, but is not limited to, Warner-Lambert employees Bruce D. Roth, Joan Thierstein, and Jerry F. Janssen.

30.     Defendants Pfizer, Pfizer Ireland Pharmaceuticals, and Warner-Lambert are collectively referred to throughout this Complaint as "Pfizer."

31.     Defendant Ranbaxy, Inc. is a corporation organized and existing under the laws of the State of Delaware, and has a place of business located at 600 College Road East, Princeton, New Jersey, 08540.

32.     Defendant Ranbaxy Pharmaceuticals, Inc. is a corporation organized and existing under the laws of the State of Delaware, and has a place of business located at 600 College Road East, Princeton, New Jersey, 08540.

33.     Defendants Ranbaxy, Inc. and Ranbaxy Pharmaceuticals, Inc are referred to throughout this Complaint as "Defendant Ranbaxy" or "Ranbaxy."

10

34.     The actions of Pfizer and Ranbaxy were in furtherance of the alleged wrongdoing described herein, and were authorized, ordered, or done by Defendants' officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

### IV.     BACKGROUND

A.     **The Regulatory Structure for Approval of Generic Drugs and Substitution of Generics for Brand Name Drugs**

35.     Under the Federal Food, Drug, and Cosmetic Act ("FDCA"), manufacturers who create a new drug product must obtain the approval of the FDA to sell the new drug by filing a New Drug Application ("NDA").  21 U.S.C. §§ 301-392.  NDAs must include submission of data concerning the safety and effectiveness of the drug, as well as any information on applicable patents.  21 U.S.C. § 355(a)-(b).

36.     When the FDA approves an NDA, the brand manufacturer may list any patents that the brand manufacturer believes could reasonably be asserted against a generic manufacturer who makes, uses, or sells a generic version of the brand name drug before the expiration of the patents listed in the FDA's book of Approved Drug Products with Therapeutic Equivalence Evaluations (the "Orange Book").  Patents issued after NDA approval may be listed within 30 days of issuance.  21 U.S.C. §§ 355 (b)(1) & (c)(2).  The FDA relies completely on the brand name manufacturer's truthfulness about patents' validity and applicability as the FDA lacks the resources to, and does not check the facts provided by the brand name manufacturer or verify the manufacturer's representations for accuracy.  After the NDA is approved, the brand-name manufacturer may list other new patents in the Orange Book as related to the NDA, if the brand-name manufacturer similarly certifies that the new patents claim either the approved drug or its approved uses.

11

1.     The Hatch-Waxman Amendments

37.     The 1984 Hatch-Waxman Amendments simplified the regulatory hurdles for prospective generic manufacturers by eliminating the need for them to file lengthy and costly NDAs and creating the Abbreviated New Drug Application ("ANDA") process.  *See* Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-4 17, 98 Stat. 1585 (1984).  A generic manufacturer seeking approval to sell a generic version of a brand name drug may now file with the FDA an ANDA.  ANDAs rely on the scientific findings of safety and effectiveness included in the brand name drug manufacturer's original NDA, but must also demonstrate that the generic drug contains the same active ingredient(s), dosage form, route of administration, and strength as the brand name drug.  Doing so establishes the generic drug as the bioequivalent to the brand name drug.  The FDA assigns an "AB" rating to generic drugs that are bioequivalent to branded drugs.

38.     The FDCA and Hatch-Waxman Amendments operate on the presumption that bioequivalent drug products containing identical amounts of the same active ingredients in the same route of administration and dosage form, and meeting applicable standards of strength, quality, purity and identity, are therapeutically equivalent and may be substituted for one another.  Thus, bioequivalence demonstrates that the active ingredient of the proposed generic drug would be present in the blood of a patient to the same extent and for the same amount of time as the branded counterpart.  21 U.S.C. § 355(j)(8)(B).

39.     Through the Hatch-Waxman Amendments, Congress sought to expedite the entry of legitimate generic competitors, thereby reducing healthcare expenses nationwide.  Congress also wanted to protect pharmaceutical companies' incentives to create new and innovative products.

96623

40.     The Hatch-Waxman Amendments achieved both goals, substantially advancing

the rate of generic product launches, and ushering in an era of historic high profit margins for

brand name pharmaceutical companies.  In 1983, prior to the Hatch Waxman Amendments, only

35% of the top-selling drugs with expired patents had generic versions available; by 1998, nearly

all did.  In 1984, prescription drug revenue for branded and generics totaled $21.6 billion and

generic drugs accounted for 18.6% of prescriptions.  By 2009, total prescription drug revenue

had soared to $300 billion and generic drugs accounted for 75% of prescriptions.

2.     Paragraph IV Certifications

41.     To obtain FDA approval of an ANDA, a generic manufacturer must certify that

the generic drug addressed in its ANDA will not infringe any patents listed in the Orange Book.

Under Hatch-Waxman, a generic manufacturer's ANDA must contain one of four certifications:

a.     that no patent for the brand name drug has been filed with the FDA
       (a "Paragraph I certification");

b.     that the patent for the brand name drug has expired (a "Paragraph
       II certification");

c.     that the patent for the brand name drug will expire on a particular
       date and the generic company does not seek to market its generic
       product before that date (a "Paragraph III certification"); or

d.     that the patent for the brand name drug is invalid or will not be
       infringed by the generic manufacturer's proposed product (a
       "Paragraph IV certification").

42.     If a generic manufacturer files a Paragraph IV certification, a brand name

manufacturer has the ability to delay FDA approval of an ANDA simply by suing the ANDA

applicant for patent infringement.  If the brand name manufacturer initiates a patent infringement

action against the generic filer within 45 days of receiving notification of the Paragraph IV

certification, the FDA may not grant final approval to the ANDA until the earlier of (a) the

passage of 30 months, or (b) a decision by a court that the patent is invalid or not infringed by

13

the generic manufacturer's ANDA.  The FDA may grant "tentative approval," but cannot authorize the generic manufacturer to go to market.

43.     As an incentive to spur competition from generic companies, the first generic manufacturer to file an ANDA containing a Paragraph IV certification receives a period of protection from competition with other generic versions of the drug.  For Paragraph IV certifications made prior to December 2003, the first generic applicant is entitled to 180 days of market exclusivity.  As a result, the first approved generic is the only available generic for at least six months.

44.     Brand name manufacturers who improperly list ineligible patents in the Orange Book and sue any generic competitor that files an ANDA with a Paragraph IV certification, irrespective as to whether the generic competitor's product actually infringes the listed patent(s), may delay final FDA approval of an ANDA for up to 30 months.

B.     **The Benefits of Generic Drugs**

45.     Typically, AB-rated generics cost much less than their branded counterparts. Over time, as more generics enter the market and compete with each other, prices decline even further. Generic competition benefits consumers and other End Payors by enabling individuals to either purchase a lower priced but equivalent generic drug or obtain the branded drug at a lower price.  Generic competition to a single branded drug product can result in billions of dollars in savings to consumers and other End Payors who make or reimburse for drug purchases.

46.     As the United States Government Accountability Office ("GAO") states in its January 31, 2012 report ("GAO-12-371R Savings from Generic Drug Use"), prescription drug spending in the United States reached $307 billion in 2010, constituting approximately 12% of total health care spending in the country.  The GAO reports that studies estimate that total savings accruing from the substitution of generic drugs for their brand name counterparts from

14

1999 through 2010 were more than $1 trillion and that, on average, the retail price of a generic drug is 75% lower than the retail price of a brand name drug.

47.     Since passage of the Hatch-Waxman Amendments, every state has adopted substitution laws that either require or permit pharmacies to substitute AB-rated generic equivalents for branded prescriptions (unless the prescribing physician has specifically ordered otherwise).

48.     The prescription drug chain provides incentives to choose less- expensive generic equivalents.  As a result of federal reimbursement rules and the industry pricing structure, pharmacies typically earn a higher markup on generics.  Private health insurers similarly offer direct incentives to pharmacies to substitute cheaper generic products for more expensive branded ones.  Health insurers are contractually obligated to pay for the bulk of their members' prescriptions, whether filled with branded or generic drugs, and so they offer their members lower co-pays for generic drugs in order to encourage the use of generics.  Members also face the threat of increased health insurance premiums if branded prescription drug costs continue to rise. Consumers routinely switch from a branded drug to an AB-rated generic drug once the generic becomes available.

49.     Once a generic equivalent enters the market, the generic quickly overtakes sales of the branded drug.  More than 90 percent of prescriptions for drugs that are available in both branded and generic forms are filled with a generic.  AB-rated generic drugs typically capture a significant share of the branded counterparts' sales, causing a significant reduction of the branded drug's sales and price.

50.     Branded manufacturers are obviously aware of the erosion of their monopolized market caused by generics.  Branded manufacturers thus seek to extend their monopoly for as long as possible, sometimes resorting to any means possible, legal or otherwise.

15

## V.   FACTS

A.   **Background Information on Statins**

51.     Lipitor belongs to a class of drugs called statins.  Discovered in the 1970s, statins

lower cholesterol by successfully inhibiting the liver enzyme 3-hydroxy 3-methylglutrayl-

coenzyme A reductase ("HMG-CoA reductase").  HMG-CoA reductase controls the rate at

which our bodies produce cholesterol; inhibiting HMG-CoA reductase reduces the production of

cholesterol.  High levels of cholesterol are thought to cause serious health problems, including

coronary heart disease and atherosclerosis in some populations.

52.     Efforts to reduce cholesterol levels are a big business: by 1997, five of the largest

pharmaceutical companies sold six different brand-name statins.  By 2002, almost one in ten

Americans aged 20 and older took a statin.  In 2004, sales of statins topped $15.5 billion and

comprised 6.6% of all prescription drug sales.

53.     Branded statins cost between $2.50 and $5.00 for a single daily pill; generic

statins cost markedly less, sometimes less than $1 a day.

54.     Statins consist of three structural parts: a lactone ring, a linkage group (denoted as

"X"), and a group or groups connected to the linkage group (referred to herein as an "R group").

55.     The R group for the well-known statins can contain one or more single rings or

fused rings, and other substituent groups.

56.     In the 1970s, researchers discovered that mevastatin, naturally occurring in red

yeast and rice, inhibited cholesterol synthesis.

57.     Around the same time, researchers discovered lovastatin, naturally occurring in

red yeast rice and Oyster mushrooms, was another highly potent HMG-CoA reductase inhibitor.

In the early 1980s Merck sought and gained approval for Mevacor, a brand name version of

lovastatin, the first statin available in the United States.

16

58.     The structure of lovastatin is very similar to mevastatin.  Lovastatin also contains a lactone ring and an R group joined to the lactone ring by a linkage group.  Lovastatin's R group is the same as mevastatin's R group but with one additional methyl group.

59.     Research in the 1980s demonstrated that statin molecules with opened lactone rings were highly potent cholesterol synthesis inhibitors — often more potent than the closed lactone ring forms of the same molecules.

60.     In the early 1980s, Warner-Lambert sought to enter the market by developing a "me-too" version of the already-identified statins.  Researchers at Warner-Lambert came up with a formulation that used the same lactone ring as mevastatin and lovastatin but contained different linked substituents as the R group.  Warner-Lambert called their new statin "atorvastatin."

B.     **The Chemistry of Enantiomers**

61.     To understand how the '893 patent covered the compound Roth and Warner-Lambert later sought to patent in the '995 patent, some background on the chemistry of enantiomers is helpful.

62.     Isomers are two or more compounds with the same chemical formula (that is, containing the same atoms) but different arrangements of atoms.  Stereoisomers are isomers in which the same atoms are bonded together, but where the three-dimensional configuration of those atoms differs.

63.     Enantiomers are stereoisomers that are mirror images of each other and cannot be superimposed; the same atoms, bonded together in the same way, but one is arranged as a reflection of the other.  Consider, for example, a left hand and a right hand.

64.     Pairs of enantiomers have many identical chemical and physical properties, such as shared melting points, solubility, and colors.  Other properties, such as biological properties, may be vastly different.

17

65.     Enzymes, including the cholesterol producing HMG-CoA reductase, typically display a preference for interacting with one enantiomer over the other.  It is common for one enantiomer to have all, or most, of the biological activity.  The other enantiomer will have little or no biological activity.

66.     Enantiomers can be distinguished from one another by their effect on the rotation of polarized light.  Enantiomers reflect polarized light in either a clockwise direction (right, denoted with a "+") or a counter-clockwise direction (left, denoted with a "-").  An unequal mixture of two enantiomers is optically active; the degree of optical rotation reflects the percentage of each enantiomer in the mixture.  When equal mixtures of two enantiomers are present, called a racemic mixture or racemate, the optical rotations of the enantiomers cancel each other.

67.     To differentiate enantiomers on paper, each enantiomer is assigned a configuration based on priority rules that rank the atoms or substituent group of atoms that are attached to the chiral center.  If the priority proceeds in a clockwise direction, the enantiomer has an 'R' (right) configuration; if the arrangement is counter-clockwise, the enantiomer has an 'S' (left) configuration.

68.     In addition to R/S and +/- configurations, a molecule's configuration can also reference the location of the substituent atoms or groups of atoms relative to each other.  An arrangement where both the major substituents lie on the same side of the plane of reference is called a *cis* arrangement.  An arrangement where the major substituents appear on the opposite sides of the plane is called a *trans* arrangement.

69.     The lactone rings found in statins have two chiral centers, one at the carbon with the hydroxyl group and the other at the carbon attached to the linkage group.  Rings containing

18

two chiral centers give rise to four possible isomers: the R-cisisomer, the S-cisisomer, the R-transisomer, and the S-transisomer.

70.     At the time Warner-Lambert and Roth were developing Lipitor, the preferred configuration for the lactone ring in a statin — the configuration offering the highest level of cholesterol inhibition — was the R-trans configuration.[2]  Both mevastatin and lovastatin have lactones in the R-trans configuration.  In the case of HMG-CoA reductase inhibitors, the R-trans enantiomer appeared to be the active enantiomer that inhibited HMG-CoA and reduced the production of cholesterol.

71.     Consistent with conventional thinking, Warner-Lambert's application for the '893 patent contemplated the trans-form of compounds sharing the same structural formula, including atorvastatin.  The application contemplated atorvastatin in a variety of formulations, including calcium salts.

C.     **The Original Lipitor Patent: Warner-Lambert Obtains the '893 Patent**

72.     On March 30, 1986, Warner-Lambert filed U.S. Patent Application No. 868867 for a group of compounds and pharmaceutical compositions useful as hypercholesterolemic and hypolipidemic agents.  The application eventually resulted in the '893 patent.

73.     Dr. Bruce David Roth applied for the '893 patent.  Roth invented Lipitor.  Roth was at all relevant times a leader of the drug discovery team at Warner-Lambert that developed Lipitor.  He is the named inventor and patent applicant of the '893 and '995 patents; both patents issued to Roth and were assigned to his employer, Warner-Lambert.  Warner Lambert patent attorneys, including Jerry F. Janssen, prosecuted the application.

---

[2] *See, e.g.,* Alberts, A. *et al., J. Proc. Natl. Acad. Sci. USA* 1980, 77:3957; Stokker, G.E*., et al., J. Med. Chem*. 1985, 28:347-358; Stokker, G.E. *et al., J. Med. Chem*, 1986, 29:849-852.

96623

74. This lawsuit alleges Warner-Lambert intentionally and affirmatively lied to the PTO regarding the single most material facts that enabled it to procure the '995 patent as well as a later reissue of that patent. To understand that fraud, the circumstances behind the '893 patent must be understood. This complaint therefore now describes the background, claims, and uses of that patent.

1. The Patent Specification Claims Atorvastatin, "the Corresponding Ring-Opened Acids Derived Therefrom" in Salt Form, and the R-trans and S-trans Enantiomers

75. Warner-Lambert stated in the patent specification for the '893 patent that "in its broadest aspect the present invention provides compounds of structural formula I."

76. Like other statins, structural formula I contains a lactone ring, a linkage group (X), and an R group.

77. Warner-Lambert claimed compounds of structural formula I were "useful as hypocholesterolemic or hypolipidemic agents by virtue of their ability to inhibit the biosynthesis of cholesterol through inhibition" of the HMG-CoA reductase enzyme. For support, the specification detailed the biological activity of three compounds compared to the prior art.

78. Research in the 1980s demonstrated that statin molecules with opened lactone rings were highly potent cholesterol synthesis inhibitors — often more potent than the closed lactone ring forms of the same molecules. Warner-Lambert claimed that the invention contemplated the hydroxyl acids, or structural formula I with an opened lactone ring:

> Also contemplated as falling within the scope of the present invention are the hydroxyl acids, and pharmaceutically acceptable salts thereof, derived from the opening of the lactone ring of the compounds of structural formula I above.

79. Importantly, Warner-Lambert's patent application specifies and covers a compound in which the R-trans enantiomer is isolated:

20

> The compounds of structural formula I above possess two asymmetric carbon centers, one at the 4-hydroxy position of the pyran-2-one ring, and the other at the 6-position of the pyran-2-one ring where the alkylpyrrole group is attached. This asymmetry gives rise to four possible isomers, two of which are the R-cis- and S-cis-isomers and the other two of which are the R-trans- and S-trans-isomers. This invention contemplates only the trans- form of the compounds formula I above.

80.     Importantly, the patent coverage of the '893 patent for atorvastatin calcium, i.e., a compound having the structural formula I which included versions in which the R-trans enantiomer is isolated, is not disputed by Warner-Lambert or Pfizer; again, this description provides the context for the later fraudulent actions of Warner-Lambert.

81.     The compounds of the '893 application and patent were not limited to any particular stereochemistry; this one structure was meant to represent four different stereo isomers, the R-trans, S-trans, R-CIS, and S-CIS isomers.[3]

2.     The PTO Issues the Original Lipitor Patent

82.     On July 21, 1987, the PTO issued the '893 patent. In the absence of an extension, this patent would have expired on May 30, 2006, twenty years from the date of the first application. Subsequent extensions, discussed later, lengthened this period of patent protection until March 24, 2010.

83.     The '893 patent envisaged the ability to have just the R-trans or S-trans enantiomers of compounds of structural formula I. The '893 patent also recognized that these compounds could be in acid or salt form.

84.     While the '893 patent covered multiple formulations of structural formula I, Warner-Lambert focused on developing and commercializing atorvastatin, the R-trans enantiomer of a particular compound with structural formula I, in calcium salt form.

---

[3] Isomers are two or more compounds with the same chemical formula but different arrangements of atoms.

21

85.     The '893 patent thus covered atorvastatin calcium, the product that would be sold as Lipitor over the years.

D.      **The Fraudulently Obtained Follow-On Patent: Warner-Lambert Obtains the '995 Enantiomer Patent by Repeatedly Misrepresenting the R-trans Enantiomer's Activity**

86.     Although the '893 patent provided Warner-Lambert with many years of patent protection — and many years of exclusive sales of Lipitor — Warner-Lambert nevertheless sought to extend this monopoly by engaging in fraud.

87.     In doing so, Warner-Lambert faced certain realities.  For example, Warner-Lambert knew the PTO would reject an application to patent the enantiomer of the racemic mixture of atorvastatin because enantiomers of the chemical were already covered by the '893 patent; an enantiomer "invention" would be either anticipated by the '893 patent or obvious in light of the '893 patent.  Thus, the only way Warner-Lambert could get around this fundamental challenge in procuring a follow-on enantiomer patent would be if it could convince the PTO that the isolated R-trans enantiomer had some claimed "surprising" or "unexpected" characteristic.

88.     Senior management at Warner-Lambert instructed the Warner-Lambert researchers to review the existing biological data for the R-trans enantiomer to find data that supported a claim that the activity of the isolated R-trans enantiomer was surprising and, therefore, patentable.

89.     During a meeting, Warner-Lambert senior management asked what the patent coverage was for the pure R-trans enantiomer.  Roth responded that the R-trans enantiomer was covered under the '893 patent.  Senior management then asked whether there was anything with the pure R-trans enantiomer that would make it patentable in and of itself.  Roth didn't know of any surprising characteristics that had unfolded over his years of working with the enantiomer atorvastatin.  So Don Maxwell, the vice president of discovery research, assigned Roth the task

22

of going back to existing lab books to see if there was some data that showed something surprising.  Roth was instructed to provide any surprising data to Warner-Lambert patent attorney Joan Thierstein.

90.  Regarding the instructions from these senior Warner-Lambert officials, Roth has stated,

> if I found something surprising I would provide that.  And what I did do was I provided that information to the patent attorney for Warner-Lambert and asked if that was sufficient, and it was and so that was the data that was used.

91.  Of course, when senior Warner-Lambert management sent Roth back to the old laboratory notebooks to "find" something surprising, there was a wealth of knowledge about statins and the formulation of isolated R-trans enantiomers.  The state-of-the-art about statin formulations gives context to Warner-Lambert's fraud.

1.  <u>The State of the Art: Knowledge of One Skilled in the Art of Statins in 1989</u>

92.  Statins are in the field of synthetic organic chemistry as it applies to discovery of compounds suitable for use as drugs directed to the regulation of the cholesterol biosynthetic pathway and HMG-CoA reductase inhibitors.  One of ordinary skill in the art of statins would have, for example, at least a bachelor's degree in organic or medicinal chemistry, a general working knowledge of statins, several years of bench work in organic molecule synthesis, some general knowledge of biochemistry and enzymology, knowledge of stereochemistry of pharmaceutically active compounds, and knowledge of resolving racemates.

93.  In 1989, one skilled in the art would be knowledgeable about the biological pathway for the synthesis of cholesterol, including that HMG-CoA reductase is the rate limiting enzyme in the biological pathway for cholesterol produced in an organism.  One skilled in the art would also know that statins were potent inhibitors of HMG-CoA reductase and that the

scientific literature had described in vitro assays as methods for testing a compound's ability to inhibit cholesterol synthesis.

94.     One skilled in the art would be aware that Mevastatin (compactin) is a natural HMG-CoA reductase inhibitor that exists as a single enantiomer.  One would also be aware that Lovastatin (mevinolin), another potent inhibitor of HMG-CoA reductase, had been isolated and was structurally very similar to compactin.  One would also know that both Mevastatin and Lovastatin have lactones in the R-trans configuration.

95.     One skilled in the art would also be aware that pravastatin (1979), symvastatin (1981), and fluvastatin (mid-1980s) were developed and/or isolated prior to 1989.

96.     One skilled in the art would understand that pharmaceutical research into improved inhibitors of HMG-CoA was focused on analogues of known statins.  One would be aware that researchers were retaining the lactone ring while investigating substitutions on the remainder of the molecule.

97.     One skilled in the art would know that the ring-opened form of the upper lactone portion of the previously discovered statins is significantly more active in inhibiting HMG-CoA reductase than the lactone (closed-ring) form.

98.     One skilled in the art would be knowledgeable that HMG-CoA reductase inhibitors are enantiomeric and one enantiomer is likely to be more active than the other.  One would know that the biological activity of a racemate in a biological system can be quite different from that of a single enantiomer, and one enantiomer is approximately twice as active as the racemate in terms of its operation in a target biological system (i.e., one enantiomer is the "active" isomer, while the other is "inactive," and thus the active enantiomer is about twice as active as the racemic mixture).  One would also know that it is desirable to separate and remove the less active enantiomer.

24

99.     One skilled in the art would know that in the case of HMG-CoA reductase inhibitors, the R enantiomer was very likely to be the active enantiomer and, conversely, the S enantiomer was very likely to be inactive.  One would know that these expected activities could be known with certainty by isolating and testing the activity of the enantiomers.

100.     One skilled in the art would understand that racemic mixtures can be separated or resolved into the individual enantiomers by well-known methods of separation or resolution. Similarly, one would be aware that single enantiomers can be isolated by chiral or achiral synthesis.

101.     One skilled in the art would be knowledgeable that it was common practice among medicinal chemists and others working in the drug discovery field in 1989 to use a single structural formula to represent both enantiomer individually as well as mixtures of enantiomers. One would be similarly aware that whether a diagram depicting the structural form for a molecule or class of molecules shows a particular stereochemistry configuration (whether absolute or relative) depends on the context in which the diagram appears.  One would know that if a diagram of a single enantiomer was intended to depict a racemate, to the exclusion of the enantiomer, it was possible to add an additional descriptor, such as (+/-), RS, or ('rac'), which would make it clear that the structure represented only a racemate.

102.     One skilled in the art, given the '893 patent, would have known that compounds in the structural formula I were racemic, that there were a discreet number of enantiomers possible from the structural formula, and that there were known methods for dissolving the racemic mixture into the enantiomers.

2.      The Application: Warner-Lambert Fraudulently Claims the R-Trans
Enantiomer is Ten Times More Active than the Racemate

103.     On July 21, 1989, Warner-Lambert and Roth applied for a patent for the R-trans

enantiomer, i.e., for the R-trans form of the ring-opened acid described in the '893 patent.  This

application would eventually lead – albeit by fraud – to the issuance of the '995 patent.

104.     Roth, the inventor and applicant, provided as part of the application a declaration

acknowledging his duty to disclose information material to the examination of the application to

the PTO, pursuant to 37 CFR 1.56-1.63.  Roth appointed Warner-Lambert's patent attorneys as

his attorneys/agents, authorized them to prosecute the application, and directed that all

correspondence related to the patent application be sent to Warner-Lambert attorney Joan

Thierstein.  The application was signed and submitted by a Warner-Lambert employee, Elizabeth

M. Anderson.

105.     Warner-Lambert, including Thierstein, Anderson and Roth, prosecuted the

application from 1989 to 1993.

106.     In the application, Warner-Lambert through Roth and Thierstein claimed, "[i]t is

now unexpectedly found that the enantiomer having the R form of [a] ring-opened acid

[described in the '893 patent] provides surprising inhibition of the biosynthesis of cholesterol,"

and further claimed "an ordinarily skilled artisan may not predict the unexpected and surprising

inhibition of cholesterol biosynthesis of the present invention in view of [prior] disclosures."  In

support of this contention, Warner-Lambert presented only one piece of evidence: a short table

stating that Warner-Lambert's Cholesterol Synthesis Inhibition ("CSI") assay data demonstrates

the R-trans enantiomer is one hundred-times more active than the S-trans enantiomer, and ten-

times more active than the racemate, in inhibiting the synthesis of cholesterol in vitro ("CSI

Table")

26

| CSI# | Date | Racemic Lactone | R-trans Lactone | S-trans Lactone | Racemic Sodium Salt | R-trans Sodium Salt | S-trans Sodium Salt | Racemic Calcium Salt | R-trans Calcium Salt | S-Trans Calcium Salt |
|------|------|-----------------|-----------------|-----------------|---------------------|---------------------|---------------------|----------------------|----------------------|----------------------|
| 92 | 7/24/85 | .0346 | | | | | | | | |
| 93 | 8/27/85 | .0275 | | | | | | | | |
| 95 | 10/15/85 | .0631 | | | | | | | | |
| 102 | 1/15/87 | .0912 | | | | | | | | |
| 107 | 7/20/87 | | .0355 | .631 | | | | | | |
| 111 | 2/25/88 | | | | | | | .0024 | | |
| 112 | 3/28/88 | | | | | | | .0776 | | |
| 118* | 10/24/88 | | | | .00977 | | | .257 | .0251 | > 1.0 |
| | | | | | .00913 | | | .234 | .0216 | |
| 119 | 11/15/88 | | | | | | | .00324 | | |
| 120 | 2/2/89 | | | | .00498 | .444 | | | | |
| 122 | 4/21/89 | | | | .00313 | | | | | |
| 123 | 5/31/89 | | | | | | | | .00948 | |
| 124 | 6/12/89 | | | | .001 | | | | | |
| 136 | 7/31/91 | | | | | .0322 | | | | |
| 138 | 1/31/95 | | | | | .0169 | | | | |

* = test calculated multiple values using different methods.

Blue = Roth used in CSI table

Yellow = Roth reported in the Roth Declaration (discussed *infra*)

107.    Warner-Lambert claims the "present invention" — the R-trans enantiomer — based on the data presented in the CSI table.

108.    The CSI assay measures the ability of a compound to inhibit cholesterol biosynthesis along the entire cholesterol biosynthesis pathway and is one of the most commonly used methods to test a compound's ability to inhibit the synthesis of cholesterol in vitro.  The results of a CSI assay are reported as an IC50 value, the concentration of a test compound that produces 50% inhibition in the conversion of cholesterol-[$^{14}$C] acetate to radioactive cholesterol. The CSI test does not identify the specific step in the cholesterol biosynthetic pathway that is being inhibited, nor is it specific to HMG-CoA reductase.

27

109.     Two other commonly used methods of measuring a compound's inhibition of cholesterol are the in vivo Acute Inhibition of Cholesterol Synthesis ("AICS") assay and the in vitro CoA Reductase Inhibition ("COR") assay.  The COR assay measures a compound's ability to inhibit HMG-CoA reductase specifically and is typically used to confirm that the activity seen in the CSI assay is attributable to inhibition of the desired target: HMG-CoA reductase.

110.     One skilled in the art of statins in 1989 — and indeed today — would have expected the active R-trans enantiomer to be about twice as active as the racemate in inhibiting cholesterol synthesis.  After all, the racemic mixture is simply the active enantiomer evenly combined with the inactive enantiomer (and thus equal amounts of each yield an active enantiomer that is twice as active as the mixture).  If the activity of one enantiomer is truly ten times that of the racemate, that indeed would be "unexpected" and "surprising"; in fact, it would be a fairly remarkable development in the science of stereochemistry.   But this was a lie.

a.       The CSI Table Is Misleading and Affirmatively False

111.     Warner-Lambert's biological data — the CSI Table — was both affirmatively false and intentionally presented in a misleading manner.  The CSI Table purports to present reliable scientific data.  It does not.  In truth, it contains limited data cherry-picked from multiple flawed tests conducted over several years using different formulations of various atorvastatin salts.  The reliable data actually shows that the R-trans enantiomer is, as expected, only about two times more active than the racemic mixture — far from the "surprising" tenfold increase Warner-Lambert claimed.

(1)      The CSI Table is Misleading

112.     Warner Lambert's CSI Table is misleading because it purports to present reliable and confirmed data, but does not.  The CSI Table does not disclose the source of its data and fails to indicate the number of CSI assays performed, the degree of variation in the test results,

28

what molecules were tested, the time period over which the assays were run, or whether the results presented were drawn from multiple tests.  Given this lack of specification, a skilled addressee would conclude the data had been confirmed by a number of repeat assays and fairly depicted all relevant appropriate data.

113.    Warner-Lambert ran a number of CSI assays prior to applying for the '893 patent — over a multi-year period and on various salt formations — as it tested the R-trans enantiomer of structural formula I.  The results fluctuated wildly.  While not apparent from the face of the specification, Warner-Lambert claimed in subsequent litigation that the CSI Table was created by averaging the results of all of the available CSI screens.  This was not true.  Warner-Lambert cherry-picked from among the results — not from all the results — in order to generate a table that supported the claim of "surprising activity."

114.    For example, the CSI Table combines results from a number of different CSI assays and compares them to a separate CSI assay.  But the standard in the 1980s for giving numbers of the kinds found in the CSI Table was to conduct repeated head-to-head tests; Roth himself has repeatedly acknowledged that head-to-head testing provides the best way to compare quantitative differences in activity.  However, the data presented to the PTO for the R-trans enantiomer and S-trans enantiomer were taken from a single run of the same experiment: CSI 120. And in bizarre contrast, the data collected for racemate represents an "average" of five separate assays: CSI 92, CSI 93, CSI 95, CSI 102, and one of three recorded values from CSI 118.

**Figure 1: Sources for Specification CSI Table**



115.    Second, taking an average across different days and experiments is not appropriate.  The five "averaged" assays were conducted over a three-year period from July 1985 through October 1988.  When taken as a whole, the results of these five experiments reported for the racemate are so variable that they cannot be averaged together with any reliability and do not provide a scientifically meaningful result.

116.    Third, it is also inconsistent with accepted pharmaco-chemistry to "average" the results of CSI values derived from both opened lactones and separately synthesized sodium salts. Four of the assays reflected in the racemate data in the CSI Table (CSI 92, 93, 105, 102) started with the lactone (unopened) form of racemic atorvastatin and were treated with sodium hydroxide to open the lactone ring and create a sodium salt in the process of running the test. One of the assays (CSI 118) started with chemically synthesized sodium salt of racemic atorvastatin prepared by a medicinal chemist.

117.    One skilled in the art would be aware that if lactone rings do not fully open when exposed to sodium hydroxide, the presence of inactive material will result in a higher IC 50

30

value — indicating the compound is less active than it actually is.  One skilled in the art would also expect that the IC 50 values for the racemic lactones in each of the four CSI assays would be similar, not report a threefold difference — from .02 (CSI 93) to .09 (CSI 102).  One skilled in the art would also expect the IC 50 values for the racemic lactones to be similar to the value of the racemic sodium salt, not report a tenfold difference — from .009 (CSI 118) to .09 (CSI 120).  Such disparate values suggest not all of the lactone rings opened during the test and/or other solubility issues that compromise the accuracy of the data.

118.    Notwithstanding that accepted science rejects the use of the average value, the table does not even constitute a true average.  Though known by and available to it, Warner-Lambert did not include all results from all conducted CSI assays, omitting the results from at least nine other CSI tests, including CSI 107, CSI 111, CSI 112, CSI 119, CSI 122, CSI 123, CSI 124, CSI 136, and CSI 138.

**Figure 2: CSI Data (IC 50 in micromoles/liter)**

| CSI# | Date | Racemic Lactone | R-trans Lactone | S-trans Lactone | Racemic Sodium Salt | R-trans Sodium Salt | S-trans Sodium Salt | Racemic Calcium Salt | R-trans Calcium Salt | S-Trans Calcium Salt |
|---|---|---|---|---|---|---|---|---|---|---|
| 92 | 7/24/85 | .0346 | | | | | | | | |
| 93 | 8/27/85 | .0275 | | | | | | | | |
| 95 | 10/15/85 | .0631 | | | | | | | | |
| 102 | 1/15/87 | .0912 | | | | | | | | |
| 107 | 7/20/87 | | .0355 | .631 | | | | | | |
| 111 | 2/25/88 | | | | | | | .0024 | | |
| 112 | 3/28/88 | | | | | | | .0776 | | |
| 118* | 10/24/88 | | | | .00977 | | | .257 | .0251 | > 1.0 |
| | | | | | .00913 | | | .234 | .0216 | |
| 119 | 11/15/88 | | | | | | | .00324 | | |
| 120 | 2/2/89 | | | | | .00498 | .444 | | | |
| 122 | 4/21/89 | | | | | .00313 | | | | |
| 123 | 5/31/89 | | | | | | | | .00948 | |
| 124 | 6/12/89 | | | | .001 | | | | | |
| 136 | 7/31/91 | | | | | .0322 | | | | |
| 138 | 1/31/95 | | | | | .0169 | | | | |

\* = test calculated multiple values using different methods.
Blue = Roth used in CSI table
Yellow = Roth reported in the Roth Declaration (discussed *infra*)

119.    Depending on which assays were included or excluded, the CSI Table could and would have reported very different results.  For example, Roth has acknowledged that had the results of CSI 107 been included in his "average," there would be no surprising or unexpected result.  Rather, had CSI 107 been included, the CSI Table show only the expected twofold increase in the activity of the R-trans enantiomer compared to the racemate.  Roth has claimed he did not include CSI 107 because he believed that the compounds it tested were not enantiomerically pure; yet, he included the results of CSI 120, which suffered from a similar level of contamination.

96623

120. Similarly, the CSI Table would have shown only this expected twofold increase had Warner-Lambert excluded the results of CSI 118 from the "average." As discussed below, CSI 118 suffered from myriad problems.

121. No matter how Warner Lambert, Thierstein and/or Roth manipulated the numbers, the critical fact is that the R-trans enantiomer is only twice as active as the racemate.

(2)    The CSI Table is Affirmatively False

122. Warner-Lambert's claim that the R-trans enantiomer has surprising activity is false. Warner-Lambert's claim that the R-trans enantiomer is ten times more active than the racemate is false. Warner-Lambert, including Roth, knew the R-trans enantiomer is, as would be expected by one skilled in the art, only about twice as active as the racemic mixture.

123. Warner-Lambert, including Thierstein and Roth, did not tell the PTO that it possessed data that expressly contradicted representations in its patent specifications.

124. In addition to CSI assays, Warner-Lambert assessed the activity of the R-trans enantiomer, S-trans enantiomer, and the racemate through the in vivo AICS assay. The ACIS assay — the only screen to be conducted twice and with consistent results — showed a twofold increase in activity of the R-trans enantiomer over the racemate. But Warner-Lambert never submitted the ACIS data to the PTO.

125. Warner-Lambert also assessed the activity of the R-trans enantiomer, S-trans enantiomer, and the racemate through the in vivo COR assay. The COR data was consistent with a twofold increase in activity of the R-trans enantiomer over the racemate. But Warner-Lambert never submitted the COR data to the PTO.

126. Warner-Lambert's own research reports conclude that the R-trans enantiomer was approximately twice as active as the racemate. A May 31, 1989 report signed by Dr. Sliskovic states that the R-trans enantiomer "was approximately twofold more active at inhibiting

33

cholesterol synthesis acutely in vivo compared to the racemic mixture … This is to be expected if 50% of the racemic salt is the inactive isomer." A June 1, 1989 report signed by Roth also reported a twofold increase in activity of the active enantiomer over the racemate: "[a]s expected, [the R-trans calcium salt] was twofold more potent than ... the racemic calcium salt, which contains 50% inactive isomer." Other internal memoranda from September and December 1989 similarly conclude that, as expected, the R-trans enantiomer was twice as active as the racemate. But Warner-Lambert never shared its own conclusion with the PTO.

127.   Roth and Warner-Lambert knew that a person skilled in the art would read the CSI Table as appropriately reflecting (1) all of the appropriate CSI data available to Warner-Lambert for the relevant compounds, and (2) that the data as a whole provided reasonable grounds for the findings set forth in the CSI Table. Warner-Lambert, Roth and Theirstein, intended that the CSI Table be read as demonstrating a tenfold increase in activity and, therefore, supporting patentability.

128.   Warner-Lambert, Roth and Theirstein also knew that the CSI data did not provide any "surprising" results. After all, Warner-Lambert scientists, including Roth, had conducted the various CSI assays over a period of more than three years. If the assays had disclosed anything surprising —certainly something as shocking as a ten-fold increase in biological activity — that would have been learned, in real time, as the tests unfolded. But none of Warner Lamberts' internal documents (produced to date in related litigation) or any of the literature published by Dr. Roth and his team concerning the discovery of atorvastatin refer to, or even suggest, a ten-fold increase in activity.[4]

---

[4] *See Ranbaxy Australia Pty Ltd. v. Warner-Lambert Company LLC*, 2006 FCA 1787 (December 20, 2006).

129.     Instead, it was only after senior Warner-Lambert managers (not the scientists)

instructed Roth to go back and "find" something in the data, and after a jumbled analysis of

different tests on different compounds was cobbled together, that the claimed ten-fold biological

activity materialized.  If Warner-Lambert truly had CSI data that established the R-trans

enantiomer was ten times more active than the racemate, as falsely claimed in the '995 patent

specification, one would expect to fund some commentary or explanation as to the different

outcomes of the CSI and AICS testing.  But no such commentary is contained in the documents

produced by Warner-Lambert to date in related patent litigation.[5]

130.     Furthermore, accepted chemistry in 1989 counseled to conduct controlled tests of

the proposed hypothesis, i.e., that there were some "surprising" attributes of the isolated R-trans

enantiomer over the racemic mixture.  This would have entailed Warner-Lambert conducting

new tests in response to senior managements' demand to find something surprising. Instead, the

entire direction, dictated by senior Warner-Lambert management, was not to conduct acceptable

science in order to make fair and accurate representations to the PTO.  The instructions were

simply to go back and gin-up old data to give an impression, albeit false, of some type of

"surprising" attribute.

         3.     The Initial Rejection: The PTO Determines the Claimed Compounds Are
                Anticipated By the '893 Patent

131.     On March 22, 1990, pursuant to 35 U.S.C. 102(b), the PTO rejected all claims in

the initial application as anticipated by — that is covered by — the '893 patent.  The PTO

determined that the '893 patent "restrict[ed] the invention to the trans-isomers and... specif[ied]

the R*, R* configuration.  Thus, the claimed compounds, salts, compositions, and method are

considered to be anticipated by [the '893 patent]."  Put simply, the PTO rejected Warner-

---

[5] See Ranbaxy Australia Pty Ltd. v. Warner-Lambert Company LLC, 2006 FCA 1787 (December
20, 2006).

Lambert's enantiomer patent application because the invention was already covered by the claims in the '893 patent.

132.    The concepts of "anticipation" and "non-obviousness" are distinct but related concepts under patent law.  A proposed invention may be rejected under 35 U.S.C. §102 (b) as being anticipated, that is, already covered by, a previous patent.  Alternatively, even if a proposed invention is not identically disclosed or described as set for in § 102, under 35 U.S.C. §103 a patent may not issue for obviousness "if the differences between the subject matters sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains...."  Because the patent examiner had concluded that the '893 patent anticipated the isolated R-trans enantiomer form of atorvastatin, the examiner did not need to reach the concept of obviousness.

133.    In response to this rejection, Warner-Lambert argued against anticipation on technical grounds that the '995 application addressed specific enantiomers, and the '893 addressed only racemates, "the presently claimed compounds are for individual enantiomers and therefore differ from the teaching in [the '893 patent] only to mixtures of enantiomers."

134.    Warner-Lambert, through Thierstein, argued that the '893 patent did not specifically identify, and therefore did not technically "anticipate," the R-trans enantiomer:

> In molecules of the kind disclosed in [the '893 patent], each possible isomer also exists in two forms which depend on a configuration which is expressed in absolute terms relative to the remainder of the molecule.  The forms are denoted as an R form and an S form.  These two forms are recognized by an ordinarily skilled artisan to be enantiomeric forms each having a specific chirality.  In [the '893 patent] the disclosure is not limited to compounds having such a specific chirality.  Thus, each isomer of [the '893 patent] is a mixture of enantiomers and not the currently claimed individual enantiomers having an R chirality.

36

In subsequent patent litigation, Roth himself disagreed with, and outright rejected, this argument.

135.    The PTO examiner also again rejected Warner-Lambert's argument that the

'893patent did not anticipate the R-trans enantiomer.  On November 7, 1990, the examiner

issued a final rejection on anticipation grounds.  The examiner determined that the '893 patent

described the R-trans enantiomer:

> Applicant's arguments... have been carefully considered, but such
> are not persuasive.  Where a reference discloses a genus or
> compound of similar structure which are sufficiently limited in
> number, the reference is deemed to provide description of those
> compounds just as specifically as if they were identified by name.

The examiner observed that to isolate the claimed invention, the R-enantiomer from the

compounds disclosed in the '893 patent, "one merely has to select from the limited possibility of

isomers to arrive at the claimed invention, and separate them using conventional techniques."

Following the rejection, Warner-Lambert abandoned the application.

    4.    <u>The Renewed Application: Warner-Lambert Submits the Roth
Declaration, Again Falsely Claiming the R-Trans Enantiomer is Ten
Times More Active than the Racemate</u>

136.    On February 29, 1991, Warner-Lambert revived its application and filed a

preliminary amendment, signed by Thierstein.[6]  The amendment included a declaration by

inventor Roth ("Roth Declaration").  The Roth Declaration was submitted in order to overcome

an obviousness rejection and support patentability of the R-trans enantiomer.  In the declaration,

Roth again acknowledges his duty to be truthful.

137.    The Roth declaration again claims a "surprising" and "unexpected" tenfold

increase in activity.  It (falsely) professes to present seemingly objective evidence of an

---

[6] The patent specification accompanying the renewed application also contains a chart (the "CSI
Chart") showing ten times greater activity of the R-trans enantiomer than the corresponding
racemate.  The information contained in this chart is identical to that presented in the original
application.

unexpected characteristic of the isolated R-trans enantiomer.  Warner-Lambert, through

Thierstein and Roth, claimed this characteristic would allow issuance of an R-trans enantiomer

patent despite the claimed invention being prima facie obvious in light of the '893 patent.  The

Roth Declaration simply presented more of the same: misleading and affirmatively false

biological data.

>    a.    Warner-Lambert Admits the R-Trans Enantiomer Is Prima Facie
>           Obvious

138.    While continuing to argue that the proposed R-trans enantiomer patent was not

technically anticipated by the '893 patent, Warner-Lambert also raised, on its own, the issue of

obviousness.   Indeed, Warner-Lambert admitted that the R-trans enantiomer was prima facie

obvious in light of the '893 patent.

139.    In its remarks in support of the renewed patent application, Warner-Lambert

directs the examiners' attention to a decision of the U.S. Court of Customs and Patent Appeals,

*In re May and Eddy*, 197 USPQ 601, 607 (1978), stating: "[a]s recognized in *In re Williams*, 36

CCPA 756, 171 F.2d 319, 80 USPQ 150 (1948), the novelty of an optical isomer is not negated

by the prior art disclosure of its racemate."[7]  "Clearly," Warner-Lambert asserts, "this case law is

applicable here."

140.    In *May* the applicant conceded prima facie obviousness, but submitted "rebuttal

evidence" in the form of four declarations that it was "unexpected" that the compounds in

question did not exhibit the addictive qualities of most opiates.  The PTO refused to consider the

rebuttal evidence.  The U.S. Court of Customs and Patent Appeals reversed.  "[B]alancing the

prima facie case of obviousness made out by the PTO against appellants' objective evidence of

---

[7] The facts here are quite distinct from *Williams*.  In *Williams*, as here, the applicant sought a
patent on a particular enantiomer.  The *Williams* court determined that the racemic compound
had been disclosed in the prior art, but (in contrast to this situation) the fact that the compound
was racemic had not been previously disclosed.

nonobviousness," the Court concluded, "the subject matter of claims 11-13 would not have been obvious to one of ordinary skill in the art."  According to *May*, an applicant may provide declarations identifying objective evidence of a surprising characteristic to overcome prima facie obviousness.

141.   Warner-Lambert purported to do just that.  In the remarks, Warner-Lambert states:

> Following the *Williams* case Applicant also now provides by a declaration a comparison among each enantiomer and mixture of enantiomers.  This comparison is provided to overcome the Roth reference [that is, the reference in the '893 patent] of the present rejection to facilitate a finding of patentability and moving the prosecution toward resolution of pertinent issues.  In other words, although Examiner has not included a rejection under 35 U.S.C. 103 [for obviousness] Applicants are including a rebuttal of such rejection to comply with the *Williams* case law.

Warner-Lambert further describes the declaration as "provid[ing] the data as set out in the present application in a manner to provide patentability to the application,"[8] and states, "in other words, the declaration is submitted to provide evidence of patentability to the instant invention."

b.   The Roth Declaration is Misleading and Affirmatively False

142.   Warner-Lambert submitted the Roth Declaration in an effort to overcome the otherwise inevitable rejection on obviousness grounds.  The Roth Declaration states, "the antihypercholesterolemia properties of ["R-enantiomer," or "Compound I"] and ["S-enantiomer," or "Compound II"] and mixtures thereof are assessed using essentially the CSI screen that is disclosed in [the '893 patent]."  The declaration continues, claiming that the R-trans enantiomer has "activity greater than fifty-fold more than that of Compound II and which

---

[8] Warner-Lambert thus at least tacitly acknowledges that the CSI Table previously submitted in the patent specification is not sufficient to provide patentability.

96623

indicates activity at least ten-fold more than that of the racemate," and contains the following table:

> 8. THAT, in said assessment, the datum from the Compound I, the datum from its enantiomer the Compound II and the datum from the racemate of the two compounds I and II are as follows:
>
> | Compound | | $IC_{50}$ (micromoles/liter) |
> |---|---|---|
> | I | [R-(R*R*)] isomer | 0.025 |
> | II | [S-(R*R*)] isomer | >1.00 |
> | | Racemate | 0.26 |
>
> 9. THAT, the data demonstrate that the Compound I provides an $IC_{50}$ which indicates activity greater than fifty-fold more than that of Compound II and which indicates activity at least ten-fold more than that of the racemate;

143.    The Roth Declaration states that the available " datum from the compound I" (the R-trans enantiomer) and "the datum from the racemate" (the S-trans enantiomer) are presented below, implying (at minimum) that the values given reflect all appropriate, reasonably available CSI assay data.  The declaration further claims that "the differences in the data among Compounds I, II and racemate shows the activity of Compound 1 is surprising and unexpected because if the Compound II is accepted as inactive, the activity of the Compound I would be expected to be only twice that of the racemic mixture."[9]

144.    The Roth Declaration, like the CSI Table, purports to present reliable scientific data but does not disclose the source of that data.  Given this lack of specification, a skilled addressee would conclude that Warner-Lambert would not have included the CSI Table in the specification in such an unqualified way unless the data had been confirmed by a number of repeat assays.

---

[9] Roth's declaration concludes with a paragraph stating, in part, "these statements are made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both ... and that such willful false statements may jeopardize the validity of the above identified US patent application ..., or any patent issuing thereon."

40

145.    In fact, the Roth Declaration presents unreliable data from a single, deeply flawed screen — CSI 118.  The declaration is false and misleading.

**Figure 3: Sources for Roth Declaration Table (IC 50 in micromoles/liter)**

| CSI# | Date | Racemic Lactone | R-trans Lactone | S-trans Lactone | Racemic Sodium Salt | R-trans Sodium Salt | S-trans Sodium Salt | Racemic Calcium Salt | R-trans Calcium Salt | S-Trans Calcium Salt |
|------|------|------|------|------|------|------|------|------|------|------|
| 118[*] | 10/24/88 | | | | .00977 | | | .257 | .0251 | > 1.0 |
| | | | | | .00913 | | | .234 | .0216 | |

\* = test calculated multiple values using different methods.

Blue = Roth used in CSI table (discussed *supra*)

Yellow = Roth reported in the Roth Declaration

146.    In addition to generating a value for the racemic sodium salt Roth used in the CSI chart in the patent specification, CSI 118 compared all three forms of calcium salt (R-trans, S-trans trails, and racemate) in a single head-to-head assay. The screen was never re-run to confirm the reported results.[10]  The test results are unusable for a number of reasons.

147.    First, in order to obtain accurate $1C_{50}$ values, the concentration of the test solutions must be known prior to testing; but Warner-Lambert did not determine the concentration of its test solutions prior to conducting the CSI 118 test.  Without accurate information about the concentration of the solutions used in the CSI 118 test, the IC50 values obtained in CSI 118 cannot be used to demonstrate a tenfold increase in activity of the R-trans enantiomer over the racemate.

148.    Second, Warner-Lambert's own lab books show that the compounds in CSI 118 did not dissolve completely in the stock solution.  Using non-homogeneous suspensions can result in variations in the concentrations of the compound in the assay solution leading to wide

---

[10] Roth has admitted that he did not conduct any additional tests to confirm that the biological data presented in the patent was in fact correct:  "it is true that [the biological data that was included in the patent] went out without any subsequent tests being asked for by me to repeat that data."

variation in the results obtained.  Given this limitation, the most that the CSI 118 results can be said to determine is whether a compound has any activity, not whether a compound has a twofold, threefold, or tenfold increase in activity over another compound.

149.    Third, an acceptable CSI test should record similar results for the racemic sodium salt and the racemic calcium salt.  Roth has agreed that, in general, the results for the racemic sodium salt and the racemic calcium salt should be equivalent or similar.  Yet, in CSI 118, the results of the racemic sodium salt (.00977) and racemic calcium salt (.257) are vastly different, almost a twenty-five-fold difference.  The difference was so great that the IC50 value for the R-trans enantiomer calcium salt showed far less potency than the racemic sodium salt — that is, the R-trans enantiomer, the active enantiomer, of the calcium salt was less active than the racemate of the sodium salt.  This difference should have been a red flag that something was wrong with the screen, likely a problem related to solubility issues.

150.    Finally, the claim in the Roth Declaration of ten times activity is also affirmatively false because the activity of the isolated R-trans enantiomer is not in fact ten times greater than the racemate.  Had Warner-Lambert employed an acceptable scientific testing process, the data would have revealed the R-trans enantiomer had at best a twofold advantage over the racemate.

151.    Roth and Warner-Lambert were aware of the numerous problems with CSI 118 identified above and knew that the results of CSI 118 were not scientifically sound.  Yet, in the face of radically different values for the sodium and calcium salts, solubility problems, unknown solution concentrations, and results that showed the racemate of one salt was more potent than the R-trans enantiomer of another salt, they used this questionable and unreliable data to support the false claim that the isolated R-trans enantiomer has ten times greater inhibition of cholesterol synthesis than the racemate, and specifically claimed this as "a surprising level of activity"

42

which, in turn, supported patentability.  Warner-Lambert and Roth admit this: Dr. Roth has

admitted under oath that he submitted CSI data for the purpose of demonstrating "a surprising

level of activity" which therefore supported patentability:

> Q.    So [the biological data] was put in to demonstrate this surprising level of
> activity for the purpose of obtaining a patent, was it not?
>
> A.    [Dr. Roth:] Yes, I guess you would say that that would be true.  I mean,
> the data supported a surprising level of activity, which we thought would
> be novel and surprising and therefore would support patentability.

152.    Warner-Lambert knew that a person skilled in the art would read the Roth

Declaration as fairly reflecting all of the appropriate CSI data available to Defendants for the

relevant compounds, and that the data as a whole provided reasonable grounds for the findings

set forth in the Roth Declaration.  Roth and Warner-Lambert intended that the Roth Declaration

should be read as suggesting a tenfold increase in activity and therefore supporting patentability.

5.    The Final Rejection: The PTO Determines the R-Trans Enantiomer is
Anticipated

153.    On September 16, 1991, the PTO examiner issued a final rejection of the follow-

on patent application, rejecting all claims under 35 U.S.C. 102(b) as being anticipated by the

'893 patent for the reasons set forth in the two rejections issued in 1990.

6.    The Appeal: the PTO Determines the R-Trans Enantiomer is Prima Facie
Obvious.

154.    On January 15, 1992, Warner-Lambert appealed the examiner's rejection to the

Board of Appeals, claiming "[t]he R isomer as claimed appears to be at least 100 times more

active than its corresponding S isomer and more than 10 times more active than the mixture.

Under ordinary circumstances one would have expected only a two-fold difference between the

particular R isomer and the mixture."  The appeal was signed by Attorney Ronald A. Daignault,

a Warner-Lambert employee.  Daignault states, "the present invention describes the particular R

43

isomer which is found to have greater than 10 times the activity of the compound described in the prior art reference, namely, the racemic mixture," "the compound of the present invention... does not produce substantially the same result since it has greater than 10 times the activity than the reference compound," and "the R isomer is the most desired and the most surprisingly active isomer of the two possibilities if one is to select from the trans compounds..."

155.     Acknowledging that the isolated R-trans enantiomer is prima facie obvious over the '893 patent, Warner-Lambert argued that the obviousness is overcome by the surprising and unexpected activity claimed in the Roth Declaration: "The examiner's rejection is erroneous as a matter of law by applying the facts of the present case to the wrong law.  The issue here is whether an optical isomer is novel over its prior disclosed racemic mixture.  The law as state[d] in *May and Eddy* affirming *In re Williams* says yes."

156.     On March 24, 1992, the examiner filed an answer to Warner-Lambert's appeal. The examiner alleged no new grounds for denial of the application, but reiterated the previously disclosed grounds, stating, "even if a preferred isomer were not disclosed [by the '893 patent], one skilled in the art expects one of the individual isomers to be more active than the other since this, too, is knowledge contemporary in the art."

157.     On October 19, 1992, the Board of Appeals overturned the Examiner's rejection for anticipation of the application, concluding that the '893 patent did not technically anticipate the R-trans enantiomer:

> at best, only describes the trans racemate containing the R-trans and the S-trans isomers in admixture.  Nowhere does [the '893 patent] state or suggest which optical isomer is preferred and, moreover, does not specifically mention how one skilled in the art could make the pure optical isomer separately.  In view of the above, we are unable to subscribe to the examiner's contention that the ['893 Patent] anticipates the claimed subject matter.

158.    However, the Board recommended to the examiner that upon remand the patent should be rejected on the basis of obviousness:

> Upon further prosecution of this application before the examiner, we recommend that the examiner analyze the claimed subject matter under the provisions of §103 of 35 USC.  An obviousness rejection of claims directed to an optically pure isomer appears to be in order when, as here, (1) the product of the prior art is known to be racemic and (2) where methods for resolving the racemic mixture into the pure optically active isomers are known to those skill[ed] in the art.

7.    The '995 Patent Issues: the PTO Relies on Biological Data to Overcome Obviousness

159.    On March 16, 1993, apparently without any further formal proceedings or briefing, the PTO issued a Notice of Allowability for the follow-on, isolated R-trans enantiomer patent application.  The '995 patent issued on December 28, 1993.

160.    Warner-Lambert had presented the results of CSI screens in both the '995 Patent specification and the Roth Declaration to support the contention that the R-trans enantiomer is surprisingly and unexpectedly ten times more active than the racemate and therefore not obvious in light of the '893 patent.  Warner-Lambert made this representation in the original application, the Roth Declaration, the appeal to the PTO, and in the final patent specification.  This is the only "surprising" activity of the isolated R-trans enantiomer that is ever discussed in the '995 patent application, and therefore, the sole reason Warner-Lambert was able to overcome an obviousness rejection.

161.    The PTO relied on the Roth Declaration and the CSI Table to find that the R-trans enantiomer was not obvious in light of the '893 patent.  The Board of Appeals explicitly (i) directed the examiner to re-evaluate the application for obviousness, and (ii) stated that an obviousness rejection appeared to be appropriate.  The examiner did precisely that.  The examiner relied on Warner-Lambert's claim of "surprising" and "unexpected" activity and

45

determined that the charts presented in support of that claim (both in the patent specification itself and the Roth Declaration) were sufficient to overcome a rejection on obviousness grounds. The only "surprising" or "unexpected" characteristic of the isolated R-trans enantiomer Warner-Lambert claimed was the tenfold increase in activity compared to the racemic mixture.  The only data presented in support of those claims were contained in the patent specification (the CSI Table) and Roth Declaration.

162.    The inclusion of particular language and data in the patent specification itself confirms that the PTO relied on both the claim of surprising and unexpected activity and the data submitted in support of that claim.  The specification states, "[i]t is now unexpectedly found that the enantiomer having the R form of [a] ring-opened acid [described in the '893 patent], ... that is [R-(R*R*)]-2-(4-fluorophenyl)- β,δ – dihydroxy-5-(1-methylethyl)-3 -phenyl-4- [phenylamino)carbonyl]- 1H-pyrrole- 1 -heptanoic acid, provides surprising inhibition of the biosynthesis of cholesterol."  The specification further states "an ordinarily skilled artisan may not predict the unexpected and surprising inhibition of cholesterol biosynthesis of the present invention in view of [prior] disclosures."

163.    But for Warner-Lambert's fraud, the '995 patent would never have issued.

E.    **Warner-Lambert Intended to Deceive the PTO**

164.    Warner-Lambert's false claims and data were made with the specific intent that the PTO rely on those claims in order to issue a follow-on patent, and with knowledge they were false and misleading.  Roth and Warner-Lambert knew that a person skilled in the art would read the CSI table and the Roth Declaration as a representation that the results in the table fairly reflected all of the scientifically reliable CSI data available to Defendants for the relevant compounds, and that the data as a whole provided reasonable grounds for the findings set forth in

46

the CSI Table.  Roth and Warner-Lambert intended that the CSI table and the Roth Declaration

should be read as suggesting a ten-fold increase in activity and therefore supporting patentability.

       1.    <u>Warner-Lambert Manipulated the Existing Biological Data to Show a Ten Fold Increase in Activity and Defendants Intentionally Presented False Information</u>

165.    Warner-Lambert manipulated the existing biologic data in order to show a tenfold

increase in activity.

166.    Warner-Lambert has acknowledged that head-to-head testing provides the best

way to compare quantitative differences in activity, yet it did not present such head-to-head data

in support of the claim of ten-fold activity of the R-isomer over the racemate.  Instead, Warner-

Lambert selected results from various tests conducted on different days, using different salts, and

suffering from various flaws and presented these cooked-up results in the CSI Table included in

the patent specification.  Such a gross departure from accepted chemistry practice shows

knowledge of falsity.

167.    Warner-Lambert acknowledged that had the results of CSI 107 been included in

the "average," there would be no surprising or unexpected result.  Warner-Lambert has claimed

it did not include CSI 107 because it believed that the compounds it tested were not

enantiomerically pure; yet, it included the results of CSI 120, which suffered from a not

substantially different level of contamination.  Such a gross departure from accepted chemistry

practice shows knowledge of falsity.

168.    Warner-Lambert claimed that it did not provide the data from CSI 119 to the PTO

because CSI 119 was not a head-to-head comparison, and it claimed it believed that it was

inappropriate to compare individual data points from different experiments.  Yet, Warner-

Lambert used different data points from multiple experiments to generate the data contained in

the CSI Table.  Such a gross departure from accepted chemistry practice shows knowledge of falsity.

169.    Warner-Lambert included one of the three results from CSI 118 in the CSI Table in order to show an alleged ten-fold increase in activity.  The sodium salt prepared by opening the racemic lactone in CST 92, 93, 95, and 102 should have given substantially identical, or at least very similar, values to the racemic sodium salt that was separately prepared in CSI 118. Yet, the results for the racemic sodium salt in CSI 118 differ from the results of the four lactone CSI tests by a factor of ten.  Such a gross departure from accepted chemistry practice shows knowledge of falsity.

170.    In CSI 118, the results of the racemic sodium salt and racemic calcium salt are vastly different, showing as much as a twenty-five-fold difference.  The difference was so great, that the IC50 value for the R-trans enantiomer calcium salt showed far less potency than the racemic sodium salt — that is, the R-trans enantiomer of the calcium salt was less active than the racemate of the sodium salt.  This difference should have been a red flag that something was wrong with the screen, likely a problem related to the difficulty with solubility of the compounds.  Instead, Warner-Lambert used this questionable data to support the false claim that R-trans enantiomer has a tenfold greater inhibition of cholesterol synthesis than the racemate.

171.    Warner-Lambert was aware of the numerous problems with CSI 118 identified above and knew that the results of CSI 118 were not scientifically sound.  Yet, in the face of radically different values for the sodium and calcium salts, solubility problems, unknown solution concentrations, and results that showed the racemate of one salt was more potent than the R-isomer of another salt, Warner-Lambert used this inconsistent outcome to further substantiate the claim that the R-isomer was ten times more active than the racemate in inhibiting cholesterol synthesis.

48

172.     Warner-Lambert's patent attorneys submitted the misleading and false CSI table generated by Roth and others and the misleading and false Roth Declaration to the PTO in support of the '995 Patent application.

2.       Warner-Lambert Admits the Patent Specification Claims a Surprising Ten-Fold Increase in Activity

173.     At numerous points in the prosecution of the '995 Patent, Warner-Lambert and Roth expressly stated that the activity of the R-trans enantiomer was both surprising and ten-times greater than the activity of the racemic mixture.  Nonetheless, in subsequent patent litigation, Roth and Warner-Lambert tried to shy away from admitting that Warner-Lambert had claimed that the surprising feature of the R-trans enantiomer was a tenfold increase in activity over the racemate.  Warner-Lambert knew that both the CSI table and Roth Declaration presented false information about the activity of the R-trans enantiomer as compared to the S-trans enantiomer and the racemate.  To acknowledge in court that the only claimed "surprising" characteristic was in fact false would result in the loss of the '995 Patent and/or its foreign counterparts.

174.     Roth's evasive testimony on this topic is illustrative:

Q.       I suggest to you that you either do or do not rely on those figures.  If you want to put out a merely qualitative statement that you have surprising activity you can put it in words.  If you put it out in figures that suggests that it is a very surprising level of activity, being a 10-fold difference?

A:       But I believe the words we used were a surprising level of activity.  We didn't say that it was surprising because it was a 10-fold difference.  We simply said that it was surprising, the numbers suggest 10-fold.  But frankly, again, anything more than twofold would be surprising.  We didn't claim 10-fold in the patent.  We said it was surprising.

Q:       You didn't put a qualification to the numbers that you give in the patent to say "beware of these numbers.  We're only really saying that we get a better than two-fold improvement"; no mention of that, was there?

A:      What we say is that the compound has surprising activity and then we put data into the patent which supported the surprising level of activity.  I don't think that we actually comment on the data except to say that it's surprising.  The data is what the data is.

Q:      The data on its face quantify that is surprising level of activity, does it not, Dr. Roth?

A:      There are numbers given, yes.

Q:      So it quantifies that surprising level of activity?

A:      What do you mean by that?

Q:      Do you know what the meaning of the word "quantifies" is?

A:      There are numbers that are given.  Again, we don't make any claims; all we say is that it's surprising.  The numbers are what the numbers are.

175.    Roth was ultimately forced to concede that the biological data contained in the

patent specification purports to show a ten-fold increase in activity, and that it was included in

the specification for that reason:

Q:      And you wanted those numbers to be taken at face value, did you not?

A:      I'm not sure I know what you mean.

Q:      What?

A:      The data is what the data is.  The data was included to support the rising level of activity.  What the numbers suggest is that it's something like 10-fold, but we don't state that.  We simply — what we simply do is we say it's surprising.

Q:      Isn't it a fair reading of this passage on page 8 that having said it's surprising that you are saying now here is why and you set out figures which show a 10-fold increase and you don't provide any qualification at all to those numbers?

A:      That is true.  We simply report the data.

176.    Roth acknowledged "[t]he data is what the data is" and "the numbers are what the

numbers are" and "the data was included to support the surprising level of activity.  What the

50

numbers suggest is that it's something like 10-fold ..."  The numbers show, based on cherry-picked test results, regardless of whether particular words appear in the text of the patent, that the R-trans enantiomer is ten times more active than the racemate.  In reality, the R-trans enantiomer is, as expected, only about twice as active as the racemate.

        3.      <u>Warner-Lambert Intended the PTO to Rely on the False Data and Claims</u>

177.    Roth has admitted under oath that he submitted CSI data for the purpose of supporting a surprising level of activity which therefore supported patentability: "the biological data that was included in the patent I felt demonstrated and supported a surprising level of biological activity."

> Q.    So [the biological data] was put in to demonstrate this surprising level of activity for the purpose of obtaining a patent, was it not?
>
> A.    Yes, I guess you would say that that would be true.  I mean, the data supported a surprising level of activity, which we thought would be novel and surprising and therefore would support patentability.

**F.    FDA Approval: The FDA approves Lipitor and the Original Lipitor Patent Provides Years of Patent Protection**

178.    On June 17, 1996, Warner-Lambert submitted a new drug application under §505(b) of the Federal Food, Drug and Cosmetic Act ("FDCA") and § 314.50 of Title 21 Code of Federal Regulations, seeking approval to sell atorvastatin calcium.  The formulation developed for FDA approval and commercialization was atorvastatin calcium, i.e., the isolated R-trans enantiomer formulated as a calcium salt.  On December 17, 1996, the FDA approved atorvastatin calcium — named "Lipitor" — for the treatment of hypercholesterolemia and mixed dyslipidemia.  The FDA initially approved 10 mg, 20 mg, and 40 mg tablets, adding approval of 80 mg tablets on April 7, 2000.

1.      The Orange Book Listings for the '893 and '995 Patents

179.    Following approval, Warner-Lambert listed both the '893 Patent and the '995 Patent in the Orange Book.  When it did so, Warner-Lambert knew that it had procured the '995 Enantiomer Patent through actual fraud on the PTO.

180.    Given Warner-Lambert's listing of both patents in the Orange Book, a generic company seeking approval for an ANDA for generic atorvastatin calcium would need to file a Paragraph IV certification as to both the '893 and '995 patents if it wished to enter the market before the expiration of the patents; such a certification would trigger Warner-Lambert's ability to file infringement litigation, which in turn would trigger the usual Hatch-Waxman statutory delays for FDA generic approval.

181.    At the time of FDA approval of Lipitor, the '893 Patent was scheduled to expire on May 30, 2006.  The '995 Patent would not expire until December 28, 2010.

182.    Pfizer also owns (through subsidiaries) two process patents — U.S. Patent No. 6,087,511 (the "'511 patent") and U.S. Patent No. 6,274,740 (the "'740 patent") — that claim a process for making amorphous atorvastatin calcium that is limited to crystalline Form I atorvastatin calcium (the '511 patent and the '740 patent are collectively referred to as "the Process Patents").  Pfizer has not listed these patents in the Orange Book; it has sued to enforce these patents on only two occasions, both times against generic competitors.  The Process Patents will expire in July 2016.

2.      The '893 Original Lipitor Patent Protected the Lipitor Franchise for Years

183.    Shortly after FDA approval, Warner-Lambert applied for an extension of the patent term of the '893 patent under 35 U.S.C. § 156.  Section 156 provides that the period of patent protection may be extended in order to account for the time lag between the issuance of a patent covering the active ingredient in a new drug, and FDA approval.

52

184.    Warner-Lambert asked the PTO to extend Lipitor's period of market exclusivity granted by the '893 patent — not the '995 patent — for about three years and four months.  That is, Warner-Lambert took the position that the '893 patent covered the isolated R-trans enantiomer, atorvastatin, in calcium salt form.

185.    Warner-Lambert informed the PTO that (i) the FDA approved Lipitor, (ii) the active ingredient in the drug Lipitor is atorvastatin calcium, and (iii) atorvastatin calcium is covered by the '893 patent.  Warner-Lambert claimed that the '893 patent claims atorvastatin calcium as a new chemical entity (Claims 1-4), as a pharmaceutical composition (Claim 8), and a method for using it to inhibit cholesterol biosynthesis (Claim 9).

186.    Claim 1 requires "a compound of structural formula I" or "a hydroxyl acid or pharmaceutically acceptable salt thereof, corresponding to the opened lactone ring of the compounds of structural formula I above."  In the extension application, Warner-Lambert claimed that Lipitor is a pharmaceutically acceptable salt of structural formula I, and thus covered by Claim 1 of the '893 patent:

> Lipitor is a pharmaceutically acceptable salt (i.e., calcium salt) of the hydroxy acid corresponding to the opened lactone ring of a compound of structural formula I.  Lipitor has the general structure:

53

where:    X is $-CH_2CH_2-$

$R_1$ is 4-fluorophenyl;

$R_2$ is phenyl;

$R_3$ is $-CONH-phenyl$; and

$R_4$ is 1-methylethyl, an alkyl group having three carbon atoms.

Lipitor™ thus has the specific chemical structure



187.    The PTO granted the patent term extension.  With both an extension for its delay in FDA approval, and for pediatric testing, the '893 patent would expire on March 24, 2010.

188.    Warner-Lambert also sought and obtained a six-month extension for pediatric testing for the '995 patent.  As a result, the expiration date of the '995 patent was June 28, 2011.

189.    In effect, the '893 patent would provide more than fourteen years of patent exclusivity to market and sell branded Lipitor — from the 1997 launch until March of 2010.  The fraudulently obtained '995 patent would tack on, if enforced by Warner-Lambert or its successors, almost another year-and-a-half of exclusive Lipitor profits.

54

### 3.   The 1997 Launch of Lipitor

190.   Warner-Lambert faced serious challenges in bringing Lipitor to market.   Lipitor would be the fifth statin available to patients and physicians.   One of Lipitor's biggest challenges was to overcome the perception that it was a "me-too" product. Merck and Bristol-Myers Squibb, the primary incumbents, already had proven products in the market.

191.   Warner-Lambert wanted to employ a "saturation" approach to selling Lipitor, an essential approach because the medical community already had available the drugs to treat high cholesterol.   The intent of the "saturation" strategy was to have as many sales representatives as possible contacting physicians.   As Anthony Wild, Warner-Lambert Pharmaceutical Sector President, explained, "[t]he more soldiers you have out there, the more guns, the more likely you are to achieve your ends."   Warner-Lambert clearly understood that the sales force was a key success factor in any drug's performance, but a 1995 sales force deployment study revealed that the Warner Lambert's sales force was inadequate in size and focus to effectively launch Lipitor.

192.   Warner-Lambert chose Pfizer to help market Lipitor.   Warner-Lambert and Pfizer outgunned the competition with the largest statin sales force ever.   Between Warner-Lambert and Pfizer, more than 2,200 sales representatives were believed to be selling Lipitor at the time of its U.S. launch.

193.   After launching in January 1997, Lipitor reached $1 billion in domestic sales within its first 12 months on the market.   By the end of 1998, Lipitor was available for sale in 50 countries.   Lipitor claimed U.S. market share leadership in the statin drug class in October 1997 with a 30% share of all new statin prescriptions.   Pfizer would later acquire Warner-Lambert.

### G.   **Patent Litigation: Pfizer Sues for Infringement of the '995 Patent to Keep Generics off the Market**

194.    Pfizer used the fraudulently obtained '995 patent to delay entry by at least four

generic manufacturers that sought approval to manufacture and sell generic atorvastatin calcium.

The generic pharmaceutical manufacturers who have filed and are seeking to sell generic

versions of Lipitor and have been sued for infringement of the '995 patent are:  Ranbaxy, Teva

Pharmaceuticals USA, Inc. ("Teva"), Cobalt Pharmaceuticals Inc. ("Cobalt") and Apotex Inc.

("Apotex").  But for the commencement of these actions by Pfizer, generic atorvastatin calcium

would have been available no later than March 24, 2010, that is, upon expiration of the '893

Patent.

> 1.    *Pfizer v. Ranbaxy*, 03-C V-209-JJF

195.    Ranbaxy was the first to file an ANDA for generic atorvastatin.  Ranbaxy was

also the first stymied by Pfizer's sham litigation claiming infringement of the '995 patent.

196.    In early 2003, Ranbaxy filed ANDA 76-477, seeking approval to sell a generic

version of Lipitor.  As the first to file an ANDA for generic atorvastatin calcium, Ranbaxy

acquired the exclusive right to manufacture and sell generic Lipitor for the first six months

following the expiration of relevant, valid Lipitor patents.

197.    On February 28, 2003, Ranbaxy sent two paragraph IV certification letters to

Pfizer with respect to the '893 and '995 patents.  In these letters, Ranbaxy asserted that no valid

patent claims covering Lipitor would be infringed by the sale, marketing, or use of Ranbaxy's

generic product.

198.    On February 21, 2003, Pfizer filed an action against Ranbaxy in the United States

District Court for the District of Delaware alleging infringement of the '893 and '995 patents.

Pfizer alleged Ranbaxy's ANDA amounted to infringement of the '893 and '995 patents.

199.    From 2003 to 2007, the '893 and '995 Ranbaxy infringement litigation progressed

through discovery, a jury-waived trial and an eventual appeal and decision by the United States

56

Court of Appeals for the Federal Circuit.  Multiple factual issues for both the '893 and the '995

patents were litigated as between Ranbaxy and Pfizer.  (Of course, the Plaintiffs here and the

proposed End Payor Class were not parties to that litigation and are not bound by any of the

determinations made in that litigation).[11]

200.    On August 2, 2006, the Federal Circuit reversed the lower court's decision

regarding the '995 patent, determining that claim six of the patent was technically invalid.[12]  The

Federal Circuit did not address the district court's other determinations.  The Federal Circuit

affirmed that Ranbaxy had infringed the '893 patent and upheld that patent's time extension.

The district court confirmed this decision on remand, and granted Pfizer exclusivity for Lipitor

until the expiration of the '893 patent.

201.    In light of the technical ruling by the Federal Circuit on claim 6 of the '995

patent, Pfizer filed with the PTO amendments to the '995 patent in order to correct the technical

nomenclature error that led to the invalidity of claim 6 of the '995 patent.  In light of that

proceeding, Ranbaxy remained foreclosed from entering the market for atorvastatin calcium by

reason of Pfizer's continued assertion of patent protection by the '995 patent.

---

[11] Among the numerous issues litigated before the district court in the jury-waived trial between
Ranbaxy and Pfizer was the early form of the evidence adduced by Ranbaxy regarding
inequitable conduct by Warner-Lambert in the procurement of the '995 patent; on that record as
between those parties, Pfizer prevailed.  The issue of Warner-Lambert's representations
regarding the biological activity of the R-trans enantiomer as compared to its racemate have also
been litigated in other fora worldwide.  There, when addressed after a more fully developed
record, Pfizer lost on the issues relating to the integrity of the "surprising" data for the
enantiomer.

[12] The PTO more recently accepted Pfizer's application to correct a technical defect in claim two
of patent no. 5,273,995, which would presumably repair the invalidity of claim six.  In March
2009, the PTO allowed the reissue of the patent as no. RE40,667, which retained the expiration
date of June 28, 2011.

202.    On March 24, 2008, Pfizer instituted a second action against Ranbaxy, citing the February 28, 2003 letter from Ranbaxy informing Pfizer of Ranbaxy's filing of ANDA 76-477 regarding the '995 patent.  This time, Pfizer's lawsuit focused on the two Process Patents (i.e., the '740 and '511).  As process patents, neither of these patents are listed in the Orange Book and thus the patents do not implicate the usual paragraph certification and statutory stay provisions of the Hatch-Waxman Act.  As a practical matter, neither of these two process patents posed any legitimate threat of infringement to Ranbaxy.  The '995 patent presented the bar to entry.

203.    On June 17, 2008, Ranbaxy and Pfizer settled their differences, but under terms that where themselves anticompetitive.  As more fully set forth later, this unlawful agreement was part of Pfizer's overarching scheme to unlawfully delay the introduction of generic Lipitor until at least November 30, 2011.  And because Ranbaxy was first to file an ANDA for Lipitor, in most circumstances all other generic entrants would need to await Ranbaxy's entry.

204.    But for Warner-Lambert's fraud in procuring the '995 patent, the '995 patent never would have issued.  Furthermore, but for the fraud of Warner-Lambert, Ranbaxy would have entered the market for atorvastatin calcium on or about the end of March of 20l0.  Since Pfizer acquired the fraudulently procured '995 patent, Pfizer was able to use that patent to unlawfully delay Ranbaxy's entry into the market for atorvastatin calcium for a period of at least fourteen months and likely longer.  Moreover, it is likely, absent the ability of later generics to get rapid decisions in patent infringement litigation, that all potential generic entrants will be delayed by reason of Ranbaxy's delay.

      2.    *Pfizer v. Teva*, 07-C V-360 (B. Del. 2007).

205.    On April 24, 2007, pursuant to Hatch-Waxman, Teva notified Pfizer it had filed ANDA 78-773 seeking approval to sell a generic version of Lipitor.  Teva included a Paragraph

IV certification that the '995 patent was invalid, unenforceable, or would not be infringed by Teva's proposed generic product.

206.    On June 7, 2007, Pfizer responded by filing an action in the United States District Court for the District of Delaware against Teva alleging infringement of the '995 patent (excepting claim 6).  As a result of this suit, the parties reached a settlement on July 15, 2009, whereby Teva would not seek approval for its generic product for a certain period of time.

207.    But for Warner-Lambert's fraudulent procurement of the '995 patent, Teva would have entered the market for generic atorvastatin calcium by September of 2010.

3.    *Pfizer v. Cobalt*, 07-CV-790 (D. Del. 2007).

208.    At some time before December of 2007, pursuant to Hatch-Waxman, Cobalt notified Pfizer of its application, seeking FDA approval to market generic atorvastatin, and a Paragraph IV certification that the '995 patent was invalid, unenforceable, or would not be infringed by Cobalt's proposed generic product.

209.    On December 6, 2007, Pfizer filed an action in the United States District Court for the District of Delaware against Cobalt alleging infringement of the '995 patent (excepting claim 6).  In consenting to judgment on May 15, 2008, Cobalt admitted the '995 patent would be infringed by the product proposed in its ANDA.  The consent also restricted the effective date of any approval of NDA 22-245 to be no earlier than the expiration of the '995 patent.

210.    But for Warner-Lambert's fraudulent procurement of '995 patent, Colbalt would have launched a generic formulation of atorvastatin by September of 2010.

4.    *Pfizer v. Apotex*, 08-C V-7231 (N.D. Ill. 2008).

211.    On November 4, 2008, pursuant to Hatch-Waxman, Apotex notified Pfizer of its ANDA 90-548, seeking FDA approval to market atorvastatin calcium, and Paragraph IV

certification that Pfizer's patent nos. 5,273,995, 6,126,971, 5,686,104, and 5,969,156 were

invalid, unenforceable, or would not be infringed by Apotex's proposed generic product.

212.    On December 17, 2008, Pfizer responded by filing an action in the United States

District Court for the Northern District of Illinois, Eastern District, against Apotex alleging

infringement of the '995 Patent.

213.    But for Warner-Lambert's fraudulent procurement of '995 patent, Apotex would

have entered the market for generic atorvastatin calcium by September of 2010.

H.    **Defendants' Scheme to Delay Generic Entry Continues Through the '995 Reissuance Process**

214.    Without Warner-Lambert's fraud on the PTO during the initial prosecution of the

'995 Patent, the '995 Patent never would have issued.  Without the '995 patent's additional

period of protection, generic versions of atorvastatin would have been available on March 24,

2010 when the '893 patent's additional marketing exclusivities expired — marketing

exclusivities that were granted because the '893 patent covered Lipitor.

215.    That Pfizer later went back and sought reissuance on the '995 patent to correct a

technical defect in its claims — claims that were only ever found patentable because of Warner-

Lambert's fraudulent claim that the R-trans enantiomer was ten times more active than the

racemate — cannot change the fact that the '995 patent would never have initially issued but for

Defendant's fraud.  Without the original issuance of the '995 patent, there could be no reissuance

of it.

216.    The reissuance proceedings actually confirm what Warner-Lambert had long

known: the biologic data submitted as part of the application for the '995 patent is false,

inaccurate, incorrect, and riddled with errors.  Throughout the reissue proceedings Pfizer

eschews all reliance on biological data (including CSI data), at one point explicitly acknowledging that the biological data originally used to support patentability was "inaccurate."

217.    Rather than submit any "corrected" biological data, Pfizer takes an entirely new tact: Pfizer argues that Lipitor is entitled to additional protection under the '995 patent because of Lipitor's overwhelming commercial success.  But Pfizer's commercial success argument is no more viable than its "surprising activity" argument was the first time around.

        1.    <u>Defendants Admit the Biologic Data is False</u>

218.    In January 2007, after the Federal Circuit invalidated Claim 6 of the '995 patent on technical grounds, Pfizer sought re-issuance of the '995 patent "to correct a technical defect in some of the patent claims...."

219.    Pfizer knew, as a result of international patent litigation, that it could no longer publicly rely on the falsified biological data Warmer-Lambert had submitted to the PTO back in 1989-1993.  As a result, during the reissuance proceedings Pfizer expressly disavowed reliance on the 1989-1993 biological data, including the data presented in the CSI table and Roth Declaration.

220.    In the absence of Warner-Lambert's original fraud on the PTO, the '995 patent would never have issued.  Without the '995 patent being issued in 1993, no reissue proceeding for a '995 patent in years 2007-2009 would be possible.  As a result, the PTO's eventual decision on these re-issue proceedings is irrelevant to this antitrust and consumer law action.

221.    The reissue proceedings do, however confirm what Defendants had long known: the biologic data submitted as part of the application for the '995 patent is false, inaccurate, incorrect, and riddled with errors.

222.    On January 16, 2007, Roth and Pfizer submitted the Claim 6 '995 patent reissue application.  The applicants did not amend or modify the '995 patent specification as part of the

reissue proceedings.  Roth's remarks include a list of the "objective evidence" that "completely

refutes any suggestion of obviousness."  But now, the list does not include the purported

surprising effectiveness of the R-trans enantiomer or a ten times greater activity of the R-trans

enantiomer than the racemate.

223.    Pfizer's Informational Disclosure Statement eschewing reliance on CSI and COR

biological data states:

> Subsequent to the Federal Circuit's decision, while preparing for
> trial in Australia on a '995 counterpart, Pfizer first learned of
> significant errors in the COR results which neither Pfizer nor the
> parties adverse to it had discovered before.  This discovery led
> Pfizer to advise the Federal Circuit that COR data could not be
> relied on to compare the relative activity of compounds — see
> Exhibit 9, page 10, fn 2.  Thus any earlier reference in Pfizer's
> findings, conclusions and brief to relative activity among
> compounds based on the COR test is withdrawn and is not relied
> on in these reissue proceedings.  Pfizer does not at this point in the
> reissue rely for patentability on any comparisons based on CSI.
> Neither CSI no COR data were relied on by either U.S. court in
> reaching their decisions regarding the validity of '995 claim 6.

Pfizer similarly states, "Pfizer does not now rely on any . . . data [comparing between and among

calcium salts and other salts of atorvastatin and its racemates] in support of patentability."

224.    On June 7, 2007, Defendants submitted a Second Informational Disclosure

Statement that discusses "Foreign Proceedings on '995 Counterparts" and attached additional

materials produced as part of certain non-U.S. proceedings.  Pfizer acknowledges therein that the

biological data submitted in support of its patent applications — in the CSI Table, the Roth

Declaration, and the foreign '995 counterparts — is inaccurate:

> [A]pplicant is submitting these documents to permit the Examiner
> to consider their potential materiality.  Further, many of these
> documents ... contain biological data or summaries of biological
> data, and some of that biological data is now understood to be
> inaccurate (due to transcription errors, calculation errors,
> experimental errors, etc.).  Applicant is not submitting corrected
> biological data at the present time because, as applicant has

emphasized repeatedly in these reissue proceedings, applicant is
not currently relying on the biological data for patentability.

225.    Elsewhere in the reissue proceedings, Roth and Pfizer refer to the biological data

at issue in the Australian and Canadian patent litigation as "biologic data that Pfizer then argued

showed that the atorvastatin enantiomer had unexpected and surprising inhibition of cholesterol

biosynthesis in-vitro in comparison to the racemic form of atorvastatin," while reiterating that

they "are not relying on any of the biological data as a basis for the patentability of the pending

claims at the present time."  Similarly, Roth and Pfizer state, "[a]pplicant is not submitting

corrected biological data at the present time because, as applicant has emphasized repeatedly in

these reissue proceedings, applicant is not currently relying on the biological data for

patentability."

226.    At one point during the reissue proceedings, the examiner relied on the biological

data to overcome an obviousness rejection:

> Claims 6, 13 and 14 have not been rejected as being obvious as the
> declaration of Bruce D. Roth filed February 25, 1991 discloses
> unexpected properties which would overcome any 35 USC 103(a)
> rejection of claims 6, 13 and 14 as atorvastatin calcium was shown
> to have activity greater than fifty-fold more than that of the S-trans
> and at least ten-fold more than that of the racemate.

227.    In response, Pfizer reiterated that it was "not presently relying on any of the

biological data (including the data contained in the Roth Declaration) as support for the

patentability of claims 6, 13 and 14."  Pfizer acknowledged that the examiner relied on the Roth

Declaration and asked her to "withdraw her reliance on the data in the Roth Declaration" and

focus on Pfizer's new argument: that it was entitled to additional patent protection based on

Lipitor's commercial success.

228.    On April 24, 2008, the PTO issued a non-final rejection of claims 6, 13, and 14.

In so doing, the Examiner formally withdrew her reliance on the Roth Declaration.  Instead, the

Examiner relied on secondary considerations identified by the Applicants, namely Lipitor's commercial success.

229.    On April 6, 2009, the PTO reissued claims 6, 13, and 14 of the '995 patent as RE 40,667 ("'667 patent").

       2.    <u>Lipitor's Commercial Success Has No Bearing on Whether the Invention Claimed by the '995 Patent is Obvious</u>

230.    The PTO based its ruling to grant the re-issuance of the '995 patent not on the basis of the biological studies and representations made by Warner-Lambert (even though a version of the CSI assay data remains in the specification for the patent), but instead on Pfizer arguments that the commercial success of Lipitor shows that the '995 patent could not have been obvious.

231.    Pfizer's argument that Lipitor's commercial success means that the invention claimed in the '995 Patent could not be obvious over the '893 patent was emphatically wrong as a matter of fact and law.

232.    First, Lipitor was commercially successful during the 1997-2010 time period, a time period during which it enjoyed patent protection under both the '893 patent and the '995 patent.  Lipitor was not commercially successful while enjoying patent protection solely under the '995 patent.  Since the question of obviousness at issue is whether or not the '995 Patent is obvious when compared to the '893 patent, the fact that Lipitor, which is covered by both patents, has been commercially successful generally, provides no meaningful information at all in terms of the distinctions between the two patents.

233.    Second, Pfizer's "commercial success" of Lipitor argument is a claim about Lipitor's success when compared to other statins, or in terms of growing overall statin use. When Pfizer boasts about Lipitor being the most successful pharmaceutical of all time, or of

Lipitor gaining the largest market share amongst all statins, the comparisons are between Lipitor and other statins, or to the growing of the statin market generally.  But the issue of obviousness here is not a comparison of Lipitor to other statins, or of Lipitor to growing statin use.  Instead, here the correct issue of patent obviousness is whether or not the invention under the '995 patent would have been successful as compared to an invention under the '893 patent.  However, because both the '893 and '995 patents cover the same product, looking to Lipitor's general success, or its success compared to other statins, provides no elucidation whatsoever as to whether the '995 patent is obvious as compared to the '893 patent.  To have any kind of a meaningful "commercial success" information that relates to the pertinent patent question, there must be a comparison of an invention under the '995 patent as compared to a different invention under the '893 patent.  There is none.

234.    In summary, Pfizer and its predecessors obtained, by actual fraud, the '995 patent. If that actual fraud had not been committed during the prosecution for the '995 patent back between 1989 and 1993, the '995 patent simply would not exist, and no other argument could or would have been made whether or not the '995 patent was legitimate.

235.    Without the '995 patent, generic makers, many of whom filed their ANDAs quite long ago, would have entered the market for generic atorvastatin calcium in March of 2010. Pfizer and its predecessors have unlawfully foreclosed the market for generic versions of Lipitor. Upon market entry of generic Lipitor, it is estimated that U.S. consumers, the government, and TPPS could save between $10.0 million and $18.6 million per day, or roughly $3.97 billion to $6.8 billion in potential savings a year.

> 3.    <u>Pfizer and Ranbaxy Conspire to Divide Markets and Cause Reissuance of the '995 Patent</u>

236.    After years of litigation, and in the context of the ongoing reissuance and Process

Patents battles, Pfizer and Ranbaxy capitalized on the opportunity to ostensibly resolve the pending disputes through arrangements which were themselves independently unlawful and anticompetitive.

237.    Back in August 2002, Ranbaxy (the largest pharmaceutical manufacturer in India) had been the first to file an ANDA for U.S. sales of generic atorvastatin calcium, and it was the first to make paragraph IV certifications as to all five patents listed at that time—the '893, '995, '104, '156, and '971 patents.  In 2003, Pfizer had sued Ranbaxy only for infringement of the '893, and the '995 patents.  See *Pfizer Inc. v. Ranbaxy Laboratories Ltd.*, 03-cv-209 (D. Del. 2003).

238.    Because it was the first to file an ANDA with paragraph IV certification for each listed patent, the Hatch-Waxman Act afforded Ranbaxy a 180-day exclusivity period to sell a generic version of Lipitor beginning on the earlier of (1) the date that of first commercial marketing of the drug, or (2) for each listed patent, on the date of a final court judgment declaring that patent invalid, unenforceable, or not infringed.  During this 180-day exclusivity period, no other drug manufacturer can market a generic Lipitor product, with the exception of an authorized generic.

239.    Because Pfizer listed the '104 and '971 patents in the Orange Book but did not file patent infringement suits against any generic ANDA filers who submitted paragraph IV certifications to those patents, Pfizer was able to ensure that (1) Ranbaxy's first-to-file exclusivity would not be triggered by a court decision, and (2) Pfizer could prevent the launch of all other generics for an indefinite period by entering into an anticompetitive agreement with Ranbaxy whereby Ranbaxy agrees to delay the launch of its generic product.

96623

240.    Ranbaxy's first-to-file exclusivity has never been triggered because (1) Ranbaxy

has not yet begun to market its product, and (2) no court decision of non-infringement or

invalidity had been issued with respect to the '104, '156, and '971 patents.

241.    Because Pfizer did not list the Process Patents in the Orange Book, those patents

were never included in any generic manufacturers' paragraph IV certification.  Pfizer could not

obtain the Hatch-Waxman 30-month stay by bringing an infringement claim on these patents.

242.    Ranbaxy and one other generic manufacturer, Mylan Pharmaceuticals Inc., were

the only companies that Pfizer ever brought infringement actions against for the Process Patents.

The lawsuit against Mylan was settled before the Court could make any substantive ruling on

either Process Patent, and the terms of the settlement have not been publicly disclosed.

243.    During the Ranbaxy action, Pfizer moved for leave to amend its pleadings to add

claims, under 35 USC §271(g), that Ranbaxy had also intended to infringe the Process Patents.

Pfizer requested a declaratory judgment of infringement under 28 USC § 2201.  Ranbaxy

opposed Pfizer's motion to add the Process Patent claims, arguing that Pfizer had not made a

sufficient allegation of immediacy and reality to establish the existence of an actual controversy

(D.I. 44).

244.    In an opinion issued in April 2004, the Ranbaxy Court agreed with Ranbaxy,

stating that, "because of the uncertainty surrounding Ranbaxy ANDA efforts, Pfizer's attempt to

join claims under its '511 and '740 patents by invoking the Declaratory Judgment Act, 28 U.S.C.

§2201, are premature."  The Court further found that "waiting for any claims involving

Ranbaxy's manufacturing process to mature so that such claims comport with the immediacy and

reality standard will not prejudice Pfizer in any way" (D.I. 139).

245.    After the 2005 bench trial and the August 2006 Federal Circuit ruling, Pfizer's

patent protection for Lipitor had been shortened from June 28, 2011 (derived from the

96623

invalidation of claim 6 of the '995 patent) to March 24, 2010, the expiration date for the '893 patent.

246.    In January 2007 when Pfizer filed the '995 patent reissue application, it sought to extend patent protection for Lipitor until June 28, 2011 (the expiry of the '995 patent which was then rendered invalid).

247.    In May 2007, Ranbaxy filed a protest with the PTO against Pfizer's reissue application.

248.    In August 2007, the PTO issued a First Office Action rejecting Pfizer's reissue application on grounds set forth in Ranbaxy's protest—that certain claims in the '995 patent were anticipated, obvious, or constituted double-patenting.

249.    Pfizer then filed a response to the PTO's initial Office Action, which was again rejected by the PTO in April 2008.

250.    Consequently, Ranbaxy intended to enter, and could have entered, the market with its generic immediately after March 24, 2010.

251.    On March 24, 2008, nearly five years after it first attempted to attach the process patents to the Ranbaxy case, and knowing that a court had already ruled that it lacked standing under 28 U.S.C. §2201 and 2208, Pfizer again sued Ranbaxy for declaratory judgment of infringement of the Process Patents on the same grounds as those on which it based its original motion to amend the Ranbaxy case pleadings.  See *Pfizer Inc. v. Ranbaxy Laboratories Ltd.*, 08-cv-164 (D. Del. 2008) (D.I. 1, ¶¶ 31, 41).

252.    Ranbaxy moved to dismiss for lack of subject matter jurisdiction arguing that the final judgment in the Ranbaxy case, which permanently enjoined Ranbaxy from engaging in the manufacture, use, offer to sell or sale of its generic version of Lipitor until the expiration of the '893 patent, made "any harm to Pfizer from alleged infringement of the '511 and '740 patents

68

much less imminent now than in the [Ranbaxy] case when the Court found no imminent threat of harm or injury." (D.I. 10 at 9).

253.    The court never had an opportunity to make a substantive ruling on Ranbaxy's motion to dismiss because on June 18, 2008, the parties filed a consent order resolving the lawsuit.  (D.I. 19).  The consent order referred to an agreement between Pfizer and Ranbaxy, dated June 17, 2008, "pursuant to which the parties have resolved this action and Pfizer has granted Ranbaxy certain rights to its portfolio of patents relating to atorvastatin." (the "Agreement") *Id*.

254.    On or about June 18, 2008, Pfizer publicly announced that it had entered into the Agreement with Ranbaxy to settle the Ranbaxy Case. Ranbaxy also publicly announced the agreement on June 18, 2008.

255.    In its press release announcing the agreement, Pfizer represented that the agreement was, *inter alia*, "pro-patient" and "pro-competitive" and that "the settlement complies with all applicable laws."  Pfizer's representations that the agreement would benefit consumers, promote competition and was lawful are false, deceptive and misleading.

256.    Defendants represented, directly or by implication, that the agreement was lawful and failed to disclose material facts, including their conduct as described in this Complaint, including without limitation Pfizer's fraudulent conduct in obtaining the follow-on patent, Pfizer's actions in delaying the entry of generic forms of Lipitor, the market allocating nature and terms of the agreement, and the effect of Defendants' conduct in maintaining supracompetitive pricing for Lipitor and preventing and delaying the entry of lower priced generics.

257.    As of the date of the Agreement, Ranbaxy's 180-day exclusivity period with respect to the '995 patent had been triggered and had expired, and its 180-day exclusivity period

with respect to the '893 patent was set to automatically terminate on the expiration of that patent on March 24, 2010.

258.    As of the date of the Agreement, there was no Hatch-Waxman impediment that would have prevented a generic Lipitor launch by Ranbaxy, whether independently or in association with another manufacturer, on or after March 24, 2010.

259.    And as of the date of the Agreement, the only means by which Pfizer could have prevented a launch by Ranbaxy on or after March 24, 2010 was by seeking an injunction.  As far as Pfizer knew in 2008, obtaining such an injunction would have required a showing that Pfizer was likely to succeed on the merits of patent infringement claims that it had never previously asserted against Ranbaxy.

260.    As additional consideration, under the terms of the Agreement, Ranbaxy was given a license to sell generic versions of Lipitor in the United States, effective November 30, 2011 — twenty months after the then-sole-principal and valid patent on Lipitor (the '893 patent) would have expired and Ranbaxy would have otherwise been able to sell its generic.  Ranbaxy was also given a license to sell generic versions of Lipitor on varying dates in several additional countries.

261.    Under the Agreement, Pfizer forgave debts owed by Ranbaxy flowing from a court judgment or judgments Pfizer won against Ranbaxy on infringement claims unrelated to the Lipitor patents.

262.    The Agreement further provided that Ranbaxy would refrain from any further challenges to the validity of patents related to Lipitor, including the reissue application for the '995 patent then pending before the PTO.

263.    In January 2009, the PTO, without any objection by Ranbaxy, issued a Notice of Allowance accepting Pfizer's application for the '995 patent and reissuing the same as the '667

70

patent.  This Notice of Allowance extended Pfizer's patent protection for Lipitor until June 28, 2011.  The notice would not have issued had Ranbaxy maintained its protest — since there were no logical grounds to grant the application, Pfizer's sophistry to the PTO (regarding the irrelevant observations about the commercial success of Lipitor) would have been disclosed as lacking all merit.

264.    By delaying Ranbaxy's generic version of Lipitor in the United States — which, in the absence of the Agreement, would have been sold lawfully as early as March 24, 2010 (but in no event later than the expiration of the '995 patent on June 28, 2011) — Pfizer was able to sell Lipitor exclusively for up to 20 additional months, resulting in extra sales of Lipitor worth approximately $10 billion dollars.  In return, Pfizer granted Ranbaxy the right to distribute a generic substitute for Lipitor in foreign markets earlier than it would have been able to do so otherwise.

265.    The Agreement denied Plaintiffs and the End Payor Class access to a generic substitute for Lipitor in the United States for up to 20 months following the expiration of the '893 patent.  Consequently, Lipitor end payors in the United States have paid and continue to pay inflated prices for Lipitor.

266.    The Agreement between Defendants, which artificially extended Pfizer's exclusivity in the domestic atorvastatin calcium market, allocated markets between the Defendants, artificially postponed price reductions, and restrained trade in the provision of Lipitor and its generic alternatives, is a violation of the various state laws set forth below.

267.    The Agreement between Pfizer and Ranbaxy is an agreement to divide markets in that Ranbaxy agreed that it would not sell its generic in the United States until November 2011 in exchange for being able to sell in other countries.

71

268.    The Agreement between Pfizer and Ranbaxy is an agreement to fix prices in that Pfizer would be able to charge many times more for Lipitor than it would otherwise have been able to charge in the absence of the unlawful agreement.

269.    The Agreement between Pfizer and Ranbaxy is a combination to monopolize, an attempt to monopolize, and monopolization in that the Agreement unlawfully extends Pfizer's exclusivity in the domestic atorvastatin calcium market, excludes competition by other generics, and fixes the price of both the generic and branded versions of Lipitor.

270.    The Agreement between Pfizer and Ranbaxy is alleged to restrain trade in that Pfizer allows Ranbaxy to sell generic Lipitor in countries other than the United States so long as it does not sell generic Lipitor in the United States, and forgives judgment debts that Ranbaxy owes to Pfizer as a result of unrelated patent disputes between the Defendants.

271.    The Agreement between Pfizer and Ranbaxy is an abuse of the Hatch-Waxman Act in that it unlawfully delays the start of Ranbaxy's period of exclusivity and Ranbaxy agreed to misuse its exclusivity to delay other generic competitors from entering the market with their generic Lipitor products.

272.    The Process Patent litigation was a sham designed to create the false impression to outsiders that Ranbaxy had incentive to enter into the Agreement with Pfizer in order to avoid potential damages resulting from losing that litigation when, in fact, there was no real case or controversy and, consequently, Ranbaxy faced no real risk.

273.    The Agreement meant that purchasers would continue to pay higher branded pharmaceutical prices for Lipitor longer than necessary.

274.    The Agreement between Defendants extending the length of the Lipitor patents constitutes fraudulent procurement and enforcement of a patent in violation of the various state laws set forth below

96623

275.    The Agreement between Defendants constitutes a market allocation agreement between competing providers of Lipitor and its generic equivalent to illegally restrain trade in violation of the various state laws set forth below.

## VI.    EFFECT ON INTERSTATE COMMERCE

276.    Defendants' conduct in unlawfully monopolizing and restraining trade and competition in the market for atorvastatin calcium have substantially affected interstate and foreign commerce.

277.    During the relevant time period, Pfizer manufactured, promoted, distributed, and sold substantial amounts of branded Lipitor in a continuous and uninterrupted flow of commerce across state and national lines and throughout the United States.  Beginning around November 30, 2011, Ranbaxy did the same with respect to generic Lipitor.

278.    During the relevant time period, Pfizer transmitted funds as well as contracts, invoices and other forms of business communications and transactions in a continuous and uninterrupted flow of commerce across state and national lines in connection with the sale of branded Lipitor.  Beginning around November 30, 2011, Ranbaxy did the same with respect to generic Lipitor.

279.    In furtherance of their successful efforts to monopolize and restrain competition in the market for atorvastatin calcium, Defendants employed the United States mail and interstate and international telephone lines, as well as means of interstate and international travel.  The activities of Defendants were within the flow of and have substantially affected interstate commerce.

280.    Defendants' unlawful conduct had substantial and significant intrastate effects in each state because Lipitor was sold to consumers and third-party payors in each state and Defendants entered into an unlawful agreement which affected commerce in each state.

73

## VII.    EFFECT ON INTRASTATE COMMERCE

281.    During the relevant time period, branded Lipitor, manufactured and sold by Pfizer, was shipped into each Class state and was sold to or paid for by End Payors.  Beginning around November 30, 2011, generic Lipitor, manufactured and sold by Ranbaxy, shipped into each Class state and was sold to or paid for by End Payors.

282.    During the relevant time period, in connection with the purchase and sale of branded Lipitor, money and business communication and transactions occurred in each Class state.  Beginning around November 30, 2011, in connection with the purchase and sale of generic Lipitor, money and business communication and transactions occurred in each Class state.

283.    Defendants' conduct as set forth in this Complaint had substantial effects on intrastate commerce in each Class state.

## VIII.   MONOPOLY POWER AND MARKET DEFINITION

284.    At all relevant times, Pfizer had monopoly power over Lipitor and its generic equivalents because it had the power to maintain the price of Lipitor at supracompetitive levels without losing substantial sales.

285.    A small but significant, non-transitory price increase of Lipitor by Pfizer would not have caused a significant loss of sales.

286.    Lipitor does not exhibit significant, positive cross-elasticity of demand with respect to price, with any product other than AB-rated generic versions of Lipitor.

287.    Because among other reasons, its use and varying ability to inhibit the production of cholesterol, Lipitor is differentiated from all products other than AB-rated generic versions of Lipitor.

288.    Pfizer needed to control only Lipitor and its AB-rated generic equivalents, and no other products, in order to maintain the price of Lipitor profitably at supracompetitive prices.

74

Only the market entry of a competing, AB-rated generic version of Lipitor would render Defendant Pfizer unable to profitably maintain its supracompetitive prices of Lipitor without losing substantial sales.

289.   Pfizer also sold Lipitor at prices well in excess of marginal costs, and in excess of the competitive price, and enjoyed high profit margins.

290.   Pfizer has had and has exercised the power to exclude competition to Lipitor.

291.   Pfizer at all relevant times enjoyed and through its conduct increased the high barriers to entry with respect to branded and generic Lipitor.

292.   To the extent that Plaintiffs are legally required to prove monopoly power circumstantially by first defining a relevant product market, Plaintiffs allege that the relevant market is all atorvastatin calcium products — i.e., Lipitor (in all its forms and dosage strengths) and AB-rated bioequivalent atorvastatin calcium products.  During the period relevant to this case, Pfizer has been able to profitably maintain the price of Lipitor well above competitive levels.

293.   The relevant geographic market is the United States or alternatively each state in the Class.

294.   Defendants' market share in the relevant market was 100% at all times.

## IX.    MARKET EFFECTS

295.   The acts and practices of Pfizer, and then later Ranbaxy with it, had the purpose and effect of restraining competition unreasonably and injuring competition by protecting Lipitor from generic competition through implementation of Defendants' unlawful anticompetitive conduct detailed in this Complaint.  Defendants' actions allowed Defendants to maintain a monopoly and exclude competition in the market for Lipitor and its AB-rated generic equivalents, to the detriment of Plaintiffs and all other members of the End Payor Class.

96623

296.    Defendants' exclusionary conduct has delayed generic competition and unlawfully enabled Defendants to sell Lipitor without generic competition.  But for Defendants' illegal conduct, one or more generic competitors would have begun marketing AB-rated generic versions of Lipitor much sooner than they actually will be marketed, and, at all events, would have been on the market no later than March 24, 2010.

297.    The generic manufacturers seeking to sell generic Lipitor had extensive experience, capability, resources and expertise in the pharmaceutical industry, including in obtaining approval for ANDAs and marketing generic pharmaceutical products and had taken affirmative steps to enter the market, including without limitation the filing of ANDAs with the FDA and were otherwise prepared and planned to enter the market.

298.    Defendants' illegal acts to delay the introduction into the U.S. marketplace of any generic version of Lipitor caused Plaintiffs and the Class to pay more than they would have paid for atorvastatin calcium products, absent Defendants' illegal conduct.

299.    Typically, generic versions of brand-name drugs are initially priced significantly below the corresponding reference listed drug ("RLD") branded counterpart to which they are AB-rated.  As a result, upon generic entry, end payor purchases of branded drugs are rapidly substituted for generic versions of the drug for some or all of their purchases.  As more generic manufacturers enter the market, prices for generic versions of a drug predictably plunge even further because of competition among the generic manufacturers, and, correspondingly, the brand name drug continues to lose even more market share to the generics.  This price competition enables all end payor purchasers of the drugs to: (a) purchase generic versions of a drug at substantially lower prices, and/or (b) purchase the brand name drug at a reduced price.  Consequently, brand name drug manufacturers have a strong financial interest in delaying the

96623

onset of generic competition, and purchasers experience substantial cost inflation from that delay.

300.    Not surprisingly, in the short time generic versions of Lipitor have been available on the market, this precise sequence of events has in fact occurred.  Fewer than 60 days after generic versions of Lipitor were finally made available, Pfizer's share of the U.S. market had already plummeted to approximately 37%.  There is little doubt that this share will continue to decline, despite Pfizer's current efforts to stem the tide by offering end payors, like Plaintiffs and their beneficiaries and plan participants, a $4 co-pay card for a month's supply.

301.    If generic competitors had not been unlawfully prevented from earlier entering the market and competing with Defendants, end payor purchasers, such as Plaintiffs and members of the Class, would have paid less for atorvastatin calcium by (a) substituting purchases of less expensive AB-rated generic Lipitor for their purchases of more-expensive branded Lipitor, (b) receiving discounts on their remaining branded Lipitor purchases, and (c) purchasing generic Lipitor at lower prices sooner.

302.    Moreover, due to Defendants' conduct, other generic manufacturers were discouraged from and/or delayed in developing and selling generic versions of Lipitor.

303.    Thus, Defendants' unlawful conduct deprived Plaintiffs and the Class of the benefits of robust, honest competition that antitrust and consumer laws were designed to ensure.

## X.    ANTITRUST IMPACT

304.    During the relevant period, Plaintiffs and members of the Class purchased and/or paid for substantial amounts of Lipitor from Pfizer and of generic Lipitor.  As a result of Defendants' illegal conduct, members of the Class were compelled to pay, and did pay, artificially inflated prices for their atorvastatin calcium requirements.  Those prices were substantially greater than the prices that members of the Class would have paid absent the illegal

77

conduct alleged herein, because: (1) the price of brand-name Lipitor was artificially inflated by Defendants' illegal conduct and/or (2) Class members were deprived of the opportunity to purchase lower-priced generic versions of Lipitor sooner.

305.    Moreover, the Defendants' conspiracy to fix, raise, maintain, and/or stabilize the prices of branded Lipitor and generic Lipitor at supracompetitive levels resulted in harm to Plaintiffs and Class members. The entire overcharge for the branded Lipitor and generic Lipitor at issue was passed on to Class members and is readily identifiable and quantifiable. As a result, Plaintiffs and Class members paid higher prices than they would have in the absence of the Defendants' unlawful conduct.

306.    As two noted antitrust scholars – Professors Robert G. Harris (Professor Emeritus and former Chair of the Business and Public Policy Group at the Haas School of Business at the University of California at Berkeley) and Lawrence A. Sullivan (former Professor of Law Emeritus at Southwestern Law School and author of the Handbook of the Law of Antitrust) – have observed, "in a multiple-level chain of distribution, passing on monopoly overcharges is not the exception; it is the rule."

307.    Defendants' anticompetitive actions forced Plaintiffs and Class members, both end users and third party payors, to pay or reimburse for prices in excess of what they otherwise would have paid or reimbursed for absent the unlawful actions of Defendants.

308.    Wholesalers and retailers passed on the inflated prices of branded Lipitor and its generic version to Plaintiffs and Class members.

309.    That these prices were inflated was a direct and foreseeable result of Pfizer's anticompetitive conduct both as a monopolist and in conspiring with and entering into an unlawful market allocation agreement with Ranbaxy as part of Defendants' anticompetitive scheme to prevent and delay the entry of generic Lipitor.

78

96623

310.     The artificially inflated prices that Plaintiffs and Class members paid are traceable to, and the foreseeable result of, the overcharges by Defendants.  As a consequence, Plaintiffs and members of the Class have sustained substantial losses and damage to their business and property in the form of overcharges.  The specific amounts of damages have not yet been determined because such determination will require discovery. Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supracompetitive charge passed-through the chain of distribution to indirect purchasers such as Plaintiffs and Class members.

311.     The full amount and forms and components of such damages will be calculated after discovery and upon proof at trial.

## XI.     CLASS ACTION ALLEGATIONS

312.     Plaintiffs, individually and on behalf of themselves and all Class members, seek damages, measured as overcharges, trebled, against Defendants based on allegations of anticompetitive conduct in the market for Lipitor and AB-rated generic equivalents.

313.     Plaintiffs bring this action on behalf of themselves and, under Fed. R. Civ. P. 23, as representatives of a Class defined as follows:

> All persons or entities in Arizona, Arkansas, California, the District of Columbia, Florida, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Puerto Rico, Rhode Island, South Dakota, Tennessee, Vermont, West Virginia and Wisconsin who, as end payors or third-party payors, indirectly purchased, paid for and/or  reimbursed for Lipitor and/or AB-rated equivalents in any form  from any of the Defendants at any time during the period from March 25, 2010 through and until the anticompetitive effects of Defendants' conduct cease (the "Class Period").

314.     For purposes of the Class definition, persons and entities "purchased," "paid for" or "reimbursed for" Lipitor and/or AB-rated equivalents if they paid for, or reimbursed someone who paid, some or the entire purchase price.  Excluded from the Class are (i) Defendants and

79

their officers, directors, management, employees, subsidiaries, or affiliates, and all governmental

entities (except for government funded employee benefit plans); (ii) all persons or entities who

purchased Lipitor or its generic equivalent for purposes of resale or directly from a Defendant

solely to the extent of such purpose for resale or as a direct purchase; (iii) insured individuals

covered by plans imposing a flat dollar co-pay that is the same dollar amount for generic as for

brand drug purchases; (iv) fully insured health plans (i.e., plans that purchase insurance from

another third-party payor covering 100% of the plan's reimbursement obligations to its

members); (v) insured individuals who purchase only generic Lipitor (and not branded Lipitor)

and whose health plans imposed a flat dollar co-pay applicable to generic drugs; (vi) all judges

presiding in this case; and (vii) all counsel of record.

315.    Members of the End Payor Class are so numerous that joinder is impracticable.

Plaintiffs believe that the Class numbers in the thousands.  Further, Class members can readily

identify themselves by reference to their medical and pharmacy records.

316.    Plaintiffs' claims are typical of the claims of the End Payor Class.  Plaintiffs and

all members of the Class were damaged by the same wrongful conduct of Defendants, i.e., they

paid artificially inflated prices for atorvastatin calcium and were deprived of the benefits of

competition from cheaper generic versions of Lipitor as a result of Defendants' wrongful

conduct.

317.    Plaintiffs will fairly and adequately protect and represent the interests of the End

Payor Class.  The interests of the Plaintiffs are coincident with, and not antagonistic to, those of

the End Payor Class.

318.    Plaintiffs are represented by counsel who are experienced and competent in the

prosecution of class action antitrust litigation, and have particular experience with class action

antitrust litigation involving pharmaceutical products and in class action consumer law litigation.

96623

319.     Questions of law and fact common to the members of the End Payor Class predominate over questions that may affect only individual Class members. Defendants have acted on grounds generally applicable to the entire End Payor Class thereby making overcharge damages with respect to the End Payor Class as a whole appropriate.  Such generally applicable conduct is inherent in Defendants' wrongful conduct.

320.     Questions of law and fact common to the End Payor Class include:

a.     whether Defendants willfully obtained and/or maintained monopoly power over Lipitor and its generic equivalents;

b.     whether Defendants improperly listed the '995 patent in the Orange Book;

c.     whether Defendants unlawfully excluded competitors and potential competitors from the market for Lipitor and its AB-rated generic bioequivalents;

d.     whether Defendants unlawfully delayed or prevented generic manufacturers from coming to market in the United States;

e.     whether Defendants maintained monopoly power by delaying generic entry;

f.     whether the law requires definition of a relevant market when direct proof of monopoly power is available, and if so the definition of the relevant market;

g.     whether the agreement between Pfizer and Ranbaxy is anticompetitive and unlawful including as an unreasonable restraint of trade, the willful acquisition or maintenance of monopoly power and/or otherwise in violation of state antitrust and consumer laws;

h.     whether, and to what extent, Defendants' conduct caused antitrust injury (i.e., overcharges) to Plaintiffs and the members of the Class; and

i.     the quantum of aggregate overcharge damages to the Class.

321.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy.  Such treatment will permit a large number of similarly situated persons to

81

prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs any potential difficulties in management of this class action.

322.    Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## XII.   CLAIMS FOR RELIEF

### A.      CLAIMS UNDER ARIZONA STATE LAW

323.    Plaintiffs incorporate by reference all preceding and succeeding allegations in this Complaint.

324.    During the Class Period and at all other relevant times, Defendant Pfizer possessed nationwide monopoly power in the market for Lipitor and atorvastatin products, including within Arizona.

325.    Defendants' conduct affected trade and commerce in Arizona, harming End Payors located therein.

326.    Defendants violated Arizona's state antitrust law, Arizona Uniform State Antitrust Act, Ariz. Revised Stat. §§ 44-1401, *et seq.,* by virtue of the scheme and conduct alleged herein. Defendant Pfizer orchestrated and implemented this unlawful scheme to delay generic entry by (i) obtaining, through fraud, a follow-on patent for Lipitor, (ii) listing that patent in the FDA Orange Book in order to block generic entry, (iii) filing sham, baseless litigation on this follow-on patent and other process patents known to have no merit, and (iv) entering into an agreement and conspiring with the first potential generic entrant, Defendant Ranbaxy, in order to delay

82

entry into, and allocate the market for, atorvastatin.  Defendants' unlawful conduct delayed and continues to delay access to less expensive generic alternatives, resulting in Plaintiffs and the End Payor Class paying billions of dollars in overcharges for Lipitor than they would have paid absent Defendants' anticompetitive scheme.

327.    As a result of the conduct alleged herein, End Payors within Arizona suffered injury in fact and lost money and/or property.

328.    Defendants violated Arizona's Consumer Fraud Act, Ariz. Rev. Stat. § 44-1522, *et seq.*, by virtue of the scheme and conduct alleged herein.  Specifically, (a) Defendants' conduct is unfair in that (i) it produces substantial injury in the form of higher prices for critical drugs, (ii) the injury is not outweighed by any countervailing benefit to End Payors or competition, and (iii) the injury is not reasonably avoidable by End Payors; (b) but for Defendants' conduct, End Payors in Arizona would not have otherwise purchased Lipitor at supracompetitive prices and  instead would have been able to purchase lower-priced generic atorvastatin products; and (c) as a result of Defendants' conduct, Arizona End Payors have suffered injury in fact by virtue of injury to their business or property.

329.    The intended and actual effect of Defendants' illegal acts was to delay the introduction of generic formulations of Lipitor into the market, thereby unlawfully extending Defendant Pfizer's monopoly in that market and enabling it to continue charging supracompetitive prices to End Payors in Arizona.  But for Defendants' conduct, generic competition would have resulted in lower prices for Lipitor, as well as the availability of lower-priced generic atorvastatin products, within Arizona.  Thus, as a result of the conduct alleged herein, End Payors within Arizona suffered injury in fact and lost money and/or property.   Such injuries were not secondary, consequential or remote as they would not have occurred but for Defendants' conduct and, therefore, were proximately caused thereby.

96623

330.    Plaintiffs and the Class seek treble damages as permitted for their injuries from Defendants' violations of the Arizona Consumer Fraud Act, and restitution as permitted for Defendants' violations of the same.

B.    **CLAIMS UNDER ARKANSAS STATE LAW**

331.    Plaintiffs incorporate by reference all preceding and succeeding allegations in this Complaint.

332.    During the Class Period and at all other relevant times, Defendant Pfizer possessed nationwide monopoly power in the market for Lipitor and atorvastatin products, including within Arkansas.

333.    Defendants' conduct affected trade and commerce in Arkansas, harming End Payors located therein.

334.    Defendants violated Arkansas' Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-101, et seq., by virtue of the scheme and conduct alleged herein.

335.    Specifically, (a) Defendants' conduct is unfair in that (i) it produces substantial injury in the form of higher prices for critical drugs, (ii) the injury is not outweighed by any countervailing benefit to End Payors or competition, and (iii) the injury is not reasonably avoidable by End Payors; (b) but for Defendants' conduct, End Payors in Arkansas would not have otherwise purchased Lipitor at supracompetitive prices and  instead would have been able to purchase lower-priced generic atorvastatin products; and (c) as a result of Defendants' conduct, Arkansas End Payors have  suffered injury in fact by virtue of injury to their business or property.

336.    The intended and actual effect of Defendants' illegal acts was to delay the introduction of generic formulations of Lipitor into the market, thereby unlawfully extending Defendant Pfizer's monopoly in that market and enabling it to continue charging

84

supracompetitive prices to End Payors in Arkansas.  But for Defendants' conduct, generic

competition would have resulted in lower prices for Lipitor, as well as the availability of lower-

priced generic atorvastatin products, within Arkansas.  Thus, as a result of the conduct alleged

herein, End Payors within Arkansas suffered injury in fact and lost money and/or property.

Such injuries were not secondary, consequential or remote as they would not have occurred but

for Defendants' conduct and, therefore, were proximately caused thereby.

337.    Plaintiffs and the Class seek damages as permitted for their injuries from

Defendants' violations of Arkansas' Deceptive Trade Practices Act and restitution as permitted

for Defendants' violations of the same.

### C.    CLAIMS UNDER CALIFORNIA STATE LAW

338.    Plaintiffs incorporate by reference all preceding and succeeding allegations in this

Complaint.

339.     During the Class Period and at all other relevant times, Defendant Pfizer

possessed nationwide monopoly power in the market for Lipitor and atorvastatin products,

including within California.

340.    Defendants' conduct affected trade and commerce in California, harming End

Payors located therein.

341.    Defendants violated California's state antitrust laws, Cal. Bus. & Prof. Code §§

16700, *et seq*. (the "Cartwright Act"), by virtue of the scheme and conduct alleged herein.

Defendant Pfizer orchestrated and implemented this unlawful scheme to delay generic entry by

(i) obtaining, through fraud, a follow-on patent for Lipitor, (ii) listing that patent in the FDA

Orange Book in order to block generic entry, (iii) filing sham, baseless litigation on this follow-

on patent and other process patents known to have no merit, and (iv) entering into an agreement

and conspiring with the first potential generic entrant, Defendant Ranbaxy, in order to delay

entry into, and allocate the market for, atorvastatin.  Defendants' unlawful conduct delayed and

continues to delay access to less expensive generic alternatives, resulting in Plaintiffs and the

End Payor Class paying billions of dollars in overcharges for Lipitor than they would have paid

absent Defendants' anticompetitive scheme.   As a result of the conduct alleged herein, End

Payors within California suffered injury in fact and lost money and/or property.

342.    Defendants violated California's Unfair Competition Law, Cal. Bus. & Prof.

Code §§ 17200, *et seq*. (the "UCL"), by virtue of the scheme and conduct alleged herein.

Specifically, (a) Defendants' conduct is unlawful in that it violates the various state  laws alleged

herein; (b) Defendants' conduct is unfair in that (i) it violates the policy and spirit of the federal

and state antitrust laws for its effects are comparable or equivalent to a violation of those laws

and otherwise significantly has harmed or threatens to harm competition, (ii) it offends an

established public policy in favor of robust competition and it is immoral, unethical, oppressive,

unscrupulous and has substantially injured End- Payors who have been forced to pay

supracompetitive prices for Lipitor, and (iii) the injury to End Payors, which they could not

avoid, is not outweighed by any countervailing consumer benefit; and (c) as a result of

Defendants' conduct, California End Payors have suffered injury in fact by virtue of injury to

their business or property in the form of purchases of Lipitor at supracompetitive prices.

343.    The intended and actual effect of Defendants' illegal acts was to delay the

introduction of generic formulations of Lipitor into the market, thereby unlawfully extending

Defendant Pfizer's monopoly in that market and enabling them to continue charging

supracompetitive prices to End Payors in California.  But for Defendants' conduct, generic

competition would have resulted in lower prices for Lipitor, as well as lower-priced generic

atorvastatin products, within California.  Thus, as a result of the conduct alleged herein, End

Payors within California suffered injury in fact and lost money and/or property.  Such injuries

96623

were not secondary, consequential or remote as they would not have occurred but for

Defendants' conduct and, therefore, were proximately caused thereby.

344.    Plaintiffs and the Class seek treble damages as permitted for their injuries from

Defendants' violations of the Cartwright Act, and restitution as permitted for Defendants'

violations of the UCL.

### D.    CLAIMS UNDER DISTRICT OF COLUMBIA LAW

345.    Plaintiffs incorporate by reference all preceding and succeeding allegations in this

Complaint.

346.    During the Class Period and at all other relevant times, Defendant Pfizer

possessed nationwide monopoly power in the market for Lipitor and atorvastatin products,

including within the District of Columbia.

347.    Defendant's conduct affected trade and commerce in the District of Columbia,

harming End Payors located therein.

348.     Defendants' unlawful scheme constitutes an unlawful trust, combine, contract

and/or combination in violation of District of Columbia Code Ann. § 28-4501, *et seq.*  Defendant

Pfizer orchestrated and implemented this unlawful scheme to delay generic entry by (i)

obtaining, through fraud, a follow-on patent for Lipitor, (ii) listing that patent in the FDA Orange

Book in order to block generic entry, (iii) filing sham, baseless litigation on this follow-on patent

and other process patents known to have no merit, and (iv) entering into an agreement and

conspiring with the first potential generic entrant, Defendant Ranbaxy, in order to delay entry

into, and allocate the market for, atorvastatin.  Defendants' unlawful conduct delayed and

continues to delay access to less expensive generic alternatives, resulting in Plaintiffs and the

End Payor Class paying billions of dollars in overcharges for Lipitor than they would have paid

87

absent Defendants' anticompetitive scheme.  As a result of the conduct alleged herein, End

Payors within the District of Columbia suffered injury in fact and lost money and/or property.

349.    Defendants' contract, combination, agreement or conspiracy has had and

continues to have the purpose, effect, tendency and capacity of: (a) affecting, fixing, controlling

or maintaining the price of Lipitor; and (b) depriving End Payors of the benefits of competition

in the Lipitor market.

350.    Defendants' acts and practices, described above, constitute the willful acquisition

and maintenance of a monopoly, or a conspiracy to attempt to monopolize in violation of District

of Columbia Code Ann.  § 28-4501, *et seq*., and has had the purpose, effect, tendency and

capacity to: (a) establish, maintain or use monopoly power over the Lipitor market; (b) raise, fix,

stabilize and maintain the price of Lipitor; and (c) deprive End Payors of the benefits of

competition in the Lipitor market.

351.    The intended and actual effect of Defendants' illegal acts was to delay the

introduction of generic formulations of Lipitor into the market, thereby unlawfully extending

Defendant Pfizer's monopoly in that market and enabling it to continue charging

supracompetitive prices to End Payors in the District of Columbia.  But for Defendants' conduct,

generic competition would have resulted in lower prices for Lipitor, as well as lower-priced

generic atorvastatin products, within the District of Columbia.  Thus, End Payors within the

District of Columbia have been injured or damaged in their business or property as a direct and

proximate result of Defendants' violation of District of Columbia Code Ann.  § 28-4501, *et seq*.

as described herein.  Such injuries were not secondary, consequential or remote as they would

not have occurred but for Defendant's conduct and, therefore, were proximately caused thereby.

352.    Defendants have violated the District of Columbia's Consumer Protection

Procedures Act, D.C. Code Ann. § 28-3901, *et seq*., by virtue of the scheme and conduct alleged

96623

herein.  Specifically, (a) Defendants' conduct is unlawful in that it violates the various state laws

alleged herein; (b) Defendants' conduct is unfair, deceptive and unconscionable in that (i) it

violates the policy and spirit of federal and state antitrust laws for its effects are comparable or

equivalent to a violation of those laws and otherwise significantly has harmed or threatens to

harm competition, (ii) it offends an established public policy in favor of robust competition and it

is immoral, unethical, oppressive, unscrupulous and has substantially injured End Payors who

have been forced to pay supracompetitive prices for Lipitor, and (iii) the injury to End Payors,

which they could not avoid, is not outweighed by any countervailing consumer benefit; and (c)

as a result of Defendants' conduct, District of Columbia End Payors have suffered injury in fact

by virtue of injury to their business or property.

353.    The intended and actual effect of Defendants' illegal acts was to delay the

introduction of generic formulations of Lipitor into the market, thereby unlawfully extending

Defendant Pfizer's monopoly in that market and enabling it to continue charging

supracompetitive prices to End Payors in the District of Columbia.  But for Defendants' conduct,

generic competition would have resulted in lower prices for Lipitor, as well as lower-priced

generic atorvastatin products, within the District of Columbia.

354.    Defendants' conduct involved acts that do or would create, alter, repair, furnish,

make available, provide information about, or directly, or indirectly, solicit or offer for or

effectuate a sale of Lipitor.

355.    As a result of the use or employment by Defendants of the unlawful, unfair,

deceptive and unconscionable acts or practices set forth in this Complaint, Plaintiffs and the

members of the Class have suffered ascertainable losses of money or property by paying higher

prices for Lipitor than they would have paid in the absence of these violations.

96623

356.     Plaintiffs and the Class seek to recover their actual damages, costs and attorneys' fees, as well as treble damages for their injuries, pursuant to District of Columbia law.

E.     **CLAIMS UNDER FLORIDA STATE LAW**

357.     Plaintiffs incorporate by reference all preceding and succeeding allegations in this Complaint.

358.     Defendants engaged  in unfair competition or deceptive acts or practices in violation of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201,  *et seq.* Specifically, Defendants' conduct is unfair and deceptive in that (i) it violates the policy and spirit of the federal antitrust laws for its effects are comparable or equivalent to a violation of those laws and otherwise significantly has harmed or threatens to harm competition, (ii) it offends an established public policy in favor of robust competition and it is immoral, unethical, oppressive, unscrupulous and has substantially injured End Payors who have been forced to pay supracompetitive prices for Lipitor, and (iii) the injury to End Payors, which they could not avoid, is not outweighed by any countervailing consumer benefit.

359.     Defendants engaged in the unfair and deceptive acts or practices set forth in this Complaint in the conduct of trade or commerce.

360.     Plaintiffs and members of the Class have been injured in their business and property by reason of Defendants' anticompetitive, unfair or deceptive acts alleged in this Complaint.  Their injury consists of paying higher prices for Lipitor and generic atorvastatin than they would have paid in the absence of these violations.

361.     Plaintiffs and the Class seek to recover their actual damages, costs and attorneys' fees, pursuant to Florida Law.

F.     **CLAIMS UNDER ILLINOIS STATE LAW**

362.     Plaintiffs incorporate by reference all preceding and succeeding allegations in this

90

96623

Complaint.

363.   During the Class Period and at all other relevant times, Defendant Pfizer possessed nationwide monopoly power in the market for Lipitor and atorvastatin products, including within Illinois.

364.   Defendants' conduct affected trade and commerce in Illinois, harming End Payors located therein.

365.   Defendants violated Illinois's Consumer Fraud and Deceptive Trade Practices Act, 815 ILCS § 505/1, *et seq.* (the "ICFA"), by virtue of the scheme and conduct alleged herein. Specifically, (a) Defendants' conduct is unlawful in that it violates the various state laws alleged herein; (b) Defendants' conduct is unfair in that (i) it violates the policy and spirit of the federal and state antitrust laws for its effects are comparable or equivalent to a violation of those laws and otherwise significantly has harmed or threatens to harm competition, (ii) it offends an established public policy in favor of robust competition and it is immoral, unethical, oppressive, unscrupulous and has substantially injured End Payors who have been forced to pay supracompetitive prices for Lipitor and generic atorvastatin, and (iii) the injury to End Payors, which they could not avoid, is not outweighed by any countervailing consumer benefit; and (c) As a result of Defendants' conduct, Illinois End Payors have suffered injury in fact by virtue of injury to their business or property.

366.   Defendants violated Illinois's Antitrust Act, 740 ILCS 10/1 *et seq.* by virtue of the scheme and conduct alleged herein.  Specifically, Defendant Pfizer violated 740 ILCS 10/3, subd. 3 by illegally maintaining monopoly power over a substantial part of trade or commerce in Illinois for the purpose of excluding competition or of controlling, fixing, or maintaining prices in such trade or commerce.

367.     The intended and actual effect of Defendants' illegal acts was to delay the introduction of generic formulations of Lipitor into the market, thereby unlawfully extending Defendant Pfizer's monopoly in that market and enabling it to continue charging supracompetitive prices to End Payors in Illinois.  But for Defendants' conduct, generic competition would have resulted in lower prices for Lipitor, as well as the availability of lower-priced generic atorvastatin products, within Illinois.  Thus, as a result of the conduct alleged herein, End Payors within Illinois suffered injury in fact and lost money and/or property.   Such injuries were not secondary, consequential or remote as they would not have occurred but for Defendants' conduct and, therefore, were proximately caused thereby.

368.     Plaintiffs and the Class seek actual and treble damages as permitted for their injuries from Defendants' violations of the Illinois Consumer Fraud Act and Antitrust Act, attorneys' fees and costs and restitution as permitted for Defendants' violations.

G.     **CLAIMS UNDER IOWA STATE LAW**

369.     Plaintiffs incorporate by reference all preceding and succeeding allegations in this Complaint.

370.     During the Class Period and at all other relevant times, Defendant Pfizer possessed nationwide monopoly power in the market for Lipitor and atorvastatin products, including within Iowa.

371.     Defendants' conduct affected trade and commerce in Iowa, harming End Payors located therein.

372.     Defendants violated Iowa antitrust law, I.C.A. § 553.1, *et seq.*, ("Iowa Competition Law") by virtue of the scheme and conduct alleged herein.  Defendant Pfizer orchestrated and implemented this unlawful scheme to delay generic entry by (i) obtaining, through fraud, a follow-on patent for Lipitor, (ii) listing that patent in the FDA Orange Book in

92

order to block generic entry, (iii) filing sham, baseless litigation on this follow-on patent and other process patents known to have no merit, and (iv) entering into an agreement and conspiring with the first potential generic entrant, Defendant Ranbaxy, in order to delay entry into, and allocate the market for, atorvastatin.  Defendants' unlawful conduct delayed and continues to delay access to less expensive generic alternatives, resulting in Plaintiffs and the End Payor Class paying billions of dollars in overcharges for Lipitor than they would have paid absent Defendants' anticompetitive scheme.  As a result of the conduct alleged herein, End Payors within Iowa suffered injury in fact and lost money and/or property.  Defendants' illegal acts were intended to, and in fact did, unreasonably restrain trade and competition in Iowa; Defendant's acts constituted a monopolization of trade or commerce within Iowa, and Defendants' illegal acts constituted exclusionary conduct which enabled Defendant Pfizer to unlawfully maintain its monopoly power in the Lipitor market.

373.    The intended and actual effect of Defendants' illegal acts was to delay the introduction of generic formulations of Lipitor into the market, thereby unlawfully extending Defendant Pfizer's monopoly in that market and enabling it to continue charging supracompetitive prices to End Payors in Iowa.  But for Defendants' conduct, generic competition would have resulted in lower prices for Lipitor, as well as the availability of lower-priced generic atorvastatin products, within Iowa.  Thus, as a result of the conduct alleged herein, End Payors within Iowa suffered injury in fact and lost money and/or property.  Such injuries were not secondary, consequential or remote as they would not have occurred but for Defendants' conduct and, therefore, were proximately caused thereby.

374.    Plaintiffs and the Class seek double damages, as well as reasonable attorneys' fees and costs, as permitted for their injuries from Defendants' violations of Iowa's Competition Law.

96623

H.     **CLAIMS UNDER KANSAS STATE LAW**

375.    Plaintiffs incorporate by reference all preceding and succeeding allegations in this Complaint.

376.    During the Class Period and at all other relevant times, Defendant Pfizer possessed nationwide monopoly power in the market for Lipitor and atorvastatin products, including within Kansas.

377.    Defendants' conduct affected trade and commerce in Kansas, harming End Payors located therein.

378.    Defendants violated Kansas' state antitrust laws, Kansas Stat. Ann. § 50-101, *et seq.*, by virtue of the scheme and conduct alleged herein.  Defendant Pfizer orchestrated and implemented this unlawful scheme to delay generic entry by (i) obtaining, through fraud, a follow-on patent for Lipitor, (ii) listing that patent in the FDA Orange Book in order to block generic entry, (iii) filing sham, baseless litigation on this follow-on patent and other process patents known to have no merit, and (iv) entering into an agreement and conspiring with the first potential generic entrant, Defendant Ranbaxy, in order to delay entry into, and allocate the market for, atorvastatin.  Defendants' unlawful conduct delayed and continues to delay access to less expensive generic alternatives, resulting in Plaintiffs and the End Payor Class paying billions of dollars in overcharges for Lipitor than they would have paid absent Defendants' anticompetitive scheme.  As a result of the conduct alleged herein, End Payors within Kansas suffered injury in fact and lost money and/or property.

379.    As a result of the conduct alleged herein, End Payors within Kansas suffered injury in fact and lost money and/or property.

96623

380.    Defendants' conduct had and continues to have the purpose, effect, tendency and capacity of:  (a) affecting, fixing, controlling or maintaining the price of Lipitor; and (b) depriving End Payors of the benefits of competition in the Lipitor market.

381.    Defendants' acts and practices, described above, constitute the willful maintenance of a monopoly in violation of Kansas law, and have had the purpose, effect, tendency and capacity to: (a) establish, maintain or use monopoly power over the Lipitor market; (b) raise, fix, stabilize and maintain the price of Lipitor; and (c) deprive End Payors of the benefits of competition in the Lipitor market.

382.    The intended and actual effect of Defendants' illegal acts was to delay the introduction of generic formulations of Lipitor into the market, thereby unlawfully extending Defendant Pfizer's monopoly in that market and enabling it to continue charging supracompetitive prices to End Payors in Kansas.  But for Defendants' conduct, generic competition would have resulted in lower prices for Lipitor, as well as the availability of lower priced generic atorvastatin products, within Kansas.  Thus, End Payors within Kansas have been injured or damaged in their business or property as a direct and proximate result of Defendant's violation of Kansas Stat. Ann. § 50-101, *et seq.* as described herein.  Such injuries were not secondary, consequential or remote as they would not have occurred but for Defendants' conduct and, therefore, were proximately caused thereby.

383.    Plaintiffs and Class members have been damaged or injured by the monopoly which is declared unlawful by any of the acts contained in chapter 50 of the Kansas Stat. Ann., relating to Defendants' unlawful acts, agreements, monopolies, trusts, conspiracies or combinations in restraint of trade.

384.    Plaintiffs and Class members paid supracompetitive, artificially inflated prices for Lipitor.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and Class

96623

members have been injured in their business and property in that they paid more for Lipitor and generic atorvastatin than they otherwise would have paid in the absence of Defendants' unlawful conduct.

385.    Defendants have violated Kansas Stat. Ann. § 50-623, *et seq.*, by virtue of the scheme and conduct alleged herein.  Specifically, (a) Defendants conduct is unlawful in that it violates the various state laws alleged herein; (b) Defendants' conduct is unfair and deceptive, and unconscionable in that (i) it violates the policy and spirit of the federal and state antitrust laws for its effects are comparable or equivalent to a violation of those laws and otherwise significantly has harmed or threatens to harm competition, (ii) it offends an established public policy in favor of robust competition and it is immoral, unethical, oppressive, unscrupulous and has substantially injured End Payors who have been forced to pay supracompetitive prices for Lipitor and generic atorvastatin, and (iii) the injury to End Payors, which they could not avoid, is not outweighed by any countervailing consumer benefit; and (c)  as a result of Defendants' conduct, Kansas End Payors have suffered injury in fact by virtue of injury to their business or property.

386.    The intended and actual effect of Defendants' illegal acts was to delay the introduction of generic formulations of Lipitor into the market, thereby unlawfully extending Defendant Pfizer's monopoly in that market and enabling it to continue charging supracompetitive prices to End Payors in Kansas.  But for Defendants' conduct, generic competition would have resulted in lower prices for Lipitor, as well as the availability of lower-priced generic atorvastatin products, within Kansas.

387.    As a result of the use or employment by Defendants of the unlawful, unfair, deceptive and unconscionable acts or practices set forth in this Complaint, Plaintiffs and the

members of the Class have suffered ascertainable losses of money or property by paying higher prices for Lipitor than they would have paid in the absence of these violations.

388.    Plaintiffs and the Class seek to recover their actual damages, costs and attorneys' fees, as well as treble damages for their injuries, pursuant to Kansas law.

I.      **CLAIMS UNDER MAINE STATE LAW**

389.    Plaintiffs incorporate by reference all preceding and succeeding allegations in this Complaint.

390.    During the Class Period and at all other relevant times, Defendant Pfizer possessed nationwide monopoly power in the market for Lipitor and atorvastatin products, including within Maine.

391.    Defendants' conduct affected trade and commerce in Maine, harming End Payors located therein.

392.    Defendants violated Maine state antitrust laws, Me. Rev. Stat. Ann. tit. 10, § 1101, *et seq.*, by virtue of the scheme and conduct alleged herein.  Defendant Pfizer orchestrated and implemented this unlawful scheme to delay generic entry by (i) obtaining, through fraud, a follow-on patent for Lipitor, (ii) listing that patent in the FDA Orange Book in order to block generic entry, (iii) filing sham, baseless litigation on this follow-on patent and other process patents known to have no merit, and (iv) entering into an agreement and conspiring with the first potential generic entrant, Defendant Ranbaxy, in order to delay entry into, and allocate the market for, atorvastatin.  Defendants' unlawful conduct delayed and continues to delay access to less expensive generic alternatives, resulting in Plaintiffs and the End Payor Class paying billions of dollars in overcharges for Lipitor than they would have paid absent Defendants' anticompetitive scheme.  As a result of the conduct alleged herein, End Payors within Maine suffered injury in fact and lost money and/or property.

97

393.     Defendants' illegal acts were intended to, and in fact did, unreasonably restrain trade and competition in Maine; Defendants' illegal acts constituted exclusionary conduct which enabled Defendant Pfizer to unlawfully maintain its monopoly power in the Lipitor market; and as a result of the conduct alleged herein, commerce within Maine was affected as End Payors located within Maine suffered injury in fact and lost money and/or property in the form of purchases of Lipitor and generic atorvastatin at supracompetitive prices.

394.     Defendants violated Maine's Unfair Trade Practices Act ("MUTPA"), Me. Rev. Stat. Ann., tit. 5, § 207, *et seq.*, by virtue of the scheme and conduct alleged herein.  Specifically, (a) Defendants' conduct is unfair in that (i) it produces substantial injury in the form of higher prices for critical drugs, (ii) the injury is not outweighed by any countervailing benefit to End Payors or competition, and (iii) the injury is not reasonably avoidable by End Payors;  (b) but for Defendants' conduct, End Payors in Maine would not have otherwise purchased Lipitor and generic atorvastatin at supracompetitive prices and instead would have been able to purchase lower-priced generic atorvastatin products; (c) the purchases in question involved a transaction for goods primarily for personal, family or household purposes; and (d) as a result of Defendants' unfair practices, Maine End Payors have suffered a loss of money.

395.     The intended and actual effect of Defendants' illegal acts was to delay the introduction of generic formulations of Lipitor into the market, thereby unlawfully extending Defendant Pfizer's monopoly in that market and enabling it to continue charging supracompetitive prices to End Payors in Maine.   But for Defendant's conduct, generic competition would have resulted in lower prices for Lipitor, as well as the earlier availability of lower-priced generic atorvastatin products, within Maine.  Thus, as a result of the conduct alleged herein, End Payors within Maine suffered injury in fact and lost money and/or property.

96623

Such injuries were not secondary, consequential or remote as they would not have occurred but for Defendant's conduct and, therefore, were proximately caused thereby.

396. Plaintiffs and the Class seek treble damages, as well as necessary and reasonable investigative costs, reasonable experts' fees and reasonable attorneys' fees, as permitted for their injuries from Defendants' violations of Maine's antitrust statutes.

397. Plaintiffs and the Class also seek damages, restitution and any other equitable relief as the Court determines to be necessary and proper, stemming from Defendants' violations of, and as permitted by, the MUTPA.

J. **CLAIMS UNDER MICHIGAN STATE LAW**

398. Plaintiffs incorporate by reference all preceding and succeeding allegations in this Complaint.

399. During the Class Period and at all other relevant times, Defendant Pfizer possessed nationwide monopoly power in the market for Lipitor and atorvastatin products, including within Michigan.

400. Defendants' conduct affected trade and commerce in Michigan, harming End Payors located therein.

401. Defendants' unlawful scheme constitutes an act to unlawfully maintain a monopoly of trade or commerce in the atorvastatin market for the purpose of excluding or limiting generic competition or controlling, fixing, or maintaining the price of atorvastatin, in violation of Michigan Comp. Laws Ann. §§ 445.771 *et seq*. Defendant Pfizer orchestrated and implemented this unlawful scheme to delay generic entry by (i) obtaining, through fraud, a follow-on patent for Lipitor, (ii) listing that patent in the FDA Orange Book in order to block generic entry, (iii) filing sham, baseless litigation on this follow-on patent and other process patents known to have no merit, and (iv) entering into an agreement and conspiring with the first

99

potential generic entrant, Defendant Ranbaxy, in order to delay entry into, and allocate the market for, atorvastatin.  Defendants' unlawful conduct delayed and continues to delay access to less expensive generic alternatives, resulting in Plaintiffs and the End Payor Class paying billions of dollars in overcharges for Lipitor than they would have paid absent Defendants' anticompetitive scheme.  As a result of the conduct alleged herein, End Payors within Michigan suffered injury in fact and lost money and/or property.

402.    The intended and actual effect of Defendants' illegal acts was to delay the introduction of generic formulations of Lipitor into the market, thereby unlawfully extending Defendant Pfizer's monopoly in that market and enabling it to continue charging supracompetitive prices to End Payors in Michigan.  But for Defendants' conduct, generic competition would have resulted in lower prices for Lipitor, as well as the availability of lower-priced generic atorvastatin products, within Michigan.

403.    Through their unlawful scheme, Defendant Pfizer overcharged direct purchaser pharmaceutical wholesalers for their Lipitor purchases, who passed on at least part of those Lipitor overcharges to End Payors.   Accordingly, End Payors have been injured or damaged in their business or property as a direct and proximate result of Defendant's violation of Michigan Comp. Laws Ann. §§ 445.771 *et seq.*  Such injuries were not secondary, consequential or remote as they would not have occurred but for Defendants' conduct and, therefore, were proximately caused thereby.

404.    Plaintiffs and the Class are entitled to recover the actual and statutory damages they suffered as a result of being forced to pay supracompetitive prices for Lipitor, as well as other equitable relief, including disgorgement.

K.    **CLAIMS UNDER MINNESOTA STATE LAW**

405.    Plaintiffs incorporate by reference all preceding and succeeding allegations in this

100

96623

Complaint.

406.     Defendants' conduct as alleged in this Complaint violates the Minnesota Antitrust

Act, Minn. Stat. §§ 325D.52, *et seq.*

407.     Defendants engaged in a contract, combination, agreement or conspiracy that

caused a restraint of business, trade, or commerce, in violation of the Minnesota Antitrust Act.

Defendant Pfizer orchestrated and implemented this unlawful scheme to delay generic entry by

(i) obtaining, through fraud, a follow-on patent for Lipitor, (ii) listing that patent in the FDA

Orange Book in order to block generic entry, (iii) filing sham, baseless litigation on this follow-

on patent and other process patents known to have no merit, and (iv) entering into an agreement

and conspiring with the first potential generic entrant, Defendant Ranbaxy, in order to delay

entry into, and allocate the market for, atorvastatin.  Defendants' unlawful conduct delayed and

continues to delay access to less expensive generic alternatives, resulting in Plaintiffs and the

End Payor Class paying billions of dollars in overcharges for Lipitor than they would have paid

absent Defendants' anticompetitive scheme.  As a result of the conduct alleged herein, End

Payors within Minnesota lost money and/or property.

408.     Defendants' illegal conduct has had and continues to have the purpose, effect,

tendency and capacity of affecting, fixing, controlling or maintaining the price of Lipitor; and

depriving consumers of the benefits of competition in the Lipitor market.

409.     Defendant Pfizer's acts and practices also constitute the willful acquisition and

maintenance of a monopoly, and have had the purpose, effect, tendency and capacity to: (a)

establish, maintain or use monopoly power over the Lipitor market; (b) raise, fix, stabilize and

maintain the price of Lipitor; and (c) deprive consumers of the benefits of competition in the

Lipitor market.

96623

410.    Plaintiffs and Class members paid supracompetitive, artificially inflated prices for Lipitor and generic atorvastatin.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and Class members have been injured in their business and property in that they paid more for Lipitor and generic atorvastatin than they otherwise would have paid in the absence of Defendants' unlawful conduct.

411.    Defendants have violated Minnesota's Consumer Fraud Act, Minn. Stat. § 325F.69, by virtue of the scheme and conduct alleged herein.  Specifically, Defendants' conduct constitutes the use of fraud, false promises, misrepresentations, misleading statements and deceptive practices in violation of Minn. Stat. § 325F.69.

412.    As a result of the use or employment by Defendants of fraud, false promises, misrepresentations, misleading statements and deceptive practices as set forth in this Complaint, Plaintiffs and the members of the Class have suffered ascertainable losses of money or property by paying higher prices for Lipitor and generic atorvastatin than they would have paid in the absence of these violations.

413.    Plaintiffs and the Class seek damages and costs of suit, including costs and reasonable attorneys' fees, restitution or other equitable relief as determined by the court, pursuant to Minnesota law, including Minn. Stat. § 8.31, subd. 1 and 3a and 325F.69.

L.    **CLAIMS UNDER MISSISSIPPI STATE LAW**

414.    Plaintiffs incorporate by reference all preceding and succeeding allegations in this Complaint.

415.    During the Class Period and at all other relevant times, Defendant Pfizer possessed nationwide monopoly power in the market for Lipitor and atorvastatin products, including within Mississippi.

416.     Defendants' conduct affected trade and commerce in Mississippi, harming End Payors located therein.

417.     Defendants' unlawful scheme constitutes an unlawful trust, combine, contract and/or combination in violation of Mississippi Code Ann. §§ 75-21-1 *et seq*.  Defendant Pfizer orchestrated and implemented this unlawful scheme to delay generic entry by (i) obtaining, through fraud, a follow-on patent for Lipitor, (ii) listing that patent in the FDA Orange Book in order to block generic entry, (iii) filing sham, baseless litigation on this follow-on patent and other process patents known to have no merit, and (iv) entering into an agreement and conspiring with the first potential generic entrant, Defendant Ranbaxy, in order to delay entry into, and allocate the market for, atorvastatin.  Defendants' unlawful conduct delayed and continues to delay access to less expensive generic alternatives, resulting in Plaintiffs and the End Payor Class paying billions of dollars in overcharges for Lipitor than they would have paid absent Defendants' anticompetitive scheme.  As a result of the conduct alleged herein, End Payors within Mississippi suffered injury in fact and lost money and/or property.

418.     As a result of the conduct alleged herein, End Payors within Mississippi suffered injury in fact and lost money and/or property.

419.     The intended and actual effect of Defendants' illegal acts was to delay the introduction of generic formulations of Lipitor into the market, thereby unlawfully extending Defendant Pfizer's monopoly in that market and enabling it to continue charging supracompetitive prices to End Payors in Mississippi.  But for Defendants' conduct, generic competition would have resulted in lower prices for Lipitor, as well as the availability of lower-priced generic atorvastatin products, within Mississippi.  Thus, End Payors within Mississippi have been injured or damaged in their business or property as a direct and proximate result of Defendants' violation of Mississippi Code Ann. §§ 75-21-1 *et seq*. as described herein.  Such

103

injuries were not secondary, consequential or remote as they would not have occurred but for

Defendants' conduct and, therefore, were proximately caused thereby.

420.    Plaintiffs and the Class are entitled to recover all damages of every kind sustained

by them plus a penalty of five hundred dollars ($500.00) for every instance they were injured as

a result of Defendants' unlawful scheme.

M.    **CLAIMS UNDER MISSOURI STATE LAW**

421.    Defendants violated Missouri's Merchandising Practices Act, Mo. Ann. Stat. §

407.020, et seq., by virtue of the scheme and conduct alleged herein.  Specifically, (a)

Defendants conduct is unlawful in that it violates the various state laws alleged herein; (b)

Defendants' conduct is unfair and deceptive, and unconscionable in that (i) it violates the policy

and spirit of the federal and state antitrust laws for its effects are comparable or equivalent to a

violation of those laws and otherwise significantly has harmed or threatens to harm competition,

(ii) it offends an established public policy in favor of robust competition and it is immoral,

unethical, oppressive, unscrupulous and has substantially injured End Payors who have been

forced to pay supracompetitive prices for Lipitor and generic atorvastatin, and (iii) the injury to

End Payors, which they could not avoid, is not outweighed by any countervailing consumer

benefit; and (c)  as a result of Defendants' conduct, Missouri End Payors have suffered injury in

fact by virtue of injury to their business or property.

422.    The intended and actual effect of Defendants' illegal acts was to delay the

introduction of generic formulations of Lipitor into the market, thereby unlawfully extending

Defendant Pfizer's monopoly in that market and enabling it to continue charging

supracompetitive prices to End Payors in Missouri.  But for Defendants' conduct, generic

competition would have resulted in lower prices for Lipitor, as well as the availability of lower-

priced generic atorvastatin products, within Missouri.

423.    As a result of the use or employment by Defendants of the unlawful, unfair, deceptive and unconscionable acts or practices set forth in this Complaint, Plaintiffs and the members of the Class have suffered ascertainable losses of money or property by paying higher prices for Lipitor than they would have paid in the absence of these violations.

424.    Plaintiffs and the Class seek to recover their damages, costs and attorneys' fees, pursuant to Missouri law.

425.    Plaintiffs incorporate by reference all preceding and succeeding allegations in this Complaint.

426.     During the Class Period and at all other relevant times, Defendant Pfizer possessed nationwide monopoly power in the market for Lipitor and atorvastatin products, including within Missouri.

427.    Defendants' conduct affected trade and commerce in Missouri, harming End Payors located therein.

428.    Defendants violated Missouri's Merchandising Practices Act, Mo. Ann. Stat. § 407.020, et seq., by virtue of the scheme and conduct alleged herein.

429.    Specifically, (a) Defendants' conduct is unfair in that (i) it produces substantial injury in the form of higher prices for critical drugs, (ii) the injury is not outweighed by any countervailing benefit to End Payors or competition, and (iii) the injury is not reasonably avoidable by End Payors; (b) but for Defendants' conduct, End Payors in Missouri would not have otherwise purchased Lipitor at supracompetitive prices and  instead would have been able to purchase lower-priced generic atorvastatin products; and (c) as a result of Defendants' conduct, Missouri End Payors have  suffered injury in fact by virtue of injury to their business or property.

96623

430.    The intended and actual effect of Defendants' illegal acts was to delay the introduction of generic formulations of Lipitor into the market, thereby unlawfully extending Defendant Pfizer's monopoly in that market and enabling it to continue charging supracompetitive prices to End Payors in Missouri.  But for Defendants' conduct, generic competition would have resulted in lower prices for Lipitor, as well as the availability of lower-priced generic atorvastatin products, within Missouri.  Thus, as a result of the conduct alleged herein, End Payors within Missouri suffered injury in fact and lost money and/or property.   Such injuries were not secondary, consequential or remote as they would not have occurred but for Defendants' conduct and, therefore, were proximately caused thereby.

431.    Plaintiffs and the Class seek damages as permitted for their injuries from Defendants' violations of Missouri's Merchandising Practices Act and seek damages as provided for in the same.

N.    **CLAIMS UNDER NEBRASKA STATE LAW**

432.    Plaintiffs incorporate by reference all preceding and succeeding allegations in this Complaint.

433.    During the Class Period and at all other relevant times, Defendant Pfizer possessed nationwide monopoly power in the market for Lipitor and atorvastatin products, including within Nebraska.

434.    Defendants' conduct affected trade and commerce in Nebraska, harming End Payors located therein.

435.    Defendants violated Nebraska's state antitrust law, Neb. Rev. Stat. § 59-801, *et seq.* (the "Nebraska Antitrust Act"), by virtue of the scheme and conduct alleged herein. Defendant Pfizer orchestrated and implemented this unlawful scheme to delay generic entry by (i) obtaining, through fraud, a follow-on patent for Lipitor, (ii) listing that patent in the FDA

106

Orange Book in order to block generic entry, (iii) filing sham, baseless litigation on this follow-

on patent and other process patents known to have no merit, and (iv) entering into an agreement

and conspiring with the first potential generic entrant, Defendant Ranbaxy, in order to delay

entry into, and allocate the market for, atorvastatin.  Defendants' unlawful conduct delayed and

continues to delay access to less expensive generic alternatives, resulting in Plaintiffs and the

End Payor Class paying billions of dollars in overcharges for Lipitor than they would have paid

absent Defendants' anticompetitive scheme.  As a result of the conduct alleged herein, End

Payors within Nebraska suffered injury in fact and lost money and/or property.

436.   Defendants violated Nebraska's Consumer Protection Act, Neb. Rev. Stat. § 59-

1601 *et seq*., by virtue of the scheme and conduct alleged herein.  Specifically, (a) Defendants'

conduct is unlawful in that it violates the various state laws alleged herein; (b) Defendants'

conduct is unfair in that (i) it violates the policy and spirit of the federal and state antitrust laws

for its effects are comparable or equivalent to a violation of those laws and otherwise

significantly has harmed or threatens to harm competition, (ii) it offends an established public

policy in favor of robust competition and it is immoral, unethical, oppressive, unscrupulous and

has substantially injured End Payors who have been forced to pay supracompetitive prices for

Lipitor, and (iii) the injury to End Payors, which they could not avoid, is not outweighed by any

countervailing consumer benefit; (c) Defendants' violations adversely affected the public interest

in the State of Nebraska; and (d)  as a result of Defendants' conduct, Nebraska End Payors have

suffered injury in fact by virtue of injury to their business or property.

437.   The intended and actual effect of Defendants' illegal acts was to delay the

introduction of generic formulations of Lipitor into the market, thereby unlawfully extending

Defendant Pfizer's monopoly in that market and enabling it to continue charging

supracompetitive prices to End Payors in Nebraska.  But for Defendants' conduct, generic

96623

competition would have resulted in lower prices for Lipitor, as well as the availability of lower-priced generic atorvastatin products, within Nebraska. Thus, as a result of the conduct alleged herein, End Payors within Nebraska suffered injury in fact and lost money and/or property. Such injuries were not secondary, consequential or remote as they would not have occurred but for Defendant's conduct and, therefore, were proximately caused thereby.

438.    Plaintiffs and the Class seek actual damages, costs and reasonable attorneys' fees as permitted for their injuries from Defendants' violations of the Nebraska Antitrust Act, and actual damages or both as permitted for Defendants' violations of the Nebraska Consumer Protection Act.

O.    **CLAIMS UNDER NEVADA STATE LAW**

439.    Plaintiffs incorporate by reference all preceding and succeeding allegations in this Complaint.

440.    During the Class Period and at all other relevant times, Defendant Pfizer possessed nationwide monopoly power in the market for Lipitor and atorvastatin products, including within Nevada.

441.    Defendants' conduct affected trade and commerce in Nevada, harming End Payors located therein.

442.    Defendants violated Nevada state antitrust laws, Nev. Rev. Stat. Ann. § 598A., *et seq.*, by virtue of the scheme and conduct alleged herein. Defendant Pfizer orchestrated and implemented this unlawful scheme to delay generic entry by (i) obtaining, through fraud, a follow-on patent for Lipitor, (ii) listing that patent in the FDA Orange Book in order to block generic entry, (iii) filing sham, baseless litigation on this follow-on patent and other process patents known to have no merit, and (iv) entering into an agreement and conspiring with the first potential generic entrant, Defendant Ranbaxy, in order to delay entry into, and allocate the

108

market for, atorvastatin.  Defendants' unlawful conduct delayed and continues to delay access to

less expensive generic alternatives, resulting in Plaintiffs and the End Payor Class paying billions

of dollars in overcharges for Lipitor than they would have paid absent Defendants'

anticompetitive scheme.  As a result of the conduct alleged herein, End Payors within Nevada

suffered injury in fact and lost money and/or property.

443.    Defendants' illegal acts were intended to, and in fact did, unreasonably restrain

trade and competition in Nevada; Defendants' acts constituted a monopolization of trade or

commerce within Nevada; and Defendants' illegal acts constituted exclusionary conduct which

enabled Defendant Pfizer to unlawfully maintain its monopoly power in the Lipitor market.

444.    The intended and actual effect of Defendants' illegal acts was to delay the

introduction of generic formulations of Lipitor into the market, thereby unlawfully extending

Defendant Pfizer's monopoly in that market and enabling it to continue charging

supracompetitive prices to End Payors in Nevada.  But for Defendants' conduct, generic

competition would have resulted in lower prices for Lipitor, as well as the availability of lower-

priced generic atorvastatin products, within Nevada.  Thus, as a result of the conduct alleged

herein, End Payors within Nevada suffered injury in fact and lost money and/or property.   Such

injuries were not secondary, consequential or remote as they would not have occurred but for

Defendants' conduct and, therefore, were proximately caused thereby.

445.    Plaintiffs and the Class seek treble damages, as well as reasonable attorneys' fees

and costs, as permitted for their injuries from Defendants' violations of Nevada's antitrust

statutes.

P.    **CLAIMS UNDER NEW HAMPSHIRE LAW**

446.    Plaintiffs incorporate by reference all preceding and succeeding allegations in this

Complaint.

96623

447. During the Class Period and at all other relevant times, Defendant Pfizer possessed nationwide monopoly power in the market for Lipitor and atorvastatin products, including within New Hampshire.

448. Defendants' conduct affected trade and commerce in New Hampshire, harming End Payors located therein.

449. Defendants violated New Hampshire state consumer protection laws, N.H. Rev. Stat. § 358-A, *et seq.*, by virtue of the scheme and conduct alleged herein. Defendant Pfizer orchestrated and implemented this unlawful scheme to delay generic entry by (i) obtaining, through fraud, a follow-on patent for Lipitor, (ii) listing that patent in the FDA Orange Book in order to block generic entry, (iii) filing sham, baseless litigation on this follow-on patent and other process patents known to have no merit, and (iv) entering into an agreement and conspiring with the first potential generic entrant, Defendant Ranbaxy, in order to delay entry into, and allocate the market for, atorvastatin. Defendants' unlawful conduct delayed and continues to delay access to less expensive generic alternatives, resulting in Plaintiffs and the End Payor Class paying billions of dollars in overcharges for Lipitor than they would have paid absent Defendants' anticompetitive scheme. As a result of the conduct alleged herein, End Payors within New Hampshire suffered injury in fact and lost money and/or property.

450. Defendants' unfair and illegal acts were intended to, and in fact did, unreasonably restrain trade and competition in New Hampshire. Defendants' unfair and illegal acts constituted exclusionary conduct which enabled Pfizer to unlawfully maintain its monopoly power in the Lipitor market. Defendants' unfair and illegal acts thus constituted a pricing of goods in a manner that tended to create or maintain a monopoly and otherwise harmed competition. But for Defendants' conduct, End Payors in New Hampshire would not have otherwise purchased Lipitor at supracompetitive prices and instead would have been able to purchase lower-priced

96623

generic atorvastatin products.  As a result of Defendants' unfair practices, New Hampshire End

Payors did in fact suffer injury in the form of loss of money or property.  Such injuries were not

secondary, consequential or remote as they would not have occurred but for Defendant's conduct

and, therefore, were proximately caused thereby.

451.    Plaintiffs and the Class seek treble damages and any other equitable relief as the

Court determines to be necessary and proper, as well as costs and reasonable attorneys' fees,

stemming from Defendants' willful and knowing violations of, and as permitted by, New

Hampshire consumer protection laws.

Q.    **CLAIMS UNDER NEW MEXICO STATE LAW**

452.    Plaintiffs incorporate by reference all preceding and succeeding allegations in this

Complaint.

453.    During the Class Period and at all other relevant times, Defendant Pfizer

possessed nationwide monopoly power in the market for Lipitor and atorvastatin products,

including within New Mexico.

454.    Defendants' conduct affected trade and commerce in New Mexico, harming End

Payors located therein.

455.    Defendants violated New Mexico state antitrust laws, N.M. Stat. Ann. §§ 57-1-1,

*et seq.*, by virtue of the scheme and conduct alleged herein.  Defendant Pfizer orchestrated and

implemented this unlawful scheme to delay generic entry by (i) obtaining, through fraud, a

follow-on patent for Lipitor, (ii) listing that patent in the FDA Orange Book in order to block

generic entry, (iii) filing sham, baseless litigation on this follow-on patent and other process

patents known to have no merit, and (iv) entering into an agreement and conspiring with the first

potential generic entrant, Defendant Ranbaxy, in order to delay entry into, and allocate the

market for, atorvastatin.  Defendants' unlawful conduct delayed and continues to delay access to

96623

less expensive generic alternatives, resulting in Plaintiffs and the End Payor Class paying billions

of dollars in overcharges for Lipitor than they would have paid absent Defendants'

anticompetitive scheme.  Defendants' illegal acts were intended to, and in fact did, unreasonably

restrain trade and competition in New Mexico.

456.    Defendants' illegal acts constituted exclusionary conduct which enabled

Defendant Pfizer to unlawfully maintain its monopoly power in the Lipitor market.  As a result

of the conduct alleged herein, commerce within New Mexico was affected as End Payors located

within New Mexico suffered injury in fact and lost money and/or property in the form of

purchases of Lipitor at supracompetitive prices.

457.    Defendants violated New Mexico's Unfair Trade Practices Act ("NMUPA"), New

Mexico §§ 57-12-1, *et seq.*, by virtue of the scheme and conduct alleged herein.  Specifically, (a)

Defendants' conduct is unfair in that (i) produces substantial injury in the form of higher prices

for critical drugs, (ii) the injury is not outweighed by any countervailing benefit to End Payors or

competition, and (iii) the injury is not reasonably avoidable by End Payors; (b) but for

Defendants' conduct, End Payors in New Mexico would not have otherwise purchased Lipitor at

supracompetitive prices and instead would have been able to purchase lower-priced generic

atorvastatin products; (c) the purchases in question involved a transaction for goods primarily for

personal, family or household purposes; and (d) as a result of Defendants' unfair practices, New

Mexico End Payors have suffered a loss of money.

458.    The intended and actual effect of Defendants' illegal acts was to delay the

introduction of generic formulations of Lipitor into the market, thereby unlawfully extending

Defendant Pfizer's monopoly in that market and enabling it to continue charging

supracompetitive prices to End Payors in New Mexico.  But for Defendants' conduct, generic

competition would have resulted in lower prices for Lipitor, as well as the availability of lower-

96623

priced generic atorvastatin products, within New Mexico.  Thus, as a result of the conduct

alleged herein, End Payors within New Mexico suffered injury in fact and lost money and/or

property.  Such injuries were not secondary, consequential or remote as they would not have

occurred but for Defendants' conduct and, therefore, were proximately caused thereby.

459.    Plaintiffs and the Class seek treble damages, as well as costs and reasonable

attorneys' fees, as permitted for their injuries from Defendants' violations of New Mexico's

antitrust statutes.

460.     Plaintiffs and the Class also seek treble damages or $300 (whichever  is greater)

and any other equitable relief as the Court determines to be necessary and proper, stemming from

Defendants' violations of, and as permitted by, the NMUPA.

R.    **CLAIMS UNDER NEW YORK STATE LAW**

461.    Plaintiffs incorporate by reference all preceding and succeeding allegations in this

Complaint.

462.    Defendants have engaged in unfair competition or deceptive acts or practices in

violation of New York General Business Law § 349 *et seq.* by virtue of the scheme and conduct

alleged herein.  Specifically, (a) Defendants engaged in conduct in New York; (b) Defendants'

conduct is unlawful in that it violates the various state laws alleged herein; (c) Defendants'

conduct is unfair in that (i) it violates the policy and  spirit of federal and state antitrust laws for

its effects are comparable or equivalent to a violation of those laws and otherwise significantly

has harmed or threatens to harm competition, (ii) it offends an established public policy in favor

of  robust competition and it is immoral, unethical, oppressive, unscrupulous and has

substantially injured New York End Payors who have been forced to pay supracompetitive prices

for Lipitor, and (iii) the injury to End Payors, which they could not avoid, is not outweighed by

any countervailing consumer benefit; (d) New York End Payors were targets of the conspiracy;

113

96623

(e) Defendants' illegal conduct was not known to New York End Payors; the Defendants: (i) made public statements that Defendants knew, or should have known, would be seen by New York End Payors, including obtaining through fraud a follow-on patent for Lipitor, listing that patent in the FDA Orange Book in order to block generic entry, filing sham litigation on this follow-on patent and other process patents known to have no merit, and ultimately turning to the first potential generic entrant, Defendant Ranbaxy, and cutting a deal with it to delay entry into, and allocate the market for, atorvastatin, all of which was merely a pretext to maintain its monopoly and delay generic entry, and making false, deceptive and misleading statements and omissions of material facts, as set forth above, in announcing and otherwise publicly disseminating statements about the agreement; (ii) such public statements and related activity either omitted material information that rendered the statements made materially misleading or affirmatively misrepresented the real cause, Pfizer's monopoly and its unlawful conduct as set forth in this Complaint; and (iii) the Defendants alone possessed material information that was relevant to New York  End Payors,  but  failed or refused to provide such information; (f) due to the Defendants' unlawful trade practices in the State of New York, New York End Payors who indirectly purchased Lipitor were misled to believe that they were paying a fair price for Lipitor. Similarly situated New York End Payors were also affected by the Defendant's unlawful conduct; (g) the Defendant knew, or should have known, that its unlawful trade practices with respect to pricing Lipitor would have a broad effect causing New York End Payor Class Members who indirectly purchased, paid or reimbursed for Lipitor to be injured by paying or reimbursing more for Lipitor than they would have paid or reimbursed absent Defendant's unlawful  trade practices and acts; (h) Defendants' consumer-oriented violations adversely affected the public interest in the State of New York; and (i) as a result of Defendants' conduct,

114

New York End Payors have suffered injury in fact by virtue of injury to their business or property.

463.    Defendants have engaged in unfair competition or deceptive acts or practices in violation of the Donnelly Act, New York General Business Law § 340 *et se.* Specifically: (a) Defendants acted to unlawfully extend Defendant Pfizer's monopoly in the Lipitor market; (b) Defendants performed illegal acts pursuant thereto, including, inter alia, by obtaining through fraud a follow-on patent for atorvastatin, (ii) listing that patent in the FDA Orange Book in order to block generic entry, (iii) filing sham litigation on this follow-on patent and other process patents known to have no merit, and (iv) ultimately turning to the first potential generic entrant, Defendant Ranbaxy, and cutting a deal with it to delay entry into, and allocate the market for, atorvastatin.  Defendants thereby delayed access to less expensive generic alternatives; (c) Defendants' illegal acts were  intended  to,  and  in  fact did, unreasonably restrain trade and competition in New York; (d) Defendants' illegal acts constituted exclusionary conduct which enabled Defendant Pfizer to unlawfully maintain its monopoly power in the Lipitor market; and (e) as a result of the conduct alleged herein, commerce within New York was affected as End Payors located within New York suffered injury in fact and lost money and/or property in the form of purchases of Lipitor at supracompetitive prices and by paying or reimbursing more for Lipitor and/or its AB-rated generic alternatives than they would have paid absent Defendants' conduct as set forth herein.

464.    Plaintiffs and the Class seek to recover their actual and statutory damages, costs, and attorneys' fees, as well as treble damages for their injuries, pursuant to New York law.

S.    **CLAIMS UNDER NORTH CAROLINA STATE LAW**

465.    Plaintiffs incorporate by reference all preceding and succeeding allegations in this Complaint.

96623

466.     During the Class Period and at all other relevant times, Defendant Pfizer possessed nationwide monopoly power in the market for Lipitor and atorvastatin products, including within North Carolina.

467.     Defendants' conduct affected trade and commerce in North Carolina, harming End Payors located therein.

468.     Defendants violated North Carolina's state antitrust law, N.C. Gen. Stat. § 75-1, *et seq.*, by virtue of the scheme and conduct alleged herein.  Defendant Pfizer orchestrated and implemented this unlawful scheme to delay generic entry by (i) obtaining, through fraud, a follow-on patent for Lipitor, (ii) listing that patent in the FDA Orange Book in order to block generic entry, (iii) filing sham, baseless litigation on this follow-on patent and other process patents known to have no merit, and (iv) entering into an agreement and conspiring with the first potential generic entrant, Defendant Ranbaxy, in order to delay entry into, and allocate the market for, atorvastatin.  Defendants' unlawful conduct delayed and continues to delay access to less expensive generic alternatives, resulting in Plaintiffs and the End Payor Class paying billions of dollars in overcharges for Lipitor than they would have paid absent Defendants' anticompetitive scheme.  As a result of the conduct alleged herein, End Payors within North Carolina suffered injury in fact and lost money and/or property.

469.     Defendant violated North Carolina's Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1, et *seq.*, by virtue of the scheme and conduct alleged herein. Specifically, (a) Defendants' conduct is unlawful in that it violates the various state laws alleged herein; (b) Defendants' conduct is unfair in that (i) it violates the policy and spirit of the federal and state antitrust laws for its effects are comparable or equivalent to a violation of those laws and otherwise significantly has harmed or threatens to harm competition, (ii) it offends an established public policy in favor of robust competition and it is immoral, unethical, oppressive,

116

unscrupulous and has substantially injured End Payors who have been forced to pay supracompetitive prices for Lipitor, and (iii) the injury to End Payors, which they could not avoid, is not outweighed by any countervailing consumer benefit; and (c) as a result of Defendants' conduct, North Carolina's End Payors have suffered injury in fact by virtue of injury to their business or property.

470.    The intended and actual effect of Defendants' illegal acts was to delay the introduction of generic formulations of Lipitor into the market, thereby unlawfully extending Defendant Pfizer's monopoly in that market and enabling it to continue charging supracompetitive prices to End Payors in North Carolina.  But for Defendants' conduct, generic competition would have resulted in lower prices for Lipitor, as well as the availability of lower-priced generic atorvastatin products, within North Carolina.  Thus, as a result of the conduct alleged herein, End Payors within North Carolina suffered injury in fact and lost money and/or property.  Such injuries were not secondary, consequential or remote as they would not have occurred but for Defendants' conduct and, therefore, were proximately caused thereby.

471.    Plaintiffs and the Class seek treble damages, attorneys' fees and costs as permitted for their injuries from Defendants' violations of the North Carolina Antitrust Act and restitution as permitted for Defendants' violations of the NCUDTPA.

T.    **CLAIMS UNDER NORTH DAKOTA STATE LAW**

472.    Plaintiffs incorporate by reference all preceding and succeeding allegations in this Complaint.

473.    Defendants' conduct as alleged in this Complaint violates the North Dakota Antitrust Act, N.D. Cent. Code § 51-08.1-01, *et seq.*

474.    Defendants engaged in illegal conduct that caused a restraint of business, trade, or commerce, in violation of the North Dakota Antitrust Act.  Defendant Pfizer orchestrated and

96623

implemented this unlawful scheme to delay generic entry by (i) obtaining, through fraud, a follow-on patent for Lipitor, (ii) listing that patent in the FDA Orange Book in order to block generic entry, (iii) filing sham, baseless litigation on this follow-on patent and other process patents known to have no merit, and (iv) entering into an agreement and conspiring with the first potential generic entrant, Defendant Ranbaxy, in order to delay entry into, and allocate the market for, atorvastatin.  Defendants' unlawful conduct delayed and continues to delay access to less expensive generic alternatives, resulting in Plaintiffs and the End Payor Class paying billions of dollars in overcharges for Lipitor than they would have paid absent Defendants' anticompetitive scheme.  Defendants thereby delayed access to less expensive generic alternatives.

475.    Defendants' acts and practices constitute the willful maintenance of a monopoly and have had the purpose, effect, tendency and capacity to: (a) establish, maintain or use monopoly power over the Lipitor market; (b) raise, fix, stabilize and maintain the price of Lipitor; and (c) deprive consumers of the benefits of competition in the Lipitor market.

476.    Plaintiffs and Class members paid supracompetitive, artificially inflated prices for Lipitor.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and Class members have been injured in their business and property in that they paid more for Lipitor than they otherwise would have paid in the absence of Defendants' unlawful conduct.

477.    Defendants have also violated the North Dakota Unlawful Sales or Advertising Practices Act, N.D. Cent. Code § 51-15-01, *et seq*, by virtue of the scheme and conduct alleged herein.  Specifically, Defendants' conduct is unfair and deceptive in that (a) it violates the policy and spirit of the federal and state antitrust laws for its effects are comparable or equivalent to a violation of those laws and otherwise significantly has harmed or threatens to harm competition, (b) it offends an established public policy in favor of robust competition and it is immoral,

unethical, oppressive, unscrupulous and has substantially injured End Payors who have been forced to pay supracompetitive prices for Lipitor, and (c) the injury to End Payors, which they could not avoid, is not outweighed by any countervailing consumer benefit.

478.    Defendants engaged in the deceptive acts or practices set forth in this Complaint with the intent that consumers, including Plaintiffs and members of the Class, would rely upon Defendants' deceptive acts or practices in connection with the advertisement or sale of Lipitor.

479.    Defendants knowingly committed the deceptive acts or practices set forth in this Complaint.

480.    As a result of the use or employment by Defendants of the unfair and deceptive acts or practices set forth in this Complaint, Plaintiffs and the members of the Class have suffered ascertainable losses of money or property by paying higher prices for Lipitor than they would have paid in the absence of these violations.

481.    Plaintiffs and the Class seek damages and costs of suit, including reasonable attorneys' fees, pursuant to North Dakota law.

U.    **CLAIMS UNDER THE COMMONWEALTH OF PUERTO RICO LAW**

482.    Plaintiffs incorporate by reference all preceding and succeeding allegations in this Complaint.

483.    Defendants' conduct as alleged in this Complaint violates the Puerto Rico Antitrust Act, Puerto Rico Code 10 LPRA § 257, *et seq.*

484.    Defendants engaged in illegal conduct that caused a restraint of business, trade, or commerce, in violation of the Puerto Rico Antitrust Act.

485.    Defendant Pfizer orchestrated and implemented this unlawful scheme to delay generic entry by (i) obtaining, through fraud, a follow-on patent for Lipitor, (ii) listing that patent

119

in the FDA Orange Book in order to block generic entry, (iii) filing sham, baseless litigation on

this follow-on patent and other process patents known to have no merit, and (iv) entering into an

agreement and conspiring with the first potential generic entrant, Defendant Ranbaxy, in order to

delay entry into, and allocate the market for, atorvastatin.  Defendants' unlawful conduct delayed

and continues to delay access to less expensive generic alternatives, resulting in Plaintiffs and the

End Payor Class paying billions of dollars in overcharges for Lipitor than they would have paid

absent Defendants' anticompetitive scheme.

486.    Defendants' acts and practices constitute the willful maintenance of a monopoly

and have had the purpose, effect, tendency and capacity to: (a) establish, maintain or use

monopoly power over the Lipitor market; (b) raise, fix, stabilize and maintain the price of

Lipitor; and (c) deprive consumers of the benefits of competition in the Lipitor market.

487.    Plaintiffs and Class members paid supracompetitive, artificially inflated prices for

Lipitor.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and Class

members have been injured in their business and property in that they paid more for Lipitor than

they otherwise would have paid in the absence of Defendants' unlawful conduct.

488.    Plaintiffs and the Class seek damages and costs of suit, including reasonable

attorneys' fees, pursuant to Puerto Rico law.

V.      **CLAIMS UNDER RHODE ISLAND STATE LAW**

489.    Plaintiffs incorporate by reference all preceding and succeeding allegations in this

Complaint.

490.    Defendants have engaged in unfair competition or deceptive acts or practices in

violation of Rhode Island's Deceptive Trade Practices Act, R.I. Gen. Laws § 6-13.1.1, *et. seq.*

Specifically, Defendants' conduct is unfair and deceptive in that (a) it violates the policy and

spirit of the federal antitrust laws for its effects are comparable or equivalent to a violation of

those laws and otherwise significantly has harmed or threatens to harm competition, (b) it offends an established public policy in favor of robust competition and it is immoral, unethical, oppressive, unscrupulous and has substantially injured End Payors who have been forced to pay supracompetitive prices for Lipitor, and (c) the injury to End Payors, which they could not avoid, is not outweighed by any countervailing consumer benefit.

491.    Defendants engaged in the unfair or deceptive trade practices set forth in this Complaint in the conduct of trade or commerce.

492.    Defendants unfair or deceptive trade practices set forth in this Complaint have the tendency or capacity to mislead and deceive consumers, including Plaintiffs and members of the Class.

493.    Plaintiffs and the members of the Class purchased Lipitor primarily for personal, family or household purposes.

494.    Defendants knew, or should have known, that their violations with respect to Lipitor would have a broad affect, causing Rhode Island natural persons who purchased Lipitor primarily for personal, family or household purposes to be injured by paying more for Lipitor then they would have paid absent Defendants' unlawful trade practices and acts.

495.    Defendants' violations set forth in this Complaint adversely affected public policy in Rhode Island.

496.    Plaintiffs and the Class seek to recover their actual damages or two hundred dollars ($200), whichever is greater, costs, reasonable attorneys' fees, and other equitable relief, including restitution, pursuant to Rhode Island law.

W.    **CLAIMS UNDER SOUTH DAKOTA STATE LAW**

497.    Plaintiffs incorporate by reference all preceding and succeeding allegations in this Complaint.

96623

498.     Defendants' conduct as alleged in this Complaint violates the South Dakota

Antitrust Act, S.D. Codified Laws Ann. § 37-1-3.1, *et seq.*

499.     Defendants engaged in illegal conduct that caused a restraint of business, trade, or

commerce, in violation of the South Dakota Antitrust Act.  Defendant Pfizer orchestrated and

implemented this unlawful scheme to delay generic entry by (i) obtaining, through fraud, a

follow-on patent for Lipitor, (ii) listing that patent in the FDA Orange Book in order to block

generic entry, (iii) filing sham, baseless litigation on this follow-on patent and other process

patents known to have no merit, and (iv) entering into an agreement and conspiring with the first

potential generic entrant, Defendant Ranbaxy, in order to delay entry into, and allocate the

market for, atorvastatin.  Defendants' unlawful conduct delayed and continues to delay access to

less expensive generic alternatives, resulting in Plaintiffs and the End Payor Class paying billions

of dollars in overcharges for Lipitor than they would have paid absent Defendants'

anticompetitive scheme.

500.     Defendants' conduct has had and continues to have the purpose, effect, tendency

and capacity of:  (a) affecting, fixing, controlling or maintaining the price of Lipitor; and (b)

depriving consumers of the benefits of competition in the Lipitor market.

501.     Defendants' acts and practices also constitute the willful maintenance of a

monopoly and have had the purpose, effect, tendency and capacity to: (a) establish, maintain or

use monopoly power over the Lipitor market; (b) raise, fix, stabilize and maintain the price of

Lipitor; and (c) deprive consumers of the benefits of competition in the Lipitor market.

502.     Plaintiffs and Class members paid supracompetitive, artificially inflated prices for

Lipitor and generic atorvastatin.  As a direct and proximate result of Defendants' unlawful

conduct, Plaintiffs and Class members have been injured in their business and property in that

they paid more for Lipitor than they otherwise would have paid in the absence of Defendants' unlawful conduct.

503.    Defendants have violated the South Dakota Deceptive Trade Practices and Consumer Protection Act, S.D. Code Laws § 37-24-1, *et. seq.*, by virtue of the scheme and conduct alleged herein.  Specifically, Defendants' conduct is unfair and deceptive in that (a) it violates the policy and spirit of the federal and state antitrust laws for its effects are comparable or equivalent to a violation of those laws and otherwise significantly has harmed or threatens to harm competition, (b) it offends an established public policy in favor of robust competition and it is immoral, unethical, oppressive, unscrupulous and has substantially injured End Payors who have been forced to pay supracompetitive prices for Lipitor, and (c) the injury to End Payors, which they could not avoid, is not outweighed by any countervailing consumer benefit.

504.    Defendants knowingly and intentionally used the deceptive acts or practices in connection with the sale or advertisement of Lipitor as set forth in this Complaint.

505.    As a result of the use or employment by Defendants of the unfair and deceptive acts or practices set forth in this Complaint, Plaintiffs and the members of the Class have suffered ascertainable losses of money or property by paying higher prices for Lipitor than they would have paid in the absence of these violations.

506.    Plaintiffs and the Class seek damages and costs of suit, including reasonable attorneys' fees, pursuant to South Dakota law.

X.    **CLAIMS UNDER TENNESSEE STATE LAW**

507.    Plaintiffs incorporate by reference all preceding and succeeding allegations in this Complaint.

96623

508.     During the Class Period and at all other relevant times, Defendant Pfizer possessed nationwide monopoly power in the market for Lipitor and atorvastatin products, including within Tennessee.

509.     Defendants' unlawful actions to delay generic competition to Lipitor have had, and continue to have, a substantial effect on Tennessee trade or commerce, harming End Payors located therein.

510.     Defendants' unlawful conduct constitutes an unlawful act in violation of Tennessee Code Ann. §§ 47-25-101 *et seq*.   Defendants' unlawful scheme was intended to, and has, lessened full and free competition in the market for atorvastatin products and was designed to, and has, raised the prices paid by End Payors for their atorvastatin purchases.   Defendant Pfizer orchestrated and implemented this unlawful scheme to delay generic entry by (i) obtaining, through fraud, a follow-on patent for Lipitor, (ii) listing that patent in the FDA Orange Book in order to block generic entry, (iii) filing sham, baseless litigation on this follow-on patent and other process patents known to have no merit, and (iv) entering into an agreement and conspiring with the first potential generic entrant, Defendant Ranbaxy, in order to delay entry into, and allocate the market for, atorvastatin.   Defendants' unlawful conduct delayed and continues to delay access to less expensive generic alternatives, resulting in Plaintiffs and the End Payor Class paying billions of dollars in overcharges for Lipitor than they would have paid absent Defendants' anticompetitive scheme.   As a result of the conduct alleged herein, End Payors within Tennessee suffered injury in fact and lost money and/or property.

511.     The intended and actual effect of Defendants' illegal acts was to delay the introduction of generic formulations of Lipitor into the market, thereby unlawfully extending Defendant Pfizer's monopoly in that market and enabling it to continue charging supracompetitive prices to End Payors in Tennessee.   But for Defendants' conduct, generic

96623

512.    Plaintiffs and the Class are entitled to recover the full amount of the

supracompetitive prices they were forced to pay as a result of Defendants' unlawful conduct.

Y.    **CLAIMS UNDER VERMONT STATE LAW**

513.    Plaintiffs incorporate by reference all preceding and succeeding allegations in this

Complaint.

514.    Defendants have engaged in unfair competition or deceptive acts or practices in

violation of Vt. Stat. §2451, *et. seq.*  Specifically, Defendants' conduct is unfair and deceptive in

that (i) it violates the policy and spirit of the federal antitrust laws for its effects are comparable

or equivalent to a violation of those laws and otherwise significantly has harmed or threatens to

harm competition, (ii) it offends an established public policy in favor of robust competition and it

is immoral, unethical, oppressive, unscrupulous and has substantially injured End Payors who

have been forced to pay supracompetitive prices for Lipitor, and (iii) the injury to End Payors,

which they could not avoid, is not outweighed by any countervailing consumer benefit.

515.    Plaintiffs and members of the Class have been injured in their business and

property by reason of Defendants' anticompetitive, unfair or deceptive acts alleged in this

Complaint.  Their injury consists of paying higher prices for Lipitor than they would have paid in

the absence of these violations.

516. Plaintiffs and the Class seek damages and costs of suit, including reasonable attorneys' fees, pursuant to Vermont law.

## Z.   **CLAIMS UNDER WEST VIRGINIA STATE LAW**

517. Plaintiffs incorporate by reference all preceding and succeeding allegations in this Complaint.

518. During the Class Period and at all other relevant times, Defendant Pfizer possessed nationwide monopoly power in the market for Lipitor and atorvastatin products, including within West Virginia.

519. Defendants' conduct affected trade and commerce in West Virginia, harming End Payors located therein.

520. Defendants' unlawful scheme constitutes a contract, combination in the form of trust or otherwise, or conspiracy which has restrained, and continues to restrain, trade within the State of West Virginia in violation of W. Va. Code §§ 47-18-1 *et seq.* Defendants' unlawful scheme also constitutes the establishment, maintenance or use of a monopoly or an attempt to establish a monopoly of trade or commerce within the State of West Virginia for the purpose of excluding generic competition to Lipitor or maintaining prices for atorvastatin products, in violation of W. Va. Code §§ 47-18-1 *et seq.* Defendant Pfizer orchestrated and implemented this unlawful scheme to delay generic entry by (i) obtaining, through fraud, a follow-on patent for Lipitor, (ii) listing that patent in the FDA Orange Book in order to block generic entry, (iii) filing sham, baseless litigation on this follow-on patent and other process patents known to have no merit, and (iv) entering into an agreement and conspiring with the first potential generic entrant, Defendant Ranbaxy, in order to delay entry into, and allocate the market for, atorvastatin. Defendants' unlawful conduct delayed and continues to delay access to less expensive generic alternatives, resulting in Plaintiffs and the End Payor Class paying billions of

126

dollars in overcharges for Lipitor than they would have paid absent Defendants' anticompetitive scheme.  As a result of the conduct alleged herein, End Payors within West Virginia suffered injury in fact and lost money and/or property.

521.    The intended and actual effect of Defendants' illegal acts was to delay the introduction of generic formulations of Lipitor into the market, thereby unlawfully extending Defendant Pfizer's monopoly in that market and enabling it to continue charging supracompetitive prices to End Payors in West Virginia.   But for Defendants' conduct, generic competition would have resulted in lower prices for Lipitor, as well as the availability of lower-priced generic atorvastatin products, within West Virginia.  Thus, Plaintiffs and other End Payors have been injured or damaged in their business or property as a direct and proximate result of Defendants' violation of W. Va. Code §§ 47-18-1 *et seq.* as described herein.  Such injuries were not secondary, consequential or remote as they would not have occurred but for Defendants' conduct and, therefore, were proximately caused thereby.

522.    Plaintiffs  and the Class are  entitled  to  recover  threefold  the  damages sustained  by them, together with reasonable attorneys' fees, filing fees and reasonable costs of the action.  Reasonable costs of the action may include, but shall not be limited to the expenses of discovery and document reproduction.

523.    Defendants' unlawful scheme constitutes unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce, in violation of W. Va. Code §§ 46A-6-101 *et seq.*  Specifically: (a) Defendants' conduct is unlawful in that it violates the various state laws alleged herein; (b) Defendants' conduct is unfair in that (i) it violates the policy and spirit of the federal and state antitrust laws for its effects are comparable or equivalent to a violation of those laws and otherwise significantly has harmed or threatens to harm competition, (ii)  it offends an established public policy in favor of robust competition and it is

immoral, unethical, oppressive, unscrupulous and  has substantially  injured End Payors who have been forced  to pay supracompetitive prices for Lipitor, and (iii) the injury to End Payors, which they could not avoid, is not outweighed by any countervailing consumer benefit; and (c) as a result of Defendants' conduct, End Payors have suffered injury in fact by virtue of injury to their business or property in the form of purchases of Lipitor at supracompetitive prices.

524.    The intended and actual effect of Defendants' illegal acts was to delay the introduction of generic formulations of Lipitor into the market, thereby unlawfully extending Defendant Pfizer's monopoly in that market and enabling it to continue charging supracompetitive prices to End Payors in West Virginia.  But for Defendants' conduct, generic competition would have resulted in lower prices for Lipitor, as well as the availability of lower-priced generic atorvastatin products, within West Virginia.  Thus, as a result of the conduct alleged herein, End Payors within West Virginia have suffered an ascertainable monetary  loss as a direct and proximate result of Defendants' violations of W.Va. Code  §§ 46A-6-101 *et seq*. Such injuries were not secondary, consequential or remote as they would not have occurred but for Defendants' conduct and, therefore, were proximately caused thereby.

525.    As a result, Plaintiffs and the Class are entitled to recover their actual damages and any equitable relief the Court deems proper.   Plaintiffs and the Class are also entitled to recover the costs of litigation, including attorneys' fees, as a result of Defendants' illegal or unconscionable conduct.

AA.    **CLAIMS UNDER WISCONSIN STATE LAW**

526.    Plaintiffs incorporate by reference all preceding and succeeding allegations in this Complaint.

96623

527.     During the Class Period and at all other relevant times, Defendant Pfizer possessed nationwide monopoly power in the market for Lipitor and atorvastatin products, including within Wisconsin.

528.     Defendants' conduct affected trade and commerce in Wisconsin, harming End Payors located therein.

529.     Defendants violated Wisconsin's state antitrust law, Wis. Stat. § 133.01, *et seq.*, by virtue of the scheme and conduct alleged herein.  Defendant Pfizer orchestrated and implemented this unlawful scheme to delay generic entry by (i) obtaining, through fraud, a follow-on patent for Lipitor, (ii) listing that patent in the FDA Orange Book in order to block generic entry, (iii) filing sham, baseless litigation on this follow-on patent and other process patents known to have no merit, and (iv) entering into an agreement and conspiring with the first potential generic entrant, Defendant Ranbaxy, in order to delay entry into, and allocate the market for, atorvastatin.  Defendants' unlawful conduct delayed and continues to delay access to less expensive generic alternatives, resulting in Plaintiffs and the End Payor Class paying billions of dollars in overcharges for Lipitor than they would have paid absent Defendants' anticompetitive scheme.  As a result of the conduct alleged herein, End Payors within Wisconsin suffered injury in fact and lost money and/or property.

530.     The intended and actual effect of Defendants' illegal acts was to delay the introduction of generic formulations of Lipitor into the market, thereby unlawfully extending Defendant Pfizer's monopoly in that market and enabling it to continue charging supracompetitive prices to End Payors in Wisconsin.  But for Defendants' conduct, generic competition would have resulted in lower prices for Lipitor, as well as the availability of lower-priced generic atorvastatin products, within Wisconsin.  Thus, as a result of the conduct alleged herein, End Payors within Wisconsin suffered injury in fact and lost money and/or

129

property.  Such injuries were not secondary, consequential or remote as they would not have occurred but for Defendants' conduct and, therefore, were proximately caused thereby.

531.    Plaintiffs and the Class seek treble damages, costs and attorneys' fees as permitted for their injuries from Defendants' violations of the Wisconsin Antitrust Act.

## UNJUST ENRICHMENT AND DISGORGEMENT OF PROFITS

532.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

533.    Defendants have been unjustly enriched through overpayments by Plaintiffs and End Payor Class members and the resulting profits of Defendants.

534.    Under common law principles of unjust enrichment in the fifty states, excluding Indiana and Ohio, Defendants should not be permitted to retain the benefits conferred via overpayments by Plaintiffs and End Payor Class members.

535.    Plaintiffs and the End Payor Class seek disgorgement of all profits resulting from such overpayments and establishment of a constructive trust from which Plaintiffs and End Payor Class members may seek restitution.

## XIII.   DEMAND FOR JUDGMENT

WHEREFORE, Plaintiffs, individually and on behalf of the End Payor Class, respectfully request that this Court enter an Order:

A.      certifying the Class pursuant to the Federal Rules of Civil Procedure, certifying Plaintiffs as the representatives of the Class, and designating their counsel as counsel for the Class;

B.      declaring the Defendants' conduct to be in violation of the antitrust and/or the unfair or deceptive practices statutes in the applicable states;

96623

C.      granting Plaintiffs and the Class damages, including multiple damages and

equitable relief as permitted by law;

D.      granting Plaintiffs and the Class their costs of prosecuting this action, together

with interest and reasonable attorneys' fees, experts' fees and costs; and

E.      granting such other relief as this Court may deem just and proper.

## XIV.   JURY DEMAND

Pursuant to Fed. Civ. P. 38, Plaintiffs on behalf of themselves and the proposed Class

demand a trial by jury on all issues so triable.


Dated:  March 9, 2012                    /s/ Glen DeValerio
                                         Glen DeValerio (BBO 122010)
                                         Nathaniel L. Orenstein (BBO 664513)
                                         BERMAN DEVALERIO
                                         One Liberty Square
                                         Boston, MA 02109
                                         Telephone:  (617) 542-8300
                                         Facsimile:   (617) 542-1194
                                         gdevalerio@bermandevalerio.com
                                         norenstein@ bermandevalerio.com

                                         Todd A. Seaver (BBO 645874)
                                         BERMAN DEVALERIO
                                         One California Street, Suite 900
                                         San Francisco, CA 94111
                                         Telephone:  (415) 433-3200
                                         Facsimile:   (415) 433-6382
                                         tseaver@bermandevalerio.com

96623

Vincent J. Esades
David Woodward
Renae D. Steiner
James W. Anderson
HEINS MILLS & OLSON, P.L.C.
310 Clifton Avenue
Minneapolis, MN 55403
Telephone:  (612) 338-4605
Facsimile:  (612) 338-4692
vesades@heinsmills.com
dwoodward@heinsmills.com
rsteiner@heinsmills.com
janderson@heinsmills.com

Heidi M. Silton
LOCKRIDGE GRINDAL NAUEN, P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone:  (612) 339-6900
Facsimile:  (612) 339-0981
hmsilton@locklaw.com

Ira Neil Richards
TRUJILLO RODRIGUEZ & RICHARDS, LLC
1717 Arch Street, Suite 3838
Philadelphia, PA 19103
Telephone:  (215) 731-9004
 Facsimile:  (215) 731-9044
 ira@trrlaw.com

*Counsel for Plaintiffs and the proposed
End Payor Class*

132

96623